REDACTED

Hearing Date: March 24, 2016 at 10:00 a.m.
Objection Deadline: March 17, 2016 4:00 p.m.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 715-9100
Fax:  (212) 715-8000
Adam C. Rogoff, Esq.
P. Bradley O'Neill. Esq.
Natan Hamerman, Esq.

*Attorneys for Sutton 58 Associates LLC*

UNITED STATES BANKRUPCY COURT
SOUTHERN DISTRICT OF NEW YORK

......................................................................... x
                                                     :

In re                                  :     Chapter 11

BH Sutton Mezz LLC,          :     Case No. 16-10455 (SHL)

        Debtor.         :     Judge Sean H. Lane

......................................................................... x

### NOTICE OF MOTION OF SUTTON 58 ASSOCIATES LLC FOR ORDER DISMISSING CHAPTER 11 CASE PURSUANT TO BANKRUPTCY CODE § 1112(b) OR, IN THE ALTERNATIVE, MODIFYING THE AUTOMATIC STAY <u>PURSUANT TO BANKRUPTCY CODE § 362(d)(1)</u>

PLEASE TAKE NOTICE that the motion (the "Motion") of Sutton 58 Associates LLC

for an order dismissing the above-captioned Chapter 11 case pursuant to Bankruptcy Code §

1112(b) or, in the alternative, modifying the automatic stay pursuant to Bankruptcy Code §

362(d)(1) will be considered at a hearing held before the Honorable Sean H. Lane, United

States Bankruptcy Judge, at the United States Bankruptcy Court located at One Bowling

Green, New York, New York 10004, Courtroom 701 on March 24, 2016 at 10:00 a.m.

prevailing New York time, or as soon thereafter as counsel can be heard.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the relief sought by the

Motion must be made in writing, conform to the Federal Rules of Bankruptcy Procedure and the

Local Rules for the United States Bankruptcy Court for the Southern District of New York, and

be filed with the Court, together with a copy to the Chambers of Judge Lane, and served so as to

be received no later than 4:00 p.m. prevailing New York time on March 17, 2016 upon (i)

Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036,

(Attention: Adam C. Rogoff), and (ii) the Office of the United States Trustee, 33 Whitehall

Street 21st Floor, New York, NY 10004.

Dated: New York, New York
     March 10, 2016

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By:   /s/ Adam C. Rogoff
     Adam C. Rogoff, Esq.
     P. Bradley O'Neill, Esq.
     Natan Hamerman, Esq.

1177 Avenue of the Americas
New York, New York  10036
Tel:  212-715-9100
Fax:  212-715-8000

*Counsel for Sutton 58 Associates LLC*

REDACTED

Hearing Date: March 24, 2016 at 10:00 a.m.
Objection Deadline: March 17, 2016 4:00 p.m.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 715-9100
Fax: (212) 715-8000
Adam C. Rogoff, Esq.
P. Bradley O'Neill, Esq.
Natan Hamerman, Esq.

*Attorneys for Sutton 58 Associates LLC*

UNITED STATES BANKRUPCY COURT
SOUTHERN DISTRICT OF NEW YORK

......................................................... x
                        :

In re                          :     Chapter 11

BH Sutton Mezz LLC,       :     Case No. 16-10455 (SHL)

         Debtor.           :     Judge Sean H. Lane

                        :
......................................................... x

## SUTTON 58 ASSOCIATES LLC'S MOTION TO DISMISS THIS CHAPTER 11 CASE PURSUANT TO BANKRUPTCY CODE § 1112(b) OR, IN THE ALTERNATIVE, TO MODIFY THE AUTOMATIC STAY PURSUANT TO BANKRUPTCY CODE § 362(d)(1)

Sutton 58 Associates LLC ("Lender") hereby moves for entry of an order, pursuant to § 1112(b) of the Bankruptcy Code, dismissing the Chapter 11 case filed by BH Sutton Mezz LLC ("Sutton Mezz" or the "Debtor"), or in the alternative, for an order, pursuant to Bankruptcy Code § 362(d)(1), modifying the automatic stay to permit Lender to pursue its state law remedies against the Debtor in this two-party, one asset dispute.

### Preliminary Statement

1.       This case is a classic bad-faith filing. The Debtor is a special purpose, bankruptcy remote, holding company with no operations or employees, whose only asset is a

100% equity interest in a property owning non-debtor subsidiary. It is encumbered by a $20 million secured loan that matured in January and has not been repaid. The case was filed after the New York State Supreme Court rejected the Debtor's last ditch attempt to stave off a fully noticed UCC foreclosure. In short, this is exactly the sort of tactical filing that has been repeatedly condemned by the Second Circuit and should therefore be dismissed.

2.    This case arises out of the acquisition and development of real estate at 428-432 East 58th Street in New York City (the "Property"). The Property is owned by non-debtor Sutton 58 Owner LLC ("Sutton Owner"). Sutton Mezz, in turn, is a holding company that owns a 100% ownership interest in Sutton Owner (the "Membership Interest"). To finance the initial stages of the development, Lender loaned $127.25 million to Sutton Owner, secured by first and second lien mortgages on the Property (the "Property Loans"). Lender also loaned $20 million to Sutton Mezz, secured by the Membership Interest (the "Mezz Loan"). Both the Property Loans and Mezz Loan matured on January 19, 2016. In the seven weeks since, no payments of any kind have been made by the Borrowers on any loan.

3.    When the Mezz Loan was not repaid at maturity, Lender sought to foreclose on the Membership Interest under New York's Uniform Commercial Code (the "UCC"). A foreclosure sale was scheduled for February 29, 2016. Although the loans were indisputably in default from nonpayment, the Debtor and Sutton Owner (together, the "Borrowers") filed suit in New York State Supreme Court to enjoin the foreclosure, contending, among other things, that the sale was not being conducted in accordance with the UCC and that the Court should disregard the mezzanine structure as illusory. On February 23, 2016, Commercial Division Justice O. Peter Sherwood denied Borrowers' motion for a preliminary injunction, finding, among other things, that Borrowers were unlikely to succeed on the merits of

their claim, that they would not be irreparably harmed by the foreclosure sale, and that the

equities favored allowing Lender to enforce its rights as agreed by the parties. Rather than

appeal or seek a stay in the Appellate Division, Sutton Mezz filed this case to do what the state

court would not: stop Lender from foreclosing on the Membership Interest.

4.      As the Second Circuit recognized in *In re C-TC 9th Avenue P'ship*, 113

F.3d 1304 (2d Cir. 1997), this is precisely the type of case that does not belong in Bankruptcy

Court: a single asset dispute between two parties – a debtor and its sole secured creditor – that

can be fully resolved in the state court system. The Debtor has no operations or employees and

no assets other than the Membership Interest. While the Debtor lists unsecured creditors, they

appear to be creditors of Sutton Owner (architects, contractors, engineers, etc.), not Sutton Mezz,

and their claims are dwarfed by the Mezz Loan. More importantly, Sutton Mezz's organizing

documents, and the terms of the Mezz Loan, forbid the Debtor from incurring more than a token

amount of such debt. The vast majority of any such obligations would  therefore be *ultra vires*

and unenforceable. In short, there is nothing here to reorganize – just a dispute over Lender's

right to foreclose on the Debtor's sole asset – and thus the real purposes for this filing were

improper ones: forum shopping and opportunistic exploitation of the automatic stay. Dismissing

the Petition would correct this misuse of bankruptcy, while leaving the Debtor free to seek

further relief in the state courts pending a rescheduled sale.

5.      Alternatively, this Court should modify the automatic stay pursuant to

Bankruptcy Code § 362(d)(1) to permit Lender to pursue its state law remedies. All of the

factors favoring dismissal of the Petition also favor lifting the stay. Moreover, the Debtor is

continuing to use Lender's collateral without the Lender's consent and without so much as

3

offering any adequate protection to Lender. With no cash flow, no operations and no other assets, the Debtor lacks the means to do so. This is yet another reason to lift the stay.

### Factual Background

6.     The facts underlying this Motion are set forth in the accompanying Declaration of N. Richard Kalikow, Lender's principal (through intermediate holding companies). We summarize those facts here for the Court's convenience.

**A.     The Project**

7.     For the past few years, Sutton Owner has pursued an extraordinarily ambitious real estate development project at 428-432 East 58th Street in New York City. Affidavit of Herman Carlinsky ("Carlinsky Aff.") [Doc. # 3] ¶ 7. Sutton Owner's business consisted of: (i) buying the existing-low-rise buildings, (ii) emptying them of rental tenants, (iii) demolishing them, (iv) buying air rights from other properties, and (v) building a super-tall residential tower exceeding 1,000 feet.     REDACTED

REDACTED     . Kalikow Decl. Exh. A at 7-8, 12; Exh. H.

8.     Sutton Mezz's role in the project was limited. Its business and corporate purpose was (i) to "acquire, own, hold, sell, transfer, pledge, or otherwise dispose of a limited liability company interest in, and to be and act as a member of, [Sutton Owner];" and (ii) to perform under the documents governing the Mezz Loan. Kalikow Decl. Exh. B at §§ 7(i) and (ii).

**B.     The First Financing (January 2015)**

9.     In January 2015, Lender's affiliate, Gamma Lending S58 LP, provided $63 million in initial financing for the development project (the "First Financing") – or about 11% of the total financing Sutton Owner acknowledges it needed. The First Financing was

broken into two separate loans: an acquisition loan of $43 million made to Sutton Owner, and a

mezzanine loan of $20 million, made to Sutton Mezz. Kalikow Decl. Exhs. II and C.

      10.    In both the First Financing and the subsequent financing (described

below), the Debtor was structured as a special purpose, bankruptcy remote, holding company.

The Debtor's Amended and Restated Limited Liability Company Agreement (the "Operating

Agreement") expressly restricts the Debtor's activities "in order to qualify the Company as a

'special purpose entity.'" Kalikow Decl. Exh. B at § 9(d)(i). Among other things, the Operating

Agreement imposes stringent restrictions on Sutton Mezz's ability to incur unsecured debt –

provisions that are typical for a special purpose entity ("SPE") such as the Debtor. In particular,

Section 9(d)(iv)(D) of the Operating Agreement provides that the Debtor shall "not incur, create

or assume any indebtedness other than as expressly permitted under the [Mezz Loan

documents]." *Id.* at § 9(d)(iv)(D). Section 4.16 of the Mezz Loan agreement, in turn, provides

that Sutton Mezz is not permitted to "incur or assume any indebtedness other than … unsecured

trade payables incurred in the ordinary course of business relating to the ownership and operation

of the Property which (A) are not evidenced by a note, (B) do not exceed at any time a maximum

aggregate amount of $50,000 and (C) are paid within thirty (30) days of date incurred." Kalikow

Decl. Exh. C at § 4.16. Consistent with these restrictions, Section 4.30 of the Mezz Loan

agreement also prohibited Sutton Mezz from entering into virtually any contractual obligations

other than those in its organizational documents and the loan agreements. *Id.* at § 4.28.

      11.    The Debtor's sole asset is a 100% Membership Interest in Sutton Owner.

Sutton Owner, in turn, owns the Property. To secure the Mezz Loan, Sutton Mezz pledged the

Membership Interest to Lender as collateral. Kalikow Decl. Exh. D at 1. The loan documents

for the First Financing provided, among other things, that if Borrowers were unsuccessful at

obtaining other funding and at maturity could not repay either the acquisition loan or the

mezzanine loan, then Sutton Mezz's ownership interest in Sutton Owner could be sold at a UCC

foreclosure sale. *Id.* at § 6(a). Sutton Mezz also expressly agreed that any notice of such UCC

foreclosure sale "shall be deemed reasonably and properly given if given at least ten (10) days

before such disposition." *Id.*

12.    Undoubtedly aware that the initial short-term $63 million First Financing

represented a fraction of the total time and financing necessary to develop the Property, the

Borrowers' manager, Joseph Beninati, made numerous statements about his efforts to find

further financing. In December 2014, Mr. Beninati stated he was already "working to finalize"

deals to obtain "several hundred million dollars" from China. Kalikow Decl. Exh. E at 1. On

January 7, 2015, Mr. Beninati boasted that there was "serious competition" among five

companies, including several large Chinese companies, to invest and that right after closing the

First Financing, Mr. Beninati would start a process to bring in those bids, in the amount of

hundreds of millions of dollars. Kalikow Decl. Exh. F at 1. On January 9, 2015, Mr. Beninati

stated "With chinese. [T]hey are all in and boiling hot for this deal." Kalikow Decl. Exh. G at 1.

In the spring of 2015, Mr. Beninati even hired Cushman & Wakefield to solicit interest.

Kalikow Decl. Exh. H at 4; Exh. I. Despite these efforts, however, Mr. Beninati did not locate

any such financing.

C.    **The Second Financing (June 2015)**

13.    Without third party financing, in the summer of 2015, Borrowers sought a

second round of financing (the "Second Financing") from Lender (an affiliate of the original

lender). The Second Financing was intended to be a short-term bridge loan with a term of seven

months. The original mezzanine loan was refinanced with a second $20 million mezzanine loan.

The property level loan (taken on by non-debtor Sutton Owner) was also refinanced, but the

amount of the loan was materially increased from $43 million to $125.8 million.  Pursuant to the

loan documents these additional funds were to be used to, among other things, purchase certain

additional neighboring air rights and repay the First Financing.  Kalikow Decl. Exh. J § 2.1.

Sutton Owner also borrowed $1.4 million from Lender under a Building Loan.  Kalikow Decl.

Exh. K.

14.    No changes were made in the structure of Sutton Mezz in connection with

the Second Financing.  The Operating Agreement and the new mezzanine loan documents again

barred Sutton Mezz from incurring any debt other than limited and *de minimis* trade debt of not

more than $50,000 in the aggregate that was to be paid off in 30 days.  Kalikow Decl. Exh. L at §

4.16; *see also id.* at § 4.30 (prohibiting Sutton Mezz from virtually all contractual obligations,

other than those in its organizational documents and loan documents).

15.    As it had in connection with the First Financing, Sutton Mezz again

agreed that upon either Borrower's default, the Membership Interest could be sold through a

UCC foreclosure sale and that any notice of that sale "shall be deemed reasonably and properly

given if given at least ten (10) days before such disposition."  Kalikow Decl. Exh. M at § 6(a);

*see also id.* Exh. L § 7.1(p) (stating that an event of default under the Property Loans would be a

default under the Mezz Loan).  This agreement reassured Lender that if either Borrower

defaulted, Lender would not be stuck with a matured but unrepaid loan, and would not need to

expose itself to the fluctuations of an uncertain real estate market, zoning regulations, or

community activism seeking to hinder or to stop the development of the Property.  Kalikow

Decl. ¶ 41.

16.    Thus, Borrowers, led by experienced real estate developers and advised by

sophisticated counsel, twice negotiated and executed hundreds of pages of meticulous financing

7

REDACTED

documents that provide for an SPE, bankruptcy remote, mezzanine loan secured by the Debtor's sole asset and consenting to a 10-day UCC foreclosure sale remedy.[1]

**D.      The Borrowers Again Fail to Locate Further Financing**

17.      In August 2015, Mr. Beninati was interviewed by the *New York Times*. "After months of fruitless hunting, Mr. Beninati said he remained confident he would find a partner. ... 'It's a real opportunity to do something special,' Mr. Beninati said, 'but if a joint venture partner doesn't show up, I'll have no choice but to sell.'" Kalikow Decl. Exh. H at 4.

18.      Throughout fall 2015, Mr. Beninati tried to obtain replacement financing to take out Lender and fund the long term development of the Property.  Mr. Beninati hired The Carlton Group to assist with this effort.            REDACTED

REDACTED                              . *See* Kalikow Decl. Exhs. A & P.

Despite these efforts, the Borrowers did not secure financing  to fund the entire project – or even funds to refinance the outstanding (and maturing) loans.

19.      On January 19, 2016, the loans matured.  Notwithstanding the many months of efforts by Mr. Beninati, Borrowers were still unable to find alternate or additional financing.  The Borrowers did not repay any portion of the outstanding loans and have not made any payments of any nature thereon since.  Kalikow Decl. ¶ 2.

**E.      Recent Events Relating to the Property**

20.      Various recent events may jeopardize the development of the Property and the value of Lender's collateral.

---

[1] Mr. Benninati's profile on his company's website states that he has decades of experience in commercial and residential real estate and has completed billions of dollars of acquisitions, development, construction, and real estate finance transactions.  Kalikow Decl. Exh. HH.

21.    <u>Community Opposition</u>: On January 21, 2016, the East River Fifties Alliance, joined by several city and state representatives, including the Manhattan Borough President, submitted a proposal to the Department of City Planning to create new zoning for the Property's location that would "Banish Megatowers." Kalikow Decl. Exh. O. The proposed zoning restrictions would limit the height of buildings in the district to no more than 260 feet, a fraction of the height that Sutton Owner planned. *Id.* On February 8, 2016, it was reported that the project "has received a great deal of pushback from community groups like the East River 50s Alliance" and already "has taken a significant height cut going down from the original planned 80 stories down to 62 stories." Kalikow Decl. Exh. P.

22.    <u>Fluctuations in the Lending and Economic Environment</u>: On February 4, 2016, *The Real Deal* reported that "[w]ary of a slowdown in high-end apartment sales and a potential supply glut, lenders are beginning to retreat from Manhattan's luxury condominium market. Many banks are either cutting down their luxury condo construction lending or stepping away from the market altogether, according to brokers and lenders." Kalikow Decl. Exh. Q. The article states that after a three-year period of record-setting luxury condominium sales, "the market is showing signs of a correction." *Id.*

**F.    Lender's Efforts to Foreclose on its Collateral, and
Borrowers' Failed Preliminary Injunction Motion**

23.    On January 20, 2016, Lender sent Borrowers notices of default. Lender also sent Sutton Mezz a notice informing it that, in accordance with the Mezz Loan agreement, Lender would conduct a UCC foreclosure sale on February 11 – 22 days later. Kalikow Decl. Exhs. N, R, & S. Lender sent a subsequent notice to plaintiffs on February 5, 2016, rescheduling the UCC foreclosure sale for February 29, with a deadline of February 24 for submission of bid deposits. Kalikow Decl. ¶ 25, Exh. U.

24.     To prepare for the UCC sale, Lender retained Eastdil, the nation's largest broker for real estate investment properties. In consultation with Eastdil, Lender advertised the sale in *The Wall Street Journal* and *Real Estate Alert* on February 10 and again on February 17. Kalikow Decl. Exhs. V & W. Lender also advertised in *The New York Times* on February 18 and in *The New York Post* on February 23. Kalikow Decl. Exhs. X & Y. On February 11, Eastdil also sent a "Teaser Blast" by direct personal e-mail to 266 major potential bidders. Kalikow Decl. Exhs. Z & AA.[2]

25.     Eastdil also created a data room containing information for potential bidders. That data room included relevant loan documents, membership certificates, zoning documents, notices relating to plaintiffs' defaults and indebtedness, documents relating to an air rights agreement with the owner of another property, bidding procedures, demolition permits, and a title abstract. Kalikow Decl. Exh. BB. Before the filing of the Petition, nine potential bidders signed confidentiality agreements and were given access to the due diligence material in this data room. Kalikow Decl. Exh. JJ at ¶ 10.

26.     On February 17, 2016, the Borrowers filed an action in New York State Supreme Court, and immediately sought a temporary restraining order (the "TRO"). In their papers, Borrowers did not dispute that they had defaulted on the loans, that the loans had matured, that the full balance was due and owing, and that nothing had been repaid. Rather, the Borrowers asked the Court to disregard the commercially reasonable and commonly-used structure of a mezzanine loan secured by an equity pledge and the SPE structure of the loan transaction. The Borrowers also asserted that the UCC foreclosure sale process was flawed.

---

[2] *Real Estate Alert* is a publication that is frequently used and consulted by the real estate investors Eastdil was targeting. Similarly, Eastdil's "Teaser Blast" was transmitted to a who's who of real estate investors. Kalikow Decl. Exh. JJ at ¶ 6.

Among other things, Borrowers incorrectly alleged that the sale was being conducted on too short notice, that Lender had advertised only in a single publication with too few subscribers, and that Lender had not made information concerning the sale available to prospective purchasers in an online data room as is customary.

27.     A TRO was entered (Kalikow Decl. Exh. CC), pending argument of the preliminary injunction motion, which occurred on February 23, six days before the scheduled UCC foreclosure sale.  After argument, the Court denied the motion on the record, finding Borrowers were not likely to succeed on the merits, would not be irreparably harmed by the foreclosure sale, and that the balance of the equities favored allowing Lender to foreclose on the pledged membership interest – the Debtor's sole asset – as provided by the parties' agreements.  Kalikow Decl. Exhs. DD at pp. 37-39 & T.

### G.    Sutton Mezz Files for Bankruptcy to Avoid Foreclosure

28.     Rather than appealing the denial of the Court's ruling to the Appellate Division, Sutton Mezz instead filed for bankruptcy on Friday, February 26, 2016.  It thereby obtained an unbonded stay of the foreclosure sale that the New York Supreme Court – the forum originally chosen by the Borrowers -- had allowed to proceed only a few days earlier.[3] In his first day affidavit, the Debtor's president concedes that the purpose of the filing was to avoid "an attempt by [Lender] to foreclose on the Debtor's membership interest."  Carlinsky Aff. ¶ 18.

29.     In addition to the Mezz Loan, Sutton Mezz's Petition alleges roughly $3,500,000 in unsecured debt.  Many, if not all, of the listed claims appear to relate to services

---

[3] Lender had requested that, if a preliminary injunction was granted, a $15 million bond be required to account for the potential diminution in value of Lender's collateral during the pendency of the litigation.  Since Justice Sherwood found that no injunction was warranted, he did not rule on the bond.

(architects, engineers, interior designers) provided to the non-debtor Sutton Owner, not to Sutton

Mezz.[4]  Nowhere, moreover, does the Petition explain how Sutton Mezz could properly have

incurred such obligations without violating the prohibitions in its Operating Agreement and the

Mezz Loan Documents.  Kalikow Decl. Exh. B at § 9(d)(iv)(D); Exh. L at § 4.16.

## Argument

I.    THE CASE SHOULD BE DISMISSED AS A BAD FAITH FILING

30.    This Court is empowered under Bankruptcy Code § 1112(b) to dismiss a

bankruptcy case that was filed in bad faith, *e.g.*, as a litigation tactic without the intention or

serious hope of reorganizing.  *See, e.g., In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1310-12 (2d

Cir. 1997) ("*C-TC*"); *In re Cohoes Indus. Terminal, Inc.*, 931 F.2d 222, 227-28 (2d Cir. 1991)

("*Cohoes*"); *In re MBM Entm't, LLC*, 531 B.R. 363, 408 (Bankr. S.D.N.Y. 2015); *In re Hartford*

*& York LLC*, No. 13-45563-ESS, 2014 WL 985449, at *6 (Bankr. E.D.N.Y. Mar. 13, 2014).  The

appropriateness of dismissing bad-faith filings, as has happened here, is widely recognized.[5]

31.    While a moving party bears the initial burden of demonstrating "cause"

for dismissal under § 1112(b), "once the good faith of a debtor is called into question, the

---

[4] Perhaps reflective of the Debtor's mischaracterization of third party claims, two of the Debtor's
alleged creditors have filed mechanics liens against the Property naming *non-debtor Sutton
Owner*, not Sutton Mezz, as liable on their claims.  Regardless, these liens, and a third filed
against Sutton Owner and the Property, give Lender yet additional reason to be concerned that
the value of its collateral is at risk and is not adequately protected by the Debtor, as creditors take
action against the underlying Property due to nonpayment.  Kalikow Decl. ¶ 47, Exhs. EE, FF, &
GG.

[5] *See, e.g., In re Premier Auto Servs., Inc.*, 492 F.3d 274, 280-281 (4th Cir. 2007) (finding bad
faith where Chapter 11 petition filed just two days before debtor's tenancy was to expire); *In re
Cedar Shore Resort, Inc.*, 235 F.3d 375, 380-382 (8th Cir. 2000) (affirming dismissal of petition
filed for primary purpose of preventing shareholders from pursuing state court lawsuit); *In re
SGL Carbon Corp.*, 200 F.3d 154, 163-165 (3d Cir. 1999) (dismissing Chapter 11 petition filed
to change venue of antitrust litigation without valid reorganizational purpose); *In re Phoenix
Piccadilly, Ltd.*, 849 F.2d 1393, 1395 (11th Cir. 1988) (Chapter 11 petition filed in bad faith
warranting dismissal where petition was filed to frustrate secured creditor's attempt to foreclose
on debtor's sole assets).

burden shifts to the debtor to demonstrate that the petition was filed in good faith." *In re Syndicom Corp.*, 268 B.R. 26, 49 (Bankr. S.D.N.Y. 2001); *see also In re Fraternal Composite Serv., Inc.*, 315 B.R. 247, 249 (Bankr. N.D.N.Y. 2003) (same), *aff'd sub nom. Fraternal Composite Servs. v. Karczewski*, 315 B.R. 253 (N.D.N.Y. 2004). A finding of bad faith need not be based on or equated with allegations of actual fraud or malice. A debtor may have a sincere desire to preserve its assets, but a petition will still not be in "good faith" unless it is motivated by a realistic desire to reorganize rather than merely to thwart creditors and escape the effects of non-bankruptcy litigation. *See In re Syndicom Corp.*, 268 B.R. at 49-50.

A.    **The Petition Was Filed to Obtain a Litigation Advantage in a Two-Party Dispute and Thus Lacks a Good-Faith Basis for Invoking Bankruptcy Jurisdiction**

32.    Where, as here, a debtor filing for bankruptcy has a single asset, has no reasonable prospects of being a going concern, and has as its primary purpose "a hope to relitigate a state court action," a bankruptcy petition should be dismissed as filed in bad faith. *In re Project Orange Assocs.*, LLC, 432 B.R. 89, 113 (Bankr. S.D.N.Y. 2010) (quotation omitted). Indeed, the bad-faith filing doctrine has been applied with particular vigor in the context of two-party single-asset real estate cases, similar to this one, where the courts have repeatedly reaffirmed that "debtors cannot manipulate the Bankruptcy Code to thwart the legitimate rights of secured creditors to realize on their claims." *In re Shea & Gould*, 214 B.R. 739, 744 (Bankr. S.D.N.Y. 1997); *see also In re Northtown Realty Co., L.P.*, 215 B.R. 906, 914 (Bankr. E.D.N.Y. 1998) (finding bad faith based on intent to delay or frustrate efforts of secured creditor to enforce legal rights).

33.    *C-TC* is a leading case in this regard. The debtor in *C-TC* was an entity formed for the purpose of purchasing and managing property, which was then pledged as security for the loan financing the purchase. 113 F.3d at 1306-07. When C-TC failed to make

13

required payments, the lender sued for foreclosure, but on the same day the court approved the

appointment of a receiver to conduct a foreclosure sale, C-TC filed a bankruptcy petition to halt

the process. *Id.* at 1307. The Bankruptcy Court ultimately found this to be a bad faith filing

based on its conclusions that C-TC had filed the petition primarily "as a litigation tactic" to

avoid foreclosure on its one asset and that the dispute could have been fully resolved in a non-

bankruptcy forum. *Id.* at 1309-10.

       34.     The Court of Appeals ultimately affirmed the Bankruptcy Court's bad-

faith finding, concluding that the Chapter 11 filing had been made "with no hope of

reorganization and at the very moment that the state litigation had taken a turn adverse to C-TC,

making mortgage foreclosure imminent." *Id.* at 1310. The court based its finding in part on a

series of factors initially set forth in *Pleasant Pointe Apartments, Ltd. v. Kentucky Housing

Corp.*, 139 B.R. 828 (W.D. Ky. 1992):

(1)     the debtor has only one asset;

(2)     the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3)     the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4)     the debtor's financial condition is, in essence, a two-party dispute between the debtor and the secured creditors which can be resolved in the pending state foreclosure action;

(5)     the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6)     the debtor has little or no cash flow;

(7)     the debtor cannot meet current expenses including the payment of personal property and real estate taxes; and

(8)     the debtor has no employees.

*C-TC*, 113 F.3d at 1311 (citing *Pleasant Pointe Apartments*, 139 B.R. at 832). The Second

Circuit affirmed the finding of bad faith in *C-TC* after observing that most of the *Pleasant Pointe* factors applied. This eight-factor analysis has been widely employed to assess the potential bad faith of bankruptcy filings. *See, e.g., In re Syndicom Corp.,* 268 B.R. at 50-51 (finding bad faith based on *C-TC* factors); *In re Northtown Realty Co.,* 215 B.R. at 915-16 (same); *In re Hartford & York LLC,* No. 13-45563-ESS, 2014 WL 985449, at *6 (Bankr. E.D.N.Y. Mar. 13, 2014) (same); *see also In re Laguna Assocs. Ltd. P'ship,* 30 F.3d 734, 738 (6th Cir. 1994) (articulating similar multipart test).

35.    Another similar case is *JER/Jameson Mezz Borrowers II, LLC,* 461 B.R. 293, 296 (Bankr. D. Del. 2011). In that case, a chain of hotels were owned and operated by various operating companies, and the ownership of those companies was held by an entity called JER/Jameson Mezz II, LLC ("JER Mezz II"). *Id.* at 296. JER Mezz II had borrowed funds to acquire the operating entities and pledged its ownership interest as collateral. After a time, JER Mezz II was unable to repay its lender and the lender took steps to conduct a UCC foreclosure. The day before the auction was scheduled to occur, JER Mezz II filed for chapter 11 relief. *Id.* The lender filed a motion to dismiss the case or, in the alternative, to lift the automatic stay. *Id.* After undertaking a multi-factor analysis substantially similar to the *C-TC* test, Judge Walrath found that "virtually all of the [relevant] factors are present," and dismissed the case with prejudice after finding that the petition was filed in bad faith and for no legitimate bankruptcy purpose. *Id.* at 299. The *JER/Jameson* case underscores how the present scenario (a holding company whose sole asset is stock in a company that owned real estate) represents a classic bad faith filing.

36.    These cases often boil down to an assessment of whether a bankruptcy petition was filed primarily as a litigation tactic or whether the debtor in fact has a reasonable

15

probability of being able to reorganize as a viable business under the protection of Chapter 11.

"[A]n entity may not file a petition for reorganization which is solely designed to attack a

judgment collaterally – the debtor must have some intention of reorganizing." *C-TC*, 113 F.3d

at 1310 (citing *Cohoes*, 931 F.2d at 228). The protections of Chapter 11 are intended to be

available only to those parties that seriously intend to reorganize, thereby yielding some benefit

for creditors as a trade-off for the breathing room provided by the automatic stay. "Chapter 11

is not a procedural vehicle which may be commandeered solely for 'the purpose of invoking

[its] automatic stay.'" *In re Premier Auto. Servs., Inc.*, 492 F.3d 274, 281 (4th Cir. 2007)

(citation omitted). Nor is Chapter 11 intended to give debtors "the option of litigating a dispute

with a single party . . . in an alternative forum, when the Debtor has no other need of or use for

the bankruptcy court." *In re Fraternal Composite Serv., Inc.*, 315 B.R. at 250. In short,

bankruptcy must be used as a shield to facilitate legitimate reorganization efforts, not as a sword

to collaterally challenge state court litigation results with which the debtor is unhappy or as a

tool to forum-shop. *See In re Briarpatch Film Corp.*, 281 B.R. 820, 834-35 (Bankr. S.D.N.Y.

2002) (debtor cannot use bankruptcy as "sword" to relitigate unfavorable judgments rather than

taking state court appeal).

      37.    The Second Circuit has focused on the timing of the filing of a petition as

a strong indication of a debtor's true intention. In *C-TC*, for example, "the Chapter 11 filing

was made with no hope of reorganization and at the very moment that the state litigation had

taken a turn adverse to C-TC" – on the eve of foreclosure of the debtor's only asset. 113 F.3d at

1310. Similarly, in *In re Wally Findlay Galleries (New York, Inc.)*, 36 B.R. 849 (Bankr.

S.D.N.Y. 1984), the Bankruptcy Court dismissed as a bad-faith filing a case commenced the

same day as entry of a judgment ordering the debtor to make certain payments to its creditors.

*Id.* at 850-51. The Bankruptcy Court found it evident that the debtor had employed Chapter 11 not to reorganize, but to relitigate the lost motions, which was "an impermissible use of Chapter 11." *Id.* at 851.

38. As demonstrated below, all of these factors point to the conclusion that the instant Petition lacks a good-faith basis and was filed merely as a litigation tactic.

**B.    This Case Presents a Classic Bad-Faith Filing**

39. The Petition in this case is a paradigmatic bad-faith filing. All of the classic indicia of "single asset" cases reflected in the *C-TC* factors are present here.

40. Factor 1: The Debtor was formed for the purpose of owning a single asset (the ownership interest in Sutton Owner) and, indeed, the parties agreed that it was a "Special Purpose Bankruptcy Remote Entity." Kalikow Decl. Exh. C at § 3.1. The Debtor acknowledges that its sole asset is the Membership Interest. Carlinsky Aff. ¶ 12 ("The Debtor's assets consist of its membership interest in Sutton 58 Owner LLC.").

41. Factor 2: The Debtor claims only a limited number of unsecured creditors – each of which has a relatively small amount of debt in relation to the Lenders' claims. Even if properly listed as owed by the Debtor (and there is reason to be skeptical), that debt was improperly incurred by Sutton Mezz. As noted above, the Debtor is an SPE that was prohibited from incurring unsecured debt greater than $50,000 in the aggregate, that was required to be paid off within 30 days. The alleged unsecured claims scheduled with the Debtor's petition far exceed this limit. The Debtor should not be allowed on the basis of these *ultra vires* acts – in violation of its own operating agreement – to render itself something other than the bankruptcy remote SPE it agreed to be. Indeed, as a matter of law, acts in violation of the operating agreement are considered null and void. *See, e.g., Feeley v. NHAOCG, LLC*, CA. No. 7304-VCL, 2012 WL 4859132, at *7 (Del. Ch. Oct. 12, 2012); *In re Tri-River Trading,*

*LLC*, 329 B.R. 252, 265 (B.A.P. 8th Cir. 2005) *aff'd sub nom. DeBold v. Case*, 452 F.3d 756

(8th Cir. 2006); *In re Min Sik Kang*, No. 1:15-CV-00953 LMB, 2015 WL 5786692, at *6 (E.D.

Va. Sept. 30, 2015).

42.     Moreover, these unsecured claims are almost entirely trade debt for

architects, engineers, and construction, among other things, that facially appear to relate to the

underlying property owner, and not the Debtor.  Insofar as these claims really are against non-

debtor Sutton Owner, these unsecured creditors would not be prejudiced by the dismissal of this

case, because they will be free to pursue their claims against that non-debtor entity.[6]

43.     Factor 3:  The Debtor's single asset – the Membership Interest – is the

subject of foreclosure proceedings that the State Court, after a hearing on the merits, has

declined to enjoin.

44.     Factor 4:  The Debtor's financial situation is in essence a two-party

dispute between itself and Lender, and that dispute is fully capable of being resolved through

state court proceedings.

45.     Factor 5:  The timing of the Petition plainly reflects an attempt to frustrate

the Lender's bargained for rights.  The Mezz Loan matured seven weeks ago.  As authorized by

the Mezz Loan documents, Lender has sought to conduct a UCC Foreclosure relating to its

undisputed collateral, the Membership Interest.  To stop that sale, the Borrowers first brought

suit in New York State Supreme Court.  Only when that litigation failed did they file this case.

In fact, Sutton Mezz's First Day Affidavit frankly admits the filing was made to stop the UCC

Foreclosure.  Carlinsky Aff. ¶ 18.  At the same time, Sutton Mezz offers no plan for

---

[6] There is no indication that any creditor was pressuring Sutton Mezz to file for bankruptcy or
were otherwise pursuing it.  This also militates in favor of dismissal. *JER/Jameson*, 461 B.R. at
299.

reorganization and, in the days since, has filed no substantive motions of any kind.  Indeed, because the Debtor has no other business activities or significant creditors, there is nothing credibly to reorganize – only a binary question of whether or not Lender will be permitted to enforce its contractual rights to foreclosure on the Debtor's sole asset.  In other words, this is a classic two party dispute between debtor/owner and lender that should be resolved in state court, and does not warrant the broader purposes of this Court.  And if this case were to be dismissed (or the automatic stay lifted to permit foreclosure proceedings to go forward, as discussed below), the Debtor would still have ample opportunity to obtain any relief to which it might be entitled in the state court system.

46.     Factors 6 and 7:  The Debtor has no cash flow whatsoever, and lacks any ability either to develop and complete the underlying project or meet the project's current expenses.  The lack of funding and any operations by the Debtor underscores that the sole purpose of this case is to obtain a delay, rather than reorganize.

47.     Factor 8:  The Debtor has no employees.  Carlinsky Aff. ¶ 8.

48.     By contrast to the classic bad-faith facts present here, motions to dismiss have been denied where debtors were conducting active businesses involving multiple constituencies and thus had a legitimate need to use the bankruptcy process to facilitate negotiations and compromises among multiple parties to restructure the company going forward.  *See, e.g., Cohoes*, 931 F.2d at 228-29 (denying motion to dismiss where debtor conducted significant business, faced financial stress and mounting expenses at the time it filed petition, and persisted in actual attempt to reorganize even after losing litigation that had driven it into bankruptcy); *In re Sletteland*, 260 B.R. 657, 667 (Bankr. S.D.N.Y. 2001) (contrasting two-party cases in finding that "Debtor's interests are sufficiently complex and sophisticated to

justify giving him the opportunity to utilize the flexible procedure of Chapter 11 in an attempt to restructure his debt, satisfy his creditors, and retain a residual interest if he is so entitled" and finding that there had been "no attempt on the part of the Debtor to relitigate or forum shop"). This case, to the contrary, involves only a two-party dispute over a single asset, and the bankruptcy filing was motivated solely by litigation tactics and forum shopping to obtain delay. This case does not necessitate negotiating compromises with multiple creditor constituencies. Rather, the only thing that this Debtor is attempting to do is buy time so that it can do what it has known it must do for months – repay the loans *and* secure much more substantial financing to allow the non-debtor Sutton Owner to develop the Property, or sell its assets. Bankruptcy protection is not intended to be a vehicle to obtain an extension of a maturity deadline merely because the debtor did not act with sufficient diligence earlier. *In re Cinole, Inc.*, 339 B.R. 40, 45 (Bankr. W.D.N.Y. 2006) (finding that the filing of a petition was improper and in bad faith where debtors filed for bankruptcy to stop a tax sale "and buy time to raise capital or get financing to rehabilitate the distressed properties").

49.    In short, the relevant factors overwhelmingly support a finding of bad faith and dismissal of Sutton Mezz's Chapter 11 case.

II.    IN THE ALTERNATIVE, THE AUTOMATIC STAY
       SHOULD BE LIFTED BECAUSE LENDER'S INTEREST IN
       THE COLLATERAL CANNOT BE ADEQUATELY PROTECTED

50.    The same factors that warrant dismissal also warrant entry of an order modifying the automatic stay to permit Lender to proceed with its efforts to foreclose on its collateral (subject to the Debtor's ability to seek to forestall that result through ordinary state court processes). An application to modify the stay based on a debtor's bad-faith filing is decided under the same standards as a motion to dismiss the entire case. *See In re 234-6 W. 22nd St. Corp.*, 214 B.R. 751, 757-60 (Bankr. S.D.N.Y. 1997) (applying *C-TC* and *Laguna*

factors to determine that debtor's bad faith filing constituted necessary "cause" to grant relief

from automatic stay pursuant to Bankruptcy Code § 362(d)(1)); *In re Syndicom Corp.*, 268 B.R.

at 48-49 ("'the standards for bad faith as evidence of cause,' whether in the context of dismissal

or relief from the stay, 'are not substantively different from each other.'") (citing *234-6 West*

*22nd St.*, 214 B.R. at 757).

   51. The stay also should be lifted because the Debtor has not even attempted

to, and cannot, offer Lender adequate protection for the use of Lender's collateral as required by

the Bankruptcy Code.  Section 363(e) of the Bankruptcy Code provides that a court shall

condition a debtor's use of property pledged to a creditor as collateral on the debtor's provision

of adequate protection.  Where there is a lack of adequate protection, section 362(d)(1) provides

that the court shall grant relief from the automatic stay such as by terminating, annulling or

modifying the stay to allow the creditor to protect its interests.  "If the value of collateral is

threatened, creditors may seek adequate protection and relief from the automatic stay, giving the

permission to foreclose on the property." *In re Price*, 370 F.3d 362, 373 (3d Cir. 2004); *see also*

*In re Rosen*, 208 B.R. 345, 356 (D.N.J. 1997) (noting that a bankruptcy court may grant stay

relief "where a secured creditor lacks adequate protection because there is a threat the value of

the property may decline."); *In re Sterling Dev., Inc.*, No. 11-08-14208 MA, 2009 WL 196250,

at *3 (Bankr. D.N.M. Jan. 26, 2009) ("A creditor seeking relief from the automatic stay for

cause based on a lack of adequate protection must demonstrate that its collateral is declining in

value, or that there is a threat of a decline in value, in order to establish a prima facie case.").

   52. Here, the Debtor is continuing to use Lender's collateral.  However, the

value of that collateral is threatened by numerous factors, including actions and liens filed by

creditors against the underlying Property owned by the non-debtor, the risk that community

21

opposition will grow to any development, and that the zoning regulations governing the

Property will be altered to forbid construction going forward as planned.  Kalikow Decl. Exh. O.

The value of the collateral also is threatened by volatility in the real estate financing world.

These factors all dramatically affect the likelihood of raising the necessary financing – which

efforts have failed over the course of the last year and show little if no prospects of being

successful now that the Debtor has filed for bankruptcy.

53.     Above all, given that the Debtor is a single asset entity, has no cash flow

whatsoever, and that the project is not even anticipated to be complete until 2019 (even if the

non-existent financing suddenly appeared), there is no viable mechanism by which the Debtor

could provide adequate protection payments to Lender.  This inability is yet another reason why

the stay should be lifted and Lender should be permitted to pursue its state law foreclosure

remedies.

## Notice

54.     Pursuant to Rule 2002(a)(4) of the Federal Rules of Bankruptcy

Procedure, notice of this motion has been given to the Debtor, the Office of the United States

Trustee, and all creditors listed in the Petition, and all other parties in interest who have

requested notice in the Chapter 11 case.  Lender submits that no further notice is required.

## Conclusion

55.      For the foregoing reasons, Lender respectfully requests that the Court (1)

enter an order, in the form attached as Exhibit 1 hereto, granting Lender's motion to dismiss the

case or, in the alternative, lifting the automatic stay and (2) grant such other and further relief as

is just.

Dated: New York, New York
          March 10, 2016

                                    Respectfully submitted,

                                    KRAMER LEVIN NAFTALIS & FRANKEL LLP


                                    By:___/s/ Adam C. Rogoff_____
                                           Adam C. Rogoff, Esq.
                                           P. Bradley O'Neill, Esq.
                                           Natan Hamerman, Esq.

                                    1177 Avenue of the Americas
                                    New York, New York  10036
                                    Tel:  212-715-9100
                                    Fax:  212-715-8000

                                    *Counsel for Sutton 58 Associates LLC*

UNITED STATES BANKRUPCY COURT
SOUTHERN DISTRICT OF NEW YORK

.......................................................................... x
                                                        :
In re                                                   :    Chapter 11
                                                        :
BH Sutton Mezz LLC,                                     :    Case No. 16-10455 (SHL)
                                                        :    Judge Sean H. Lane
            Debtor.                                     :
                                                        :
.......................................................................... x

## ORDER DISMISSING CHAPTER 11 CASE

Upon the motion (the "Motion") of Sutton 58 Associates LLC seeking entry of an order

dismissing the above-captioned Chapter 11 case pursuant to Bankruptcy Code § 1112(b) or, in

the alternative, modifying the automatic stay pursuant to Bankruptcy Code § 362(d)(1) [Docket

No. _____]; and the Court having jurisdiction to consider the

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided and it appearing that no

other or further notice need be given; and a hearing having been held before this Court on [ ];

and all objections, if any, to the Motion having been overruled, settled, or withdrawn, and

sufficient cause appearing thereof, it is hereby

ORDERED that the Motion is granted; and it is further

ORDERED that Chapter 11 case of BH Sutton Mezz LLC is dismissed; and it is further

ORDERED that this Court shall retain jurisdiction with respect to all matters arising from

or related to the implementation of this Order.

Dated: New York, New York
March [ ], 2016

_____
UNITED STATES BANKRUPTCY JUDGE