**LaMonica Herbst & Maniscalco, LLP**
3305 Jerusalem Avenue
Wantagh, New York 11793
(516) 826-6500
Joseph S. Maniscalco, Esq.
Jordan Pilevsky, Esq.

Relates to a Hearing to be Held on:
**April 7, 2016 at 11:00 a.m.**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

In re:                                          Chapter 11
                                                Case No.: 16-10455 (SHL)

BH SUTTON MEZZ LLC,

                          Debtor.
--------------------------------------------------------------x

**CHAPTER 11 DEBTOR'S RESPONSE IN OPPOSITION TO THE MOTION OF
SUTTON 58 ASSOCIATES LLC FOR AN ORDER DISMISSING THE CHAPTER 11
CASE PURSUANT TO SECTION 1112(b) OF THE BANKRUPTCY CODE OR,
IN THE ALTERNATIVE, MODIFYING THE AUTOMATIC STAY PURSUANT TO
SECTION 362(d)(1) OF THE BANKRUPTCY CODE**

To:     **The Honorable Sean H. Lane
        United States Bankruptcy Judge
        United States Bankruptcy Court
        Southern District of New York:**

        BH Sutton Mezz LLC, as the debtor and debtor-in-possession (the "**Debtor**"), by its

proposed attorneys, LaMonica Herbst & Maniscalco, LLP, submits the instant response in

opposition (the "**Opposition**") to the motion (the "**Motion**") of Sutton 58 Associates LLC (the

"**Lender**"), an entity controlled by N. Richard Kalikow ("**Kalikow Lender**") for an Order

dismissing the Chapter 11 case, pursuant to 11 U.S.C. § 1112(b), or, in the alternative, modifying

the automatic stay, pursuant to 11 U.S.C. § 362(d)(1).  In support of its Opposition, the Debtor

respectfully represents and alleges as follows:

## Preliminary Statement

        1.      In its Motion, the Lender attempts to couch the Debtor's bankruptcy filing as

nothing more than a dilatory tactic to "stave off a fully noticed UCC foreclosure".  See Motion,

¶ 1.  As set forth below and in the declaration of Joseph Beninati (the "**Beninati Declaration**"),

this is simply untrue.  Lender hopes it can somehow conceal a 15-month plot that it artfully choreographed with its principal and related parties to wrest control of a billion dollar residential real estate development project in Midtown Manhattan (the "**Project**").  The highly unique financing structure created by Kalikow Lender, Lender and the Lender's affiliate, Gamma Lending S58 LP ("**Gamma**", and together with Lender and Kalikow Lender, the "**Lenders**") and manipulative actions it took to sidetrack the Debtor's principal forced the Debtor into an untenable situation that made it virtually impossible to refinance its debt and develop the Project.[1]  Kalikow Lender was able to accomplish this exercise of control through insider information obtained from the Debtor's own lawyer, Richard Kalikow, Esq. ("**Kalikow Attorney**") – the first cousin of Kalikow Lender.  Knowing litigation against the Lender is inevitable, the Lender's approach has been to stave off a defense by asserting a frivolous offense.

2.      Aside from the claims to be asserted against the Lenders, the Debtor has never been provided an accounting of loan monies purportedly disbursed.  The Lenders have controlled all money from the each of its financings and the Debtor questions whether its loan was ever actually funded.  In this case, the Lender and Kalikow Lender crossed the line of traditional lender and conducted itself as an owner and (unwanted) joint venture partner.  Its exercise of dominion and control over the Debtor is vast and illuminating.  It shows the detail and concerted attempts to control the Project including, but not limited to, deciding on which creditors to pay, when and how much to pay them, disregarding proper requisition and draw requests, dictating on closet placement and sizes and dimensions of the residential units, changing architectural drawings, berating the Debtor's consultants and engineers, and even the minutia of demanding a

---

[1]      The Debtor intends to file an adversary proceeding against the Lender and others to recover damages for, *inter alia*, breach of contract, prefabricated default, breach of its implied duty of good faith and fair dealing, unconscionable behavior, fraud, deceit, estoppel, equitable subordination, unjust enrichment, and declaratory relief determining the nature, extent and validity of the Lender's purported loan and lien.

short wave radio antenna be placed on the roof. This was no traditional lender. Instead, it was an intentional concerted bad faith attempt to manipulate and control the Project through devious tactics and unconscionable loan documents.

3. Contrary to the position advanced by the Lender, this case is not a simple two party dispute without creditors. Rather, it is a complex commercial transaction involving insatiable greed and disturbing facts. Indeed, the Debtor has listed numerous general unsecured creditors and an Official Committee of Creditors has been appointed by the Office of the United States Trustee. There is a substantial unity of creditors that are owed money from the Debtor and Sutton Owner related to legitimate services rendered.

4. Further, the Debtor is not a shell entity but rather owns 100% of the membership interest in Sutton 58 Owner LLC ("**Sutton Owner**") as well as contracts to purchase air rights. Sutton Owner owns several assets including 428, 430, and 432 East 58th Street, New York, New York (collectively, the **"Real Property"**). A recent appraisal from the international real estate services firm Cushman & Wakefield dated February 16, 2016 (the "**Appraisal**") reveals a current value of the Project in its present state of at least $181,000,000.00, an amount well in excess of any purported amounts claimed by the Lender and all unsecured debt. A copy of the Appraisal is annexed hereto as **Exhibit "A"**. As such, there is no basis to lift the automatic stay as there is a substantial equity cushion in the Project. The Appraisal exposes the Lender's claims that its collateral is not adequately protected and that the Debtor has no hope of reorganizing as pure fiction.

5. Dismissal at this early stage of the case is not appropriate and will only serve to prejudice all creditors of the Debtor.[2] The Debtor respectfully requests an opportunity to

---

[2]    On March 23, 2016, the Office of the United States Trustee appointed three (3) creditors to the Official Committee of Unsecured Creditors.

propose a plan of reorganization and complete its Project. As the Debtor contemplates a full restructuring of its assets, there is a strong likelihood the Debtor's plan will be confirmed. However, before that occurs, it is necessary to carefully analyze the nature, extent and circumstances of the Lenders' behavior in this matter. Clearly, there is no harm or prejudice to the Lender and the Motion should be denied.

## A.     Procedural Background

6.     On February 26, 2016 (the "**Petition Date**"), the Debtor filed a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

7.     By Order dated March 18, 2016, the Court enlarged and extended the Debtor's time to file its schedules of assets and liabilities and statement of financial affairs, pursuant to Rule 1007(c) of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**") through and including April 7, 2016. See Dkt. No. 26.

8.     The Debtor has continued in the management of its business and the operation of its affairs as a debtor and debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

9.     No Trustee or Examiner has been appointed in this case.

10.     Within two weeks of the Petition Date, on March 10, 2016, the Lender filed its Motion. See Dkt. Nos. 13-15 and 23. The next day, the Lender served discovery under Rule 30(b)(6) and Rule 34 of the Federal Rules of Civil Procedure. The Debtor's documents are due on April 12, 2016. The Debtor has also served discovery on the Lender.

11.     On March 23, 2016, an Official Committee of Unsecured Creditors was formed in this case (the "**Committee**").  <u>See</u> Dkt. No. 28.  The Committee has already agreed on its counsel and a retention application has been filed.

12.     Pursuant to Order of the Court dated March 18, 2016, the Debtor's schedules are to be filed by April 7, 2016.  As such, the Section 341(a) meeting of creditors has been adjourned to April 20, 2016.

13.     Despite that schedules will not be filed by April 7, 2016, and document discovery will not occur until after April 12, 2016, the Lender would not adjourn the Motion or enter into a discovery scheduling order under Rule 7029. In view of this and the Debtor's discovery requests, it is unlikely the Motion can proceed substantively.

**B.     <u>Factual Background</u>**

**i.     <u>The Project</u>**

14.     In 2014, Joseph Beninati ("**Beninati**") embarked on assembling the Project.  The Project's construction alone will provide thousands of job opportunities to the local area beginning from its initial stages.

15.     Simultaneous with negotiating and finalizing numerous contracts for the purchase of three (3) adjoining parcels, significant air rights from neighboring buildings and tenant buyouts, Beninati sought the initial phase of project acquisition financing.  Although Beninati had been speaking with various lenders about financing approximately $60,000,000.00 to fund the first round of acquisition costs, his lawyer, Kalikow Attorney, urged him to engage Kalikow Lender in a lending relationship for this Project.  Despite Beninati's concerns, Kalikow Attorney continued to insist that financing be obtained from Kalikow Lender.  In reliance on Kalikow Attorney, Beninati agreed to use Kalikow Lender for the initial financing.

### ii.    **The First Financing**

16.    On or about January 16, 2015, Gamma, an affiliate or nominee controlled by Kalikow Lender, entered into a loan agreement with Sutton Owner, a non-debtor, in the principal amount, on paper, of $32,250,000.00.  That loan was secured by a first priority mortgage on the Real Property in favor of Gamma (the "**Original Mortgage**").  The salient terms of the Original Mortgage are as follows:

| | |
|---|---|
| Lender: | Gamma Lending S58 LP |
| Borrower: | Sutton 58 Owner LLC |
| Principal: | $32,500,000.00 |
| Interest Rate: | 9% |
| Exit Fee: | $3,547,500.00 (equivalent to 11%) |
| Date: | January 16, 2015 |
| Maturity: | August 1, 2016 |

17.    Also, on or about January 16, 2015, Gamma and the Debtor entered into a Mezzanine Loan Agreement in the principal amount of $20,000,000.00 secured by the Debtor's pledge to Gamma of security interest in its membership interest of the Debtor (the "**Original Mezz Loan**").  The salient terms of the Original Mezz Loan are as follows:

| | |
|---|---|
| Lender: | Gamma Lending S58 LP |
| Borrower: | BH Sutton Mezz LLC |
| Principal: | $20,000,000.00 |
| Interest Rate: | 9% |
| Exit Fee: | $2,100,000.00 (equivalent to 11%) |
| Date: | January 16, 2015 |
| Maturity: | August 1, 2016 |

18.    A mezzanine loan, not collateralized in real property, is a higher risk loan than a first mortgage loan and, therefore, will typically earn a higher interest rate.  It is highly unusual for both a mezzanine loan and a first mortgage loan for the same project to bear the same rate of interest.  Curiously, here the Original Mortgage and the Original Mezz Loan bear the exact same rate of interest and have exactly the same terms except for the names and amount borrowed.

19.     At the same time, and as a condition precedent to the loans, Gamma required that Sutton Owner execute an agreement under which Gamma retained the right to exercise an option to purchase a residential unit of its choice from the Project at a present day cost basis with no requirement of a down payment with all transfer taxes to be borne by Sutton Owner or its affiliates (the "**Option Agreement**").  In a seeming attempt to ridicule, the Option Agreement provided that such option may be exercised "on or before the 21st anniversary of the date of the death of the last survivor of the lineal descendants now living of former United States Presidents George H.W. Bush and William J. Clinton, and of former Governors of the State of New York George Pataki and Mario Cuomo . . .".  In other words, Gamma, through Kalikow Lender, demanded the right to wait until well into the 22nd century to purchase a Manhattan residential unit at an early 21st century building costs.

20.     On January 20, 2015, Sutton Owner purchased certain of the buildings for a purchase price of $32,300,000.00.

21.     Days later, on January 23, 2015, Gamma purportedly extended another loan to Sutton Owner in the principal amount of $10,750,000.00.  In connection therewith, Sutton Owner granted a mortgage secured against the Real Property in favor of Gamma in the amount of $11,494,970.00 (the "**GAP Mortgage**").[3]  The salient terms of the Gap Loan are as follows:

| | |
|---|---|
| Lender: | Gamma Lending S58 LP |
| Borrower: | Sutton 58 Owner LLC |
| Principal: | $10,750,000.00 |
| Interest Rate: | 9% |
| Exit Fee: | $4,730,000.00 (equivalent to 44%) |
| Date: | January 23, 2015 |
| Maturity: | August 1, 2016 |

---

[3]     The difference between $10,750,000.00 and $11,494,970.00 relates to additional accrued interest Gamma received in the amount of $744,970.00.  See GAP Mortgage at ¶ 27(b).

22.     Upon information and belief, bifurcating Beninati's request for a $63,000,000.00 loan into the Original Mortgage and the Original Mezz Loan, each held by the same lender with substantially similar terms was intended to provide Gamma and Kalikow Lender with a mechanism by which to circumvent the traditional real property foreclosure process. Beninati was not aware that the loan would be split this way until shortly before the closing. When made aware in the eleventh hour of the splitting of the loans from the same lender under identical terms, Beninati was faced with the last minute prospect of defaulting on each of the property contracts, tenant buyout agreements and air right agreement(s) if he were not to execute the Original Mezz Loan agreements. As such, Beninati was compelled to execute the Original Mezz Loan documents without being afforded a reasonable opportunity by Gamma and Kalikow Lender to digest, negotiate and/or dispute the loan structure.

23.     By Agreement dated January 23, 2015, the Original Mortgage and the GAP Mortgage were consolidated to create a single first priority lien secured against the Real Property in the amount of $45,979,880.00 (the "**Consolidated Original Senior Mortgage**", and together with the Original Mezz Loan, the "**Gamma 1 Loan**").[4] Consistent with its strategy, Gamma did not, however, consolidate the original Mezz Loan. The Gamma 1 Loan Documents each had a maturity date of August 1, 2016. As a result, the Debtor and Sutton Owner had 18 months to satisfy the Gamma 1 Loan.

24.     On January 23, 2015, using the Gamma 1 Loan, Sutton Owner purchased certain air rights in connection with the Project for $8,847,129.00.

---

[4]     Based upon a review of the closing statement and loan files in the Debtor's possession, an entity called Gamma Funding Management provided the proceeds for the Gamma 1 Loan and not the contract Lender on the loan documents.

### iii.    **The Second Financing**

25.    Within months of Gamma 1 Loan, Kalikow Lender realized how lucrative the Project was and the herculean accomplishments of Beninati and his team in putting together this massive assemblage of several properties for the Project. On or about April 10, 2015, while Beninati was seeking new financing sources for the Project's eventual needs, Kalikow Lender started to email Beninati about a new senior first loan to pay off the existing loans with Gamma. Instead of encouraging Beninati to pursue all debt opportunities, Kalikow Attorney and Kalikow Lender collaborated to have Beninati take a new senior loan from the Lender.

26.    As a result, by Acquisition Loan Agreement dated June 19, 2015, Lender purportedly extended a loan to Sutton Owner in the principal amount of $125,850,000.00. In connection therewith, Sutton Owner granted a first priority mortgage secured against the Real Property in favor of Lender (the "**New Senior Mortgage**"). The salient terms of the New Senior Mortgage are as follows:

| | |
|---|---|
| Lender: | Sutton 58 Associates LLC |
| Borrower: | Sutton 58 Owner LLC |
| Principal: | $125,850,000.00 |
| Interest Rate: | 6% |
| Exit Fee: | $25,170,000.00 (equivalent to 40% annualized) |
| Date: | June 19, 2015 |
| Maturity: | January 19, 2016[5] |

27.    Upon information and belief, the proceeds of the New Senior Mortgage were purportedly used to (a) pay off the principal of the Original Mortgage; (b) pay off the principal of the Original Mezz Loan; (c) pay interest; (d) pay exit fees; and (e) pay closing costs. Kalikow Lender even demanded $1,375,000.00 be paid in order to buy back the ridiculously onerous

---

[5]    The maturity date was shortened from August 2016 to January 2016.

Option Agreement.  The Option Agreement did not require payment for its termination through a refinance.[6]

28.     As a result of the foregoing, Gamma, through Kalikow Lender, received the sum of approximately $75,000,000.00 on a $63,000,000.00 loan within a 6-month period.  In doing so, Gamma and Kalikow Lender collected approximately $12,000,000.00 in interest, exit fees and buy back fees within five months of making its original loan (i.e. a 38% annualized interest rate).  Additionally, Kalikow Lender even managed to modify the original loan maturity date from August 1, 2016 to January 19, 2016, a reduction of eight (8) months.  As a result, the Debtor and Sutton Owner now had a shorter window within which to pay off a loan more than double in size.

29.     One of the most troubling pieces to this transaction at the time was the interpersonal relationship of Kalikow Lender and Kalikow Attorney.  Effectively, Kalikow Lender sat at both sides of the negotiating table.  The attorney for the borrower was family to Kalikow Lender.  A review of the loan documents, exorbitant fees, transaction costs and reserves illustrate a strange and unconscionable transaction.  As set forth in the Beninati Declaration, a copy of which is annexed as **Exhibit "B"**, Mr. Beninati was completely trusting that the loan documents would be negotiated in good faith and fair dealing, and that the Debtor's attorney would insure legal documents which were fair and reasonable. This relationship that Kalikow Lender enjoyed was tantamount to insider trading.

30.     By Building Loan Agreement dated June 19, 2015, the Lender extended a loan to Sutton Owner in the principal amount of $1,400,000.00 intended to be used to complete demolition of the existing (now vacant) buildings on the parcels.  In connection therewith, Sutton

---

[6]     Presumably, the Option Agreement could have been extended through the second loan as Kalikow Lender was the principal behind both loans.

Owner granted a mortgage secured against the Real Property in favor of Lender (the "**Building Mortgage**").  The salient terms of the Building Mortgage are as follows:

| | |
|---|---|
| Lender: | Sutton 58 Associates LLC |
| Borrower: | Sutton 58 Owner LLC |
| Principal: | $1,4000,000.00 |
| Interest Rate: | 6% |
| Exit Fee: | $280,000.00 (equivalent to 40% annualized) |
| Date: | June 19, 2015 |
| Maturity: | January 19, 2016 |

31.     The proceeds of the Building Mortgage were purportedly used to pay transactional costs and fund certain reserves.  Such reserves included an interest reserve in the amount of $49,933.00, a demolition reserve in the amount of $1,243,000.00 and an architectural reserve in the amount of $107,067.00.

32.     By Mezzanine Loan Agreement dated June 19, 2015, the Lender purportedly extended a loan to the Debtor in the principal amount of $20,000,000.00 secured with the Debtor's pledge of its membership interest (the "**New Mezz Loan**", and together with the New Senior Mortgage and the Building Mortgage, the "**Gamma 2 Loan**").  As noted above, the Debtor has never received an accounting from Kalikow Lender as to the funding of this loan and the use of such proceeds. In fact, as the New Mezz Loan documents provide that the New Mezz Loan was only to be used for capital contributions and was always held by Kalikow Lender, the Debtor never received the New Mezz Loan, as it was never disbursed.[7] Equally as important, according to the Lender's own payoff statement, the Debtor was never in default and had unused reserves on this purported New Mezz Loan of $3,300,000.00.[8]

---

[7]     The Debtor was not even permitted to have a pre-petition bank account.

[8]     Despite repeated demand, Kalikow Lender has never been able to reconcile the loans.

33.     The salient terms of the New Mezz Loan are as follows:

| | |
|---|---|
| Lender: | Sutton 58 Associates LLC |
| Borrower: | BH Sutton Mezz LLC |
| Principal: | $20,000,000.00 |
| Interest Rate: | 6% |
| Exit Fee: | $4,000,000.00 (equivalent to 40% annualized) |
| Date: | June 19, 2015 |
| Maturity: | January 19, 2016 |

34.     As a result, the Debtor effectively transferred a pledge of its membership interests to the Lender and paid approximately $4,100,000.00 in exit fees without receiving any consideration in exchange. It is clear that the New Mezz Loan was concocted without prior notice or explanation to Beninati merely as a way to circumvent the State Court mortgage foreclosure process and strip the Debtor of its rights and the ability to raise the wrongdoings of the Lender. Although Beninati protested the structure to his counsel, Kalikow Attorney structured the legal documents to effectively harm or place the Debtor in a precarious position.

35.     As set forth in the Beninati Declaration, the relationship with the Lender became difficult in or about August 2015. Then, in or about September 2015, the Debtor, and/or Sutton Owner, through its normal procedure, requisitioned $3.5 Million Dollars ("**Draw No. 3**") from the funds controlled by the Lender. In connection with Draw No. 3, the Debtor and Sutton Owner sought to pay architects, engineers, contracts, vendors, payables, development fee, etc. Lender only partially funded Draw No. 3. It also failed to explain why it did not fully fund Draw No. 3. The Debtor never received written notice of any default in September 2015 and never received written notice of Lender's failure to fund.

36.     With a week thereof, the Debtor and Sutton Owner sought an additional draw of $4.5 Million Dollars ("**Draw No. 4**"). The purpose of Draw No. 4 was to fund payments to complete the assemblage, fund crucial architects and engineer expenses to advance the permit

process on the Project and to stay ahead of any rezoning effects, and to pay other critical carrying costs.

37.     Lender again failed to fully fund Draw No. 4 for the first time alleging that the demolition permit was held up and that the assemblage was inadequate related to a fictitious issue they concocted about 426 East 58th Street.  To make matters worse, Lender began to send payments directly to vendors on Draw No. 3 and Draw No. 4 in an irreconcilable manner that the respective vendor did not know how to apply such payment(s).  This direct payment scheme was yet another way for the Lender to exert control of the Project and, in essence, this caused Beninati and his team of professionals over 100 hours to properly reconcile the lack of draw payments and vendors who were owed money, depriving Beninati of the time to refinance the Gamma 2 Loan.

38.     During this timeframe, the parties' relationship became very tense.  Beninati then sent a letter to his counsel expressing his frustrations with the situation with how Kalikow Lender carelessly wrangled his accounting systems and then sent a letter to his counsel about how the Lender forced the signing of a pre-negotiation letter (as explained below), just so that Draw No. 4 could be resubmitted. The Lender then terminated all funding and communications with the Debtor.

39.     One of the most telling and disturbing collaborations by Kalikow Lender and Kalikow Attorney took place in December 2015, forty-five (45) days before maturity of the loan. As a condition to even speaking with Kalikow Lender, the Debtor was advised and directed to execute a pre-negotiation letter prepared by Kalikow Attorney which provided, among other things, a purported waiver and release of (a) any lender liability claims against Lender and Kalikow Lender, and (b) any attorney conflict claims against Kalikow Attorney (the "**Waiver Letter**").  Without such a document, Kalikow Lender was not ready to start its non-judicial

private UCC foreclosure sale. Once the Waiver Letter was executed, Kalikow Lender agreed to resume communications.

### iv.    The Attempted Non-Judicial U.C.C. Sale

40.    In a shifty and calculated maneuver, Lender scheduled a non-judicial U.C.C. sale of the Debtor's membership interests to be held in early February 2016 the "**UCC Sale**").[9] Kalikow Attorney then stepped out of the picture after involving himself in the disputes between Debtor and Lender and making the Debtor and affiliates execute the Waiver Letter which provided Kalikow Attorney with a purported release.

### v.    The State Court Preliminary Injunction Action

41.    On February 17, 2016, the Debtor and Sutton Owner commenced an action in the Supreme Court of the State of New York, County of New York (the "**State Court**") captioned as, Sutton 58 Owner, LLC and BH Sutton Mezz LLC v. Sutton 58 Associates, LLC, under Index Number 650832/2016, seeking a temporary restraining order and preliminary injunction enjoining the UCC Sale from moving forward on February 29, 2016 (the "**State Court Action**"). After initially obtaining a TRO, the State Court denied the Debtor and Sutton Owner's request for a preliminary injunction. Contrary to the Lender's assertions in its Motion, the State Court did not make any determination regarding any of the issues raised herein. If fact, the impropriety and devious efforts by Kalikow Lender were not even raised in the Sate Court Action. Instead, the focus was pointed towards the procedures and reasonableness of a UCC foreclosure sale. In fact, there is no written decision from the State Court. Here, the Debtor is not seeking to litigate the same issues from the State Court Action.

---

[9]    The UCC Sale was eventually re-scheduled for February 29, 2016.

42. In order to protect its interests and rights, the Debtor requires the watchful eye of the Bankruptcy Court due to the numerous grounds of impropriety on the part of the Lender throughout the underlying transactions.

## THE LENDER HAS FAILED TO SUSTAIN ITS BURDEN OF PROOF

**C.** **The Debtor's Bankruptcy Was Not Filed in Bad Faith**
**and Dismissal is not Warranted**

43. Quite simply, Lender has failed to sustain its burden of proof in causing the case to be dismissed. Section 1112(b) of the Bankruptcy Code ("**Section 1112(b)**") provides, in relevant part, that a Chapter 11 case may be dismissed if the movant establishes cause and demonstrates that such dismissal is in the best interests of creditors and the estate. See 11 U.S.C. § 1112(b). Further, a motion to dismiss under Section 1112(b) of the Bankruptcy Code requires a showing of cause by a preponderance of the evidence. In re St. Stephen's 350 East 116th Street, 313 B.R. 161, 170 (S.D.N.Y. 2004). When moving the court to dismiss a bankruptcy case for bad faith, the "burden is on the movant to prove bad faith, and dismissal for bad faith is used sparingly to avoid denying bankruptcy relief to statutorily eligible debtors except in extraordinary circumstances." In re Century/ML Cable Venture, 294 B.R. 9, (S.D.N.Y. 2003). "Dismissal of a Chapter 11 case is a drastic measure and the burden is on the movant to prove the relief requested is warranted and not premature. In re Dark Horse Tavern, 189 B.R. 576 (N.D.N.Y. 1995) citing In re Sal Caruso Cheese, Inc., 107 B.R. 808, 817 (Bankr. N.D.N.Y. 1989). "The harshness of dismissal mandates that dismissal result only upon a strong evidentiary showing." In re Dark Horse Tavern, 189 B.R. at 580.

44. The Lender has failed to meet its burden in seeking dismissal of the case. The Lender has asserted nothing more than bald, unsubstantiated and conclusory statements in support of its Motion. Equally as important, the Lender has failed to articulate with evidence the

actual disbursement of money to or for the benefit of the Debtor. To grant the Motion without Lender sustaining its burden would be inequitable and substantially prejudicial to the Debtor.

45. First, Lender argues the Debtor does not have creditors. This is simply untrue. The Debtor has creditors and the Office of the United States Trustee appointed a Committee. Next, it argues the loan documents do not permit the Debtor to incur debt more than $50,000.00. Even if that were true, the remedy is for Lender to seek recourse against the Debtor for incurring the debt. However, legitimate creditors, who do not have knowledge of Kalikow Lender's intricate loan documents cannot be prejudiced. Last, the Motion is premature. In fact, Kalikow Lender served discovery which is not due until after the hearing on the Motion. At the very least, the Debtor would request that the Court establish a briefing schedule and set the matter down for an evidentiary hearing.

46. In the instant case, the facts and course of dealings between the Debtor and Lender as delineated above clearly illustrate that cause does not exist to dismiss this case. In fact, the Debtor was indisputably impeded by Lender from focusing on developing the Real Property and seeking proper financing from other traditional lenders due to Kalikow Lender's constant, continuous and predatory actions to undermine the Debtor and its affiliates efforts so that Kalikow Lender could take control of the Project. As stated herein, the Lender dragged the Debtor through an administrative nightmare by failing to respond to requisitions, improperly paying certain vendors directly, and not paying others. This caused the Debtor and its team to spend countless weeks reconciling their accounts while vendors refused, due to a lack of payment, to perform additional services needed to be able to progress and refinance due to lack of payment. Moreover, Lender continued to derail the Debtor by refusing to fund legitimate Project expenses even though sufficient funds remained in their reserve accounts. As such,

Lender defaulted on its own obligations under its loan documents with the Debtor, and its prefabricated defaults are insufficient to sustain its burden.

47.     Furthermore, the Debtor is not attempting to re-litigate matters already decided upon in the State Court Action.   The discreet relief sought in the State Court Action was obtaining a preliminary injunction so that the UCC Sale would be adjourned to allow for a determination of the merits of the disputes and the commercially reasonable nature of the purported sale.   Here, the Debtor seeks protection from this Court and an opportunity to restructure its financial affairs so that it may exit its Chapter 11 bankruptcy in a reorganized manner.   The Motion seeks to deny the Debtor this right within the first 2-weeks of the case in an effort to avoid the true substantive issues in the case.

48.     Accordingly, the Debtor respectfully submits that this bankruptcy case was filed in good-faith and the Motion should be denied.

**D.      The Totality of the Circumstances**

49.     The Second Circuit has stated that when it is clear from the filing date that if the debtor has no reasonable probability of emerging from bankruptcy and no realistic chance of reorganizing, then the filing may be frivolous.   In re C-TC 9th Avenue Partnership, 113 F.3d 1304 (2d. Cir. 1997) citing In re Cohoes Indus. Terminal, Inc. 931 F.2d 222 (2d. Cir. 1991).   In this case, no such showing has been made by Kalikow Lender.   Clearly, based upon the facts of this case and the improper and underhanded conduct of Kalikow Lender, the Debtor's case was not filed in bad faith.   Rather, the Debtor submits that its bankruptcy filing was proper and, but for the protections afforded by the Bankruptcy Code, the Debtor would have lost its entire investment.

50.     The C-TC Court provided a list of factors for a court to consider when making a bad faith determination.   See In re C-TC 9th Avenue Partnership, 113 F.3d at 1311, citing

Pleasant Point Apartments, Ltd. v. Kentucky Hous. Corp., 139 B.R. 828, 832 (W.D.Ky. 1992).
See also In re Adorn Glass & Venetian Blind Corp., 2005 WL 3481325 (S.D.N.Y.).

51.     However, when evaluating the C-TC factors, a court will not simply "engage in a mechanical counting exercise" to determine if bad faith existed.  Century/ML Cable Venture, 294 B.R. at 35.  A court will look at the totality of the facts in each specific case.  In re R & G Properties, Inc., 2009 WL 1076703 (Bkrtcy. D. Vt.) citing In re FMO Assocs. II, LLC, 402 B.R. 546, 2009 WL 367540 (Bankr. E.D.N.Y. 2009). See In re Cohoes Industrial Terminal, Inc., 931 F.2d at 227 (the court must consider the totality of circumstances to determine if there is substantial evidence to indicate that the debtor made a bad faith filing).  The R & G Court reiterated this point by stating that simply checking off factors which are present does not prove bad faith.  See In re R & G Properties, Inc., 2009 WL 1076703 (Bkrtcy. D. Vt.).  As demonstrated herein, the totality of the circumstances negates any bad faith determination of the Debtor's filing.

52.     "In evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended.  When a debtor is motivated by plausible, legitimate reorganization (or liquidation) purposes and not solely or predominantly by the mere desire to prevent foreclosure or hinder creditors, bad faith is not present in a chapter 11 case." In re 68 W. 127 St., LLC, 285 B.R. 838, 844 (quoting In re Clinton Centrifuge Inc., 72 B.R. 900, 905 (Bankr. E.D.Pa. 1987). See also, In re 221-06 Merrick Blvd. Assocs. LLC, 2010 Bankr. LEXIS 4431.  The critical test of a debtor's bad faith remains whether on the filing date there was no reasonable likelihood that the debtor intended to reorganize and whether there is no reasonable possibility that the debtor will emerge from bankruptcy.'" In re Loco Realty Corp., 2009 Bankr. LEXIS 1724, 2009 WL 2883050, at *3) (quoting In re 68 W. 121 St., LLC, 285 B.R. 838 (Bankr. S.D.N.Y.

2002)) (internal quotation marks omitted). Here, the Debtor has filed for bankruptcy relief with the intent to reorganize.

53. Lender erroneously claims that the Debtor filed for Chapter 11 relief for an improper purpose. To the contrary, the events leading up to the Petition Date and Lender's lack of willingness to comply with its own obligations and underhanded maneuvering throughout their relationship, asserted by the Debtor's own attorney, forced the Debtor to seek the protections under the Bankruptcy Code. As stated earlier, it was Lender that breached first and created fabricated defaults. It stopped funding without notice, allowed insurance to lapse and failed to pay the demolition company so that existing structure could be demolished and construction work could proceed.

54. Equally important, the Debtor never received any of the loan proceeds from Lender. Instead, Lender controlled the loan proceeds and the Debtor does not even have knowledge of whether loan proceeds were used. Compounding the bad faith, Lender stalled material payments, denied certain payments and/or sent partial payments to vendors without any way for the Debtor and vendors to reconcile such payments. These calculated acts and omissions by Kalikow Lender deprived the Debtor from properly developing the Project while it was already vulnerable due to the unsustainable position it was placed in by Kalikow Attorney. In essence, Lender orchestrated a scheme in which it used inside information from its principal's cousin to force its way to be the lender on this Project and concoct all sorts of measures to derail the development of the Project so that it can conduct a non-judicial sale of the Debtor's ownership of the fee owner. Lender effectively violated the Debtor's rights at every stage of their relationship by forcing it into a position in which it could not develop the Real Property and refinance its debt. The Lender and Kalikow Attorney then went for the final knock out by forcing the Debtor to execute the Waiver Letter which granted an unconscionable one-sided

waiver in an attempt to shield themselves from all wrongdoings. The Debtor is simply looking

to perform its development of the Project and hold Kalikow Lender responsible and accountable

for its improper behavior. This can only happen through the oversight of this Court.

**E.     Good Faith Attempt to Reorganize**

55.     One of the issues in determining if there is a bad faith filing is whether there was,

on the filing date, a good faith intent to reorganize and a lack of any intent to use the bankruptcy

process **solely** as a means to delay, frustrate, and re-litigate state court issues. In re Sletteland,

260 B.R. 657 (S.D.N.Y. 2001). Here, the Debtor seeks its full and rightful opportunity to

properly reorganize its affairs. Absent the impediments experienced thus far in connection with

Kalikow Lender and its affiliates blatant and "behind the scenes" hindrances, the Debtor would

have an opportunity to reorganize.[10]

56.     The State Court Action centered around an issue not before this Court and the

Debtor does not simply seek to delay matters. In fact, the Debtor is already cultivating a plan to

reorganize its affairs under the Bankruptcy Code and plans to file a motion for debtor in

possession financing soon. It is in the best interests of the Debtor's estate and its creditors that

the Debtor be provided every opportunity to succeed in Chapter 11. Kalikow Lender's egregious

conduct and premature request for relief should not be rewarded to the detriment of the creditors

of the Debtor's estate.

**F.     Providing the Debtor with "Breathing Space"**

57.     The Debtor had been in bankruptcy for approximately 13-days when Lender filed

the Motion. Although the Debtor filed a motion seeking an extension of its time file its

schedules and Statement of Financial Affairs, Lender filed the Motion without any party having

---

[10]     The Debtor was even prepared to pay Kalikow Lender's entire Mezz Debt shortly before the bankruptcy
but Kalikow Lender denied the opportunity to be repaid stating "there is more equity here over our loan
proceeds".

an opportunity to review the schedules. Prior to filing the Motion, neither the Initial Debtor's Interview nor the 341 Meeting had even been conducted.

58. The Second Circuit, in <u>Cohoes</u>, stated:

> Indeed, because a major purpose behind our bankruptcy laws is to afford a debtor some **breathing room** from creditors, it is almost inevitable that creditors will, in some sense, be "frustrated" when their debtor files a bankruptcy petition. In reality, there is "a considerable gap between delaying creditors... and the concept of abuse of judicial purpose."

<u>In re Cohoes Industrial Terminal, Inc.</u>, 931 F.2d at 228 (citations omitted and emphasis added).

59. The Debtor is entitled to the breathing space afforded by the Bankruptcy Code. Here, Kalikow Lender is attempting to deprive the Debtor's breathing space to focus on critical matters much like Kalikow Lender did pre-petition. Dismissal of this case is not in the best interest of the estate given the pre-petition circumstances that have transpired and bad faith dealings by Kalikow Lender, as detailed herein.

60. While the Debtor believes the Motion should be denied in its entirety, if the Court believes there is any basis to proceed, the Debtor would request discovery, briefing and an evidentiary hearing.

**G.    The Automatic Stay Should Not be Vacated**

61. Lender falls woefully short of what is necessary to sustain granting relief from the automatic stay. As stated above, the bad faith arguments lack any credible merit and were made simply to cast doubt on the Debtor's efforts to reorganize.

62. Critically absent from the Motion is any reference to the value of the Project and/or the membership interests in both the Project's current state and fully developed state. The Debtor submits that such an indication that Lender is truly aware of the significant equity in the Real Property that is well beyond its purported liens. As such, Lender's failure to submit an

appraisal warrants denial of its Motion as it has failed to establish that there is no equity in the Real Property.

63.     As Lender is aware, the Debtor obtained an Appraisal dated February 22, 2016 from Cushman & Wakefield, Inc.  Specifically, the Appraisal provides the following valuations of the Real Property:

| | |
|---|---|
| "As Is": | $    181,000,000.00 |
| Value as "Fully Massed":[11] | $    256,000,000.00 |
| Value upon Completion of Foundation: | $    276,000,000.00 |
| Value upon Completion of Development: | $ 1,000,000,000.00 |

64.     Pursuant to a payoff letter from Lender dated January 14, 2016, the aggregate amount needed to satisfy the Gamma 2 Loans which consist of the New Senior Mortgage, the Building Loan and the New Mezz Loan is $155,834,596.25.  Although the Debtor disputes that Kalikow Lender is even owed that much, the "As Is" appraisal value provides an equity cushion in excess of $26,000,000.00.  The Debtor is close to being a "Fully Massed" position.  When this occurs, the Project will have an appraised value in excess of $100,000,000.00 more than Lender's purported liens.  Cleary, there is significant equity in the Real Property and, therefore, relief from stay is not warranted.

65.     Upon information and belief, part of the Lender's pre-petition plot to stop funding demolition was in furtherance of its efforts to give the phantom appearance of a smaller equity cushion.  The Debtor submits that the Lender filed this Motion in the very early stages of this bankruptcy in a disingenuous attempt to cloud the Debtor's filing with irrelevant information.  Lender's actions both pre-petition and post-petition have been in bad faith and an improper attempt to strip the Debtor and Sutton Owner of their ability to properly perform.

---

[11]     For the purposes of the Appraisal, "Fully Massed" means when the purchase of the assemblage of all the property rights, tenant buyouts and air rights are consummated.

66.     Based on the foregoing, the Debtor respectfully submits that the relief requested in the Motion is, at best, premature as the Debtor requires time to receive and analyze documents pertaining to the questions and concerns that arise surrounding the nature, extent and validity the New Senior Mortgage, the Building Loan, the New Mezz Loan, the exorbitant exit fees of $40,000,000.00, and the nature of information and confidence obtained by Kalikow Lender from Kalikow Attorney.  In fact, the only way to protect the integrity of this judicial process is to deny the Motion and compel disclosure of crucial documents and information from Kalikow Lender.

67.     Based on the reasons set forth above, the Debtor respectfully submits that the Motion should be denied in its entirety.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an order denying the Motion in its entirety, and granting such other and further relief as is just and proper.

Dated: March 31, 2016
        Wantagh, New York

                                        **LaMonica Herbst & Maniscalco, LLP**
                                        Proposed Attorneys for the Debtor

                        By:     *s/ Joseph S. Maniscalco*
                                Joseph S. Maniscalco, Esq.
                                Jordan Pilevsky, Esq.
                                3305 Jerusalem Avenue, Suite 201
                                Wantagh, New York 11793
                                (516) 826-6500