KRAMER LEVIN NAFTALIS & FRANKEL LLP

1177 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 715-9100
Fax:  (212) 715-8000
Adam C. Rogoff, Esq.
P. Bradley O'Neill, Esq.
Natan Hamerman, Esq.

*Attorneys for Sutton 58 Associates LLC*

UNITED STATES BANKRUPCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
..........................................................  x
                                                    :
In re                                               :     Chapter 11
                                                    :
BH Sutton Mezz LLC,                                 :     Case No. 16-10455 (SHL)
                                                    :     Judge Sean H. Lane
            Debtor.                                 :
                                                    :
..........................................................  x
```

## SUTTON 58 ASSOCIATES LLC'S REPLY MEMORANDUM
## IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THIS CHAPTER 11 CASE
## PURSUANT TO BANKRUPTCY CODE § 1112(b) OR, IN THE ALTERNATIVE, TO
## MODIFY THE AUTOMATIC STAY PURSUANT TO BANKRUPTCY CODE § 362(d)(1)

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................................... 1

Argument ................................................................................................................... 4

I.    THE CASE SHOULD BE DISMISSED AS A BAD FAITH FILING ............................ 4

    A.    All of the Governing C-TC Factors Favor Dismissal ............................................4

    B.    The Debtor's Purported Desire to Reorganize Is Neither Genuine Nor Realistic ........................................................................................................10

    C.    The Debtor's Allegations About Lender Are False  and Irrelevant, and Do Not Justify this Bankruptcy ................................................................................13

II.    IN THE ALTERNATIVE, THE AUTOMATIC STAY  SHOULD BE LIFTED BECAUSE LENDER'S INTEREST IN  THE COLLATERAL CANNOT BE ADEQUATELY PROTECTED ....................................................................... 17

Conclusion ........................................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 234-6 W. 22nd St. Corp.*,
214 B.R. 751 (Bankr. S.D.N.Y. 1997) ....................................................................17

*In re 68 W. 127 St., LLC*,
285 B.R. 838 (Bankr. S.D.N.Y. 2002) ....................................................................13

*In re C-TC 9th Ave. P'ship*,
113 F.3d 1304 (2d Cir. 1997)...................................................................... *passim*

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ......................................................................8

*In re Clinton Centrifuge, Inc.*,
72 B.R. 900 (Bankr. E.D. Pa. 1987) .......................................................................13

*In re Cohoes Indus. Terminal, Inc.*,
931 F.2d 222 (2d Cir. 1991)....................................................................................11

*Feeley v. NHAOCG, LLC*,
CA. No. 7304-VCL, 2012 WL 4859132 (Del. Ch. Oct. 12, 2012)...........................5

*In re Fortune Smooth (U.S.) Ltd.*,
No. 93 B 40907 (JLG), 1993 WL 261478 (Bankr. S.D.N.Y. July 6, 1993) ...........19

*In re Jug End in the Berkshires, Inc.*,
46 B.R. 892 (Bankr. D. Mass. 1985) ......................................................................19

*In re Kost*,
102 B.R. 829 (D. Wyo. 1989)..................................................................................19

*In re Krilich*,
87 B.R. 178 (Bankr. M.D. Fla. 1988) .....................................................................13

*In re Lindstrom*,
331 B.R. 267 (Bankr. E.D. Mich. 2005)....................................................................8

*In re McDermott*,
78 B.R. 646 (Bankr. N.D.N.Y. 1985) ......................................................................10

*In re Min Sik Kang*,
No. 1:15-CV-00953 LMB, 2015 WL 5786692 (E.D. Va. Sept. 30, 2015)................5

*In re Nesenkeag, Inc.*,
    131 B.R. 246 (Bankr. D.N.H. 1991) ..................................................................10

*Sapphire Dev., LLC v. McKay*,
    No. 3:15-CV-1097 (MPS), 2016 WL 389961 (D. Conn. Feb. 1, 2016) ...................................11

*In re Syndicom Corp.*,
    268 B.R 26 (Bankr. S.D.N.Y. 2001)..................................................................17

*In re Tri-River Trading, LLC*,
    329 B.R. 252 (B.A.P. 8th Cir. 2005) *aff'd sub nom. DeBold v. Case*, 452 F.3d
    756 (8th Cir. 2006)..................................................................................5

*Ukrainian Sav. and Loan Assoc. v. Trident Corp.*,
    22 B.R. 491 (E.D. Pa. 1982) ...........................................................................19

*U.S. Bank Nat. Ass'n v. 653 Eleventh Ave. LLC*,
    889 N.Y.S.2d 508 (N.Y. Sup. Ct., N.Y. Cnty. 2009) .............................................4

Sutton 58 Associates LLC ("Lender") respectfully submits this reply memorandum in further support of its motion to dismiss this Chapter 11 case, or in the alternative, to modify the automatic stay to permit Lender to pursue its state law remedies against the Debtor in this two-party, single asset dispute.[1]

## Introduction

1.      In its Motion to Dismiss, Lender carefully demonstrated that each of the eight factors established in *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1310-12 (2d Cir. 1997), the governing Second Circuit decision on bad faith filings, weighs in favor of dismissal of this case.  In response, the Debtor says virtually nothing about seven of the eight factors, thereby conceding that:

- it has no assets other than its 100% equity interest in Sutton Owner;
- its sole asset is the subject of state law foreclosure proceedings;
- this is, in essence, a two party dispute between the Debtor and Lender;
- the timing of its bankruptcy petition reflected an attempt to frustrate Lender's exercise of its state law rights;
- it has no cash flow;
- it has no employees; and
- it cannot meet current expenses.

2.      As to the remaining factor – whether the Debtor has few creditors with comparatively small claims – the Debtor offers only conclusory and superficial responses. Instead, the Debtor devotes the overwhelming majority of its brief and declaration to describing the alleged misdeeds of Lender and trying to shift both focus and blame for its (and Sutton Owner's) failure to repay the fully matured Mezz and Property Loans, which aggregate over $171 million (including interest and fees to date).  If anything, the Debtor's response underscores

---

[1] Capitalized terms not defined herein shall have the meanings set forth in Lender's motion (the "Motion") [Docket No. 14].  We refer to the Debtor's Objection to the Motion as the "Obj.," the declaration of their principal, Joseph Beninati, as the "Beninati Dec.," and the Creditors Committee's Objection as "UCC Obj."  Though we dispute both the Committee's and the Debtor's positions with equal rigor, we focus more on the Debtor's Objection because it covers all of the issues that the Committee addresses as well.  By doing so, we do not intend to concede any of the points addressed by the Committee or the propriety of any Committee in this case.

that this proceeding is very much a two-party dispute that, at best, belongs in State Court, not federal Bankruptcy Court.

3.     The Debtor's arguments ignore the central elements required to demonstrate that this case belongs in Bankruptcy Court.  To show that the Debtor has other creditors holding substantial claims, the Debtor does no more than assert that "[t]he Debtor has creditors and the Office of the United States Trustee appointed a Committee."  Obj. ¶ 45.  This circular justification fails, especially since the U.S. Trustee *relied upon the Debtor's (improper) listing of alleged creditors* as part of its Petition.  The U.S. Trustee did not investigate the bona fides of the creditors listed in the Petition, and its appointment is not proof of such status.

4.     There are no contracts to show that *any* of these supposed creditors transacted with Sutton Mezz – a special purpose bankruptcy remote holding company – as opposed to with the non-Debtor property owner, Sutton Owner, or other affiliates of the developer.  Although these documents should be readily available, both the Debtor and the Committee have stonewalled Lender's requests to obtain them.  Surely, if they had vendor contracts naming Sutton Mezz as a counterparty, both the Debtor and the Committee gladly would have provided them.  Instead, they have forced full litigation of this Motion, with its attendant burdens on Lender and the estate.

5.     The underlying invoices Sutton Owner provided to Lender prepetition bolster Lender's position.  Frustrated with the lack of basic disclosures, Lender searched its own files and located invoices for 22 of the 43 "creditors" listed in the Debtor's petition.  *Not one* of the invoices shows Sutton Mezz as the obligor/debtor.  Instead, *all* are addressed to Sutton Owner, or other non-Debtor entities.  Similarly, each and every one of the funds transfer requests provided to Lender is signed on behalf of *Sutton Owner*.  This result should not be surprising,

given Sutton Mezz's purpose as a non-operating holding company.  As importantly, each and every one of these creditors is unaffected by the relief sought by the Lender because *they have claims against Sutton Owner that are structurally senior to any alleged unsecured creditors of the Debtor holding company*.

6.     Ignoring the absence of other creditors (material or otherwise), the Debtor focuses on its alleged intent to reorganize.  Even if true, however, vague hopes of reorganization are beside the point, if the Debtor cannot show a realistic chance of actually accomplishing it.  This case does not involve an overleveraged operating business.  The Debtor is a holding company that owns the equity in a non-debtor single asset real estate entity that owns presently unusable and uninhabitable parcels of land, and air rights – *all for a future development project*.  Sutton Owner's secured debt is also in default.  The Debtor aptly concedes that the Project is *years away* from completion (indeed, it has barely commenced).  Nor does the Debtor dispute that hundreds of millions of dollars of additional financing will be required before the Property can be built, let alone completed so as to generate any revenues.  These substantial future financial requirements – totaling over $500 million – far exceed the amount of matured debt owed to the Lender, which the Debtor and Sutton Owner have been unable to refinance.  (At best, the Debtor might seek to sell its asset – the equity of a defaulting entity.  Such a sale is not a "reorganization").

7.     The absence of any operations is reflected by the docket in this case.  Since filing six weeks, the Debtor has sought nothing but professional retentions and extensions of time.  Even now, all the Debtor offers are vague assurances that it "is already cultivating a plan to reorganize its affairs under the Bankruptcy Code and plans to file a motion for debtor in possession financing soon."  Obj. ¶ 56.  Not only is it unclear why a holding company with no

operations would need a DIP – or how it could obtain one without violating the limitations in its operating agreement – but a DIP loan also is not a reorganization.

8.     Finally, the vast bulk of Debtor's objection is a series of misguided complaints about Lender's actions that are not only false and baseless, but *wholly irrelevant to this Motion*. The *C-TC* test focuses on the Debtor's intent and ability to reorganize. No case the Debtor or the Committee has cited suggests, let alone holds, that a creditor's (alleged) prepetition actions are at all pertinent to that analysis. At best, the Debtor's allegations detail claims that should be brought in State Court. That the Debtor wants the benefit of an unbonded stay of Lender's remedies while it does so does not establish a reorganization purpose.

## Argument

### I.     THE CASE SHOULD BE DISMISSED AS A BAD FAITH FILING

#### A.     All of the Governing *C-TC* Factors Favor Dismissal

9.     The Debtor does not dispute that *In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1310-12 (2d Cir. 1997) is the governing Second Circuit decision on bad faith filings, and that it sets forth eight factors to be considered when analyzing that question. The only *C-TC* factor that the Debtor contests in any significant way is the second factor, concerning whether the Debtor has only few creditors with small claims. It has thus conceded that the remaining *C-TC* factors favor dismissal, and accordingly we will focus only on the second factor.[2]

---

[2] Two statements in the Debtor's objection relate to other factors. First, the objection states that the Debtor owns an air rights contract – which might suggest that it has more than a single asset. Obj. ¶ 4. However, this statement is made without evidentiary support, is not repeated in the Beninati declaration, and, indeed, is contradicted by the Debtor's first day affidavit. Carlinsky Aff. ¶ 12 ("The Debtor's assets consist of its membership interest in Sutton 58 Owner LLC."). Lender is not aware of Sutton Mezz entering into any air rights contract, and does not believe that it did so. There is one executory air rights contract, but Sutton Owner, not Sutton Mezz, is the purchaser. *See* Kalikow Rep. Dec. ¶ 36, Exh. BBB. In any event, if the Debtor entered into an additional contract without Lender's permission, that contract would be void as *ultra vires* under the Debtor's own operating agreement. *See* Motion ¶ 41. Second, the Debtor claims that "this case is not a simple two party dispute" – which would seem to dispute the fourth *C-TC* factor. However, the Debtor's only explanations for its position are nonsensical: (i) it claims that this case involves "greed and disturbing facts" – which just refers to the two-party dispute between the Debtor and Lender; and (ii) it claims that "the Debtor has listed numerous general unsecured creditors" – which appears to refer

4

10.     Lender made various arguments concerning why this factor favors dismissal in its moving papers.  For example, Lender showed that Sutton Mezz was prohibited from incurring any debt other than limited and *de minimis* trade debt of not more than $50,000 in the aggregate that was to be paid off in 30 days.  Motion ¶ 14.  Any other debt would violate the Mezz Loan documents and would therefore be legally void as *ultra vires* under Sutton Mezz's operating agreement.  *Id.* ¶ 41 (citing *Feeley v. NHAOCG, LLC*, CA. No. 7304-VCL, 2012 WL 4859132, at *7 (Del. Ch. Oct. 12, 2012); *In re Tri-River Trading, LLC*, 329 B.R. 252, 265 (B.A.P. 8th Cir. 2005) *aff'd sub nom. DeBold v. Case*, 452 F.3d 756 (8th Cir. 2006); *In re Min Sik Kang*, No. 1:15-CV-00953 (LMB/IDD), 2015 WL 5786692, at *6 (E.D. Va. Sept. 30, 2015)).  The Debtor's sole response is to argue that taking on such debt in violation of the Mezz Loan agreements would merely give Lender a claim against Sutton Mezz.  Obj. ¶ 45.  While Lender undoubtedly would have claims against Sutton Mezz for violations of the Mezz Loan agreements, the Debtor offers no authority of any kind to support its position.  As importantly, the Debtor does not address the operating agreement, or make any effort to distinguish Lender's legal authorities, thereby conceding the point.  In any event, these creditors have other remedies – including against Sutton Owner – and thus would not be prejudiced if their contracts with the Debtor (assuming any exist) are void.

11.     Lender also argued in its moving papers that many (if not all) of the unsecured claimholders identified in the Petition likely were not creditors of Sutton *Mezz*, but instead creditors of Sutton *Owner*.[3]  Lender annexed mechanic's liens filed by two of the

<hr />

to the second *C-TC* factor.  The Debtor does not actually mention any *disputes* other than with Lender.  To the contrary, it states that it does *not* dispute any of the unsecured creditors' claims, and wants to pay all of them in full.  Obj. ¶ 3; Beninati Dec. ¶ 3, n.1.  Accordingly, the Debtor does not effectively contest that this is only a two-party dispute.

[3] The Debtor repeatedly mischaracterizes Lender's position as being that the Debtor has *no* creditors.  This is not correct.  Lender is itself a creditor, and it is possible that there may be a small number of other creditors who may

purported creditors listed in the petition asserting claims against Sutton Owner, not Sutton Mezz. Kalikow Dec. Exhs. EE, FF, & GG. Then, after the U.S. Trustee appointed a Creditors' Committee, and based upon the refusal of the Debtor to provide any documentation, Lender located invoices from each of the committee members asserting claims against Sutton Owner, not Sutton Mezz. Those documents were provided to the U.S. Trustee, and then to the Debtor. Remarkably, in response, the Debtor has provided no contracts or other documents evidencing *any* agreement between *it* and *any* unsecured creditor.

12.     Lender also served discovery requests on the Debtor and a letter requesting voluntary disclosure from the Committee of documents clarifying whether *Sutton Mezz* indeed has any unsecured claims properly asserted against it. Tellingly, both the Debtor and the Committee refused those basic information requests. The inference from these failures is clear – most, if not all, of the unsecured creditors' agreements name only the non-debtor Sutton Owner (or affiliates of Mr. Beninati's development company, the Bauhouse Group), not the Debtor.[4]

13.     Faced with the Debtor's and the Committee's stonewalling, Lender reviewed its own files and found copies of various invoices and other documents relating to 22 of the 43 so-called "creditors" listed in the Petition. The Lender also located funds transfer requests asking for payment to various vendors – all made by Mr. Beninati or his colleagues on behalf of the Sutton Owner. Kalikow Rep. Dec. Exhs. WW and DDD. *None of those*

---

have provided services directly to Sutton Mezz – although Lender has not seen evidence of that to date. However, a small number of such creditors, with small debts, would not alter the analysis of *C-TC* factors. *In re C-TC 9th Ave. P'ship*, 113 F.3d at 1312 (recognizing that "C–TC has few unsecured creditors and their claims are small in relation to [the secured creditor's claim]," and that this factor weighed in favor of a finding of bad faith).

[4] The Debtor and the Committee should simply reveal that it is Sutton Owner (or affiliates of the Bauhouse Group) that have contracts with these vendors and obviate the need for the discovery on this issue that was requested by Lender. If the Debtor and the Committee continue to act vexatiously on this issue – and perhaps even insist on an evidentiary hearing on it – Lender reserves the right to hold them responsible for its costs and fees.

*documents substantiate the existence of unsecured claims against Sutton Mezz.* Rather, all of them show that these unsecured claimants are creditors of Sutton Owner or Mr. Beninati's development entity, Bauhouse Group. These documents include invoices and mechanics' liens from all three members of the Creditors' Committee, and ten of the top twenty "creditors." *Id*. Similarly, at least one purported creditor – AAI Architects, P.C. – which the Debtor listed as one of its 20 largest creditors, has filed a statement confirming that it contracted and dealt with Sutton Owner, and not with Sutton Mezz. It asserts that the same is true of each member of the Committee. [Docket No. 42.] All of this is entirely consistent with the Debtor's status as a non-operating special purpose holding company, subject to the operating restrictions described above and in Lender's Motion. *Supra* ¶ 4, Motion ¶ 10.

14. To sidestep the absence of any contracts, invoices or other documents demonstrating that any of the unsecured claimants identified in the Petition are actually creditors of the Debtor's estate, the Debtor has argued in submissions both to the U.S. Trustee and to this Court that one of its ultimate principals operated it and non-debtor Sutton Owner as "one entity." Kalikow Rep. Dec. Exh. XX; *see also* Beninati Dec. ¶ 3 ("all creditors dealt with me providing them with direction on the Project … the creditors have a right, if not paid, to pursue claims against the Debtor and Sutton 58 Owner… Indeed, work, labor and services were rendered for the Project *as a whole unit*.") (emphasis added); Obj. ¶ 3 ("There is a substantial unity of creditors that are owed money from the Debtor and Sutton Owner related to legitimate services rendered"). As such, the Debtor summarily concludes that it is appropriate to treat creditors of Sutton Owner as creditors of the Debtor.

15. This contention should be rejected for several reasons. First, the Debtor is effectively arguing that its estate should be substantively consolidated with that of the non-

debtor Sutton Owner. But the Debtor has filed no such motion with the Court, let alone made the extraordinary evidentiary showing required to obtain such relief. In the absence of an order directing substantive consolidation, the Debtor's estate is presumed to be separate from that of Sutton Owner, and there is no basis to allow the creditors of that entity to assert claims against the Debtor. *See, e.g., In re Charter Commc'ns*, 419 B.R. 221, 269-70 (Bankr. S.D.N.Y. 2009) ("These chapter 11 cases, however, have not been substantively consolidated and such consolidation may not be inferred"); *In re Lindstrom*, 331 B.R. 267, 269-70 (Bankr. E.D. Mich. 2005) ("Until such time as the Bankruptcy Court has been asked to substantively consolidate the estates of these two Debtors and determines to substantively consolidate them, after due notice and process, the two estates of the Debtors remain separate").

16.     Second, the Debtor's remarkable assertion that it and Sutton Owner were operated as "one entity" violates numerous provisions of the Debtor's operating agreement, which was expressly structured to maintain the Debtor's separate legal status as a "special purpose entity." Among other things, this governance document expressly required that the Debtor:

- "at all times hold itself out to the public as a *legal entity separate and distinct from any other entity* (including any Affiliate of the Company or any constituent party of the Company);"

- "not guarantee or become obligated for the debts of any other Person and shall *not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person*, except as permitted pursuant to the Loan Agreement;"

- "maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person;" and

- "maintain all of its books, records, financial statements and bank accounts *separate* from those of its Affiliates and any constituent party."

Kalikow Dec. Exh B §§ 9(d)(iv)(H), (M), (L), & (G) (emphasis added).

17.     The Debtor's self-serving assertions about its principal's alleged actions treating the Debtor and non-debtor as "one entity" cannot circumvent these clear and unambiguous restrictions on the Debtor's corporate authority.[5]  Indeed, as noted above – and not disputed by the Debtor – actions that violate the Debtor's operating agreement are improper.

18.     Third, the Debtor's assertions are belied by its actions.  While the Debtor has now claimed that it was operated as "one entity" with Sutton Owner, only the Debtor has filed for bankruptcy.  The failure to file Sutton Owner appears designed to obtain a tactical benefit – most prominently, allowing that entity to avoid the single asset real estate ("SARE") requirements in Section 362 of the Bankruptcy Code.  The Debtor should not now be heard to argue that Sutton Owner is really one and the same entity as the Debtor in derogation of the SARE requirements of the Bankruptcy Code.[6]

19.     Fourth, the Debtor's suggestion that dismissal will prejudice creditors is simply wrong.  Obj. ¶¶ 5 and 45.  It is wrong because, as Mr. Beninati acknowledges, the unsecured "creditors" the Debtor has identified actually have claims against non-debtor property owner, Sutton Owner.  Beninati Dec. ¶ 19 (acknowledging that the creditors listed in the Petition have claims against Sutton Owner).  Far from being prejudiced, because Sutton Owner creditors hold claims against the Property owning entity, they are *structurally senior* to unsecured claims against the Debtor.  Additional claims against the parent entity, which owns only the equity in the non-debtor, confers no benefit on the creditors.[7]  The Lender's foreclosure on the

---

[5] Likewise, the "Project" is not a legal entity and the Debtor's use of a defined term cannot disregard proper corporate formalities.

[6] The Lender reserves all of its rights as to the applicability of the SARE provisions.

[7] It is clear that the prejudice is not to the so-called creditors.  Rather, the case was filed to benefit the ultimate principals of the Debtor who failed to refinance the substantial secured indebtedness.  Such disputes between the ultimate principals and the Lender do not alter the dynamics of this two-party dispute.  *See, e.g., In re Nesenkeag, Inc*., 131 B.R. 246, 249 (Bankr. D.N.H. 1991) ("This is simply a 'two-party lawsuit' which has been transferred from the state courts to this court under the guise of a 'reorganization' that amounts to nothing more than

Membership Interest, moreover, will not impair the rights of Sutton Owner's creditors. In fact, those creditors are far more likely to be paid after a UCC foreclosure, because the new owner of the Membership Interest is likely to be an entity with cash available, unlike Mr. Beninati or Sutton Mezz.

20.     The Debtor's argument also is cynical because, if any creditors' claims against Sutton Mezz are voided on *ultra vires* grounds, that it is due to the Debtor's willful violation of the operating agreement. The Debtor's claim that it is now concerned for its supposed creditors when its own misconduct placed them in this situation is disingenuous.

21.     The Debtor and the Committee's counsel also stress the U.S. Trustee's appointment of a Creditors Committee as purported evidence of the validity of those creditors' claims against Sutton Mezz. This is false and circular logic. The U.S. Trustee did not conduct an inquiry into whether the creditors' claims are against Sutton Mezz or Sutton Owner before forming a Committee. The U.S. Trustee's reliance upon the Debtor's creditor list to appoint a Committee does not somehow make that incorrect list correct.[8]

22.     Therefore, all the *C-TC* factors, including the second, favor dismissal.

B.      The Debtor's Purported Desire to Reorganize Is Neither Genuine Nor Realistic

23.     Unable to prevail on the basis of the governing *C-TC* factors, the Debtor instead pleads its supposed desire to reorganize. A self-serving assertion by a debtor that it wants to reorganize alone is not enough (especially for a SARE which has more stringent requirements for filing a plan). "Good faith requires an intent to reorganize accompanied by a

---

further delay during which the equity-holders hope to salvage their investment. No other parties are involved and no need for 'reorganization' in any meaningful sense pertinent to the Bankruptcy Code is shown."); *In re Krilich*, 87 B.R. 178, 183 (Bankr. M.D. Fla. 1988) (petition was filed in bad faith where debtor's sole purpose was preventing foreclosure "in the hope and expectation that the property might increase in value and hopefully might create an equity for the owners.")

[8] The Lender has a pending request before the U.S. Trustee for reconsideration of the formation of the Committee.

reasonable possibility of success; honesty and good intentions are not sufficient." *In re McDermott*, 78 B.R. 646, 651 (Bankr. N.D.N.Y. 1985) (citations omitted). The *C-TC* factors are designed to gauge the veracity and viability of such a desire. *In re C-TC 9th Ave. P'ship*, 113 F.3d at 1310 ("When it is clear that, from the date of filing, the debtor has no reasonable probability of emerging from the bankruptcy proceedings and no realistic chance of reorganizing, then the Chapter 11 petition may be frivolous. Further, … the debtor must have some intention of reorganizing.") *quoting In re Cohoes Indus. Terminal, Inc*., 931 F.2d 222, 227-28 (2d Cir. 1991); *see also Sapphire Dev., LLC v. McKay*, No. 3:15-CV-1097 (MPS), 2016 WL 389961, at *9 (D. Conn. Feb. 1, 2016) (recognizing that *C-TC* described "'reasonable probability' and 'intention to reorganize' as independent requirements that the debtor must meet to invoke the bankruptcy laws – and thus, at least implicitly, as independent bases to dismiss a petition").

24.      Here, the Debtor does not come close to meeting this test. Not only do all of the *C-TC* factors favor dismissal, but there simply is nothing *to* reorganize. The Debtor is a special purpose, bankruptcy remote, holding company. It has no operations, employees or cash flow. Its sole asset is the equity of the Property owning entity. Its Mezz Loan, and its subsidiary's Property Loans, both matured in January and have not been repaid. Importantly, and at best, the Project is *many years away from completion* and from generating any revenues, even assuming the massive investment needed to build and complete the Project is obtained. The principals of the Debtor have tried for years to obtain a fraction of the required financing, and have employed expert consultants, all to no avail. No credible basis exists to believe that this bankruptcy will generate the *hundreds of millions of dollars* needed to proceed with the Project and confirm a feasible plan (beyond that required to repay the Lender in full).

25.     The Debtor's motivation in filing is apparent from the uncontested facts. The Debtor knew that its and its subsidiary's loans were maturing, and did not file for Chapter 11 then, as a company truly interested in reorganizing might have done.  It knew only one day after the loans' maturities that Lender was going to foreclose, and it still did not come to this Court for assistance.  It waited until only a few days remained before the foreclosure sale, and it then ran – not to this Court – but to State Court to seek an injunction.  Only when that injunction was denied, and the sale was looming, did it come to this Court.  The Debtor's first day affidavit candidly admits that it was Lender's looming foreclosure sale that spurred it to file.  Carlinsky Aff. ¶ 18.

26.     Since filing the Petition nearly six weeks ago, the Debtor has not made any applications or motions suggesting a genuine desire or ability to reorganize.  To the contrary, aside from professional retention applications, all it has done is submit requests for delays to prepare basic schedules and have creditor meetings (even though its first day affidavit states that the Debtor has "limited books and records" (*Id.* ¶ 14)).

27.     Even in its Objection the Debtor says virtually nothing about its supposed desire to reorganize.  It merely states that it "is already cultivating a plan to reorganize its affairs under the Bankruptcy Code and plans to file a motion for debtor in possession financing soon." Obj. ¶ 56.  The Debtor fails to provide even a glimpse of what it purportedly is doing to "reorganize its affairs," and how it hopes to achievable a confirmable plan.

28.     The Debtor's statement that it hopes to obtain DIP financing does nothing to stave off dismissal.  DIP financing is not a reorganization or a plan for reorganization.  Nor is there any reason for DIP financing for the Debtor that: (i) is a holding company with one single asset; (ii) has no operations or cash flow; (iii) is in default of its loans (as is its non-debtor

subsidiary); (iv) has no hope for a return on any investment in its non-debtor subsidiary anytime soon; and (v) is barred from taking on additional loans under its governing operating agreement.

29.     In sum, the Debtor's professed desire to reorganize is neither genuine nor realistic.

C.     The Debtor's Allegations About Lender Are False
       and Irrelevant, and Do Not Justify this Bankruptcy

30.     Because the *C-TC* factors favor dismissal, and because the Debtor does not have either a genuine or realistic plan to reorganize, it desperately fills its papers with legally irrelevant and false allegations that Lender engaged in misconduct.  These allegations do not justify keeping this bankruptcy case, for several reasons.

31.     First, the test for dismissal of a bad faith filing focuses on a *debtor's* good faith, not the actions of its creditors.  *See In re 68 W. 127 St., LLC*, 285 B.R. 838, 844 (Bankr. S.D.N.Y. 2002) *citing  In re Clinton Centrifuge, Inc.*, 72 B.R. 900, 905 (Bankr. E.D. Pa. 1987) ("[I]n evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended.").  None of the cases the Debtor cites suggest otherwise.

32.     Second, the claims that the Debtor wants to assert have no place in Bankruptcy Court, and should be litigated (if at all) in State Court.  The Debtor argues that it can "only" hold Lender "responsible and accountable for its improper behavior" with the Bankruptcy Court's "oversight."  This makes no sense.  The State Court (the Debtor's original chosen forum) is a perfectly appropriate and able forum to address all of these alleged claims – whether sounding in contract, tort, law, or equity.  Moreover, the plain meaning of the Debtor's argument is that it wants to continue prosecuting its claims against Lender without losing its Membership Interest, and, therefore, it needs this Court's automatic stay.  This is an

unmistakable request to overrule the State Court, which squarely denied any stay of foreclosure because the Debtor can be made whole by claims for monetary damages. Kalikow Decl. Exh. DD at 38.

33.     This is not the appropriate forum for the Debtor to challenge the State Court's preliminary injunction ruling. If it wants to appeal the denial of the preliminary injunction, it can easily do so in the Appellate Division. The Debtor's displeasure with the outcome of its preliminary injunction motion does not justify commencing a Chapter 11 case, nor is the automatic stay meant to enable evasion of State Court decisions.[9]

34.     Third, the Debtor has no claims or defenses against Lender based on the conduct alleged in its opposition papers because it knowingly released those claims and defenses in December 2015 in a pre-negotiation agreement between the parties (the "PNA"). Specifically, in Paragraph 6 of the PNA, the Debtor expressly agreed as follows:

> [E]ach of the Borrower Parties [*i.e.*, Sutton Mezz and Sutton Owner] waives, releases and discharges any right any of them may now or in the future have to raise any defenses, offsets, cross-claims or counterclaims and/or to make any claim against Lender or any subsidiary, affiliate, successor, assign, officer, director, direct or indirect member (including, without limitation, Gamma Real Estate LLC ("Gamma")), partner, principal, employee, agent, attorney or other representative of Lender or any representative of Gamma (all of the foregoing, "Lender Parties") based upon the Discussions [*i.e.*, prior and contemplated discussions and negotiations concerning the Loan, the Property, the Project, administration of reserves, etc.] and relying on a theory of "lender liability", laches or estoppel or any similar theory.

Kalikow Rep. Dec. Exh. SS ¶ 6.

35.     The Debtor's Objection suggests that, by claiming Lender misconduct, it is hoping this release will not be enforced. But by the time the Debtor signed the release in December 2015, it knew of almost all of its purported misconduct claims, including that: (i)

---

[9] The Debtor tries to distinguish its current claims from those previously asserted in State Court. Obj. ¶ 5. But whatever differences exist are immaterial. The Debtor can easily add any new claims and theories to the State Court action by amending its complaint.

instead of a single loan, it had entered separate property and mezzanine loans not once, but *twice*; (ii) the interest rate of the Mezz Loan was the same as on the Property Loans; (iii) the duration of the second Mezz Loan was shorter than the duration that had been agreed to under the first Mezz Loan; (iv) it had paid "exit fees" on the original loan; (v) Herrick Feinstein attorney Richard R. Kalikow, Esq., had prior and unrelated dealings with the Lender's principals; and (vi) Lender had not paid certain draw requests in the fall of 2015. Yet the Debtor still agreed to the release. This straightforward, knowing and willful release should be enforced in accordance with its terms. *See, e.g., U.S. Bank Nat. Ass'n v. 653 Eleventh Ave. LLC*, 889 N.Y.S.2d 508 (N.Y. Sup. Ct., N.Y. Cnty. 2009) (enforcing a general release in a pre-negotiation agreement that waived defenses and counterclaims in a foreclosure action).[10]

   36. Fourth, the Debtor's allegations, even if considered on their merits, are baseless. The Debtor – led by sophisticated, experienced New York City real estate developers – is attempting to backpedal on agreements it willfully considered, negotiated, and executed. Though all of these allegations of misconduct are irrelevant, Lender is compelled to respond to some of them (and disputes the substance of all of them):[11]

- The Debtor accuses Lender of colluding with Herrick Feinstein's Richard R. Kalikow, Esq. Obj. ¶ 54. This is a false and scurrilous accusation; there was no such collusion. Kalikow Rep. Dec. ¶ 5. Regardless, this "accusation" was both released and waived in the PNA, as the Debtor concedes. Kalikow Rep. Dec. Exh. SS ¶¶ 5-6; Beninati Dec. ¶ 19. The Debtor also agreed to a conflict waiver dated as of December 5, 2014 – more than a year earlier – explicitly waiving any conflicts and confirming that it relied upon independent counsel in agreeing to the waiver. Kalikow Rep. Dec. ¶ 9.

- The Debtor raises several complaints about the financing agreements, including that the second financing resulted in a shorter loan duration than contemplated under the first financing. The Debtor had no obligation to agree to this shorter term, but it

---

[10] Contrary to the Debtor's assertions in its Objection, the PNA also expressly states the Debtor will not claim that the Lender was acting like it was a joint venturer or partner of, or had exercised improper control over, the Debtor. Kalikow Rep. Dec. Exh. SS ¶ 5.

[11] Some additional detail can be found in the Reply Declaration of N. Richard Kalikow.

wanted the additional money that Lender was offering to its subsidiary Sutton Owner (*i.e.*, the increase from $63 million in total loans under the first financing, to $147.25 million under the second). Thus, while the loans' duration changed, so did Lender's risk and exposure. There is no basis to say that this or any other modification to the loan documents was without consideration.

- The Debtor refers to the structure of the loans – including certain aspects of the Mezz Loan – as "highly unusual." Obj. ¶ 18. Yet the Debtor agreed to this structure not once, but *twice* – so the structure certainly was not a surprise on the Mezz Loan presently at issue. Indeed, not only did Mr. Beninati sign a term sheet reflecting this structure some six weeks before the first loans closed, but the borrower actually requested the Mezz Loan because it reduced the amount of the property level mortgage and thus saved Sutton Owner considerable mortgage recording taxes. Kalikow Rep. Dec. ¶ 12. Further, the Debtor, in the State Court proceedings, has already tried and failed to convince Justice Sherwood that this financing structure was inappropriate. Kalikow Dec. Exhs. DD & T; Kalikow Rep. Dec. Exh. YY at 8-10; Obj. ¶ 41; *see also* Exh. ZZ (describing prevalence and benefits to both borrowers and lenders of mezzanine loans).

- The Debtor complains that it never received an accounting from Lender as to the funding of the relevant loans and the use of such proceeds. But the Borrowers were provided with *and signed* closing statements that showed exactly how all funds were dispersed (including to payoff the old loans, acquire new assets, pay expenses, and fund reserves). Kalikow Rep. Dec. Exh. OO.

- Additionally, the Debtor complains that Lender failed to timely fund certain demolition draw requests. However, the Debtor fails to mention that Lender explained in an email in August of 2015 that, under the terms of the Building Loan Agreement, demolition draws were conditioned on the Debtor obtaining demolition permits – which it had failed to do. Kalikow Rep. Dec. Exhs. CCC & PP. Lender reiterated this position in October. Kalikow Rep. Dec. Exh. DDD. As soon as the permits were acquired, Mr. Beninati forwarded them to Lender (and apologized for the delay), and Lender then funded the requests. Kalikow Rep. Dec. ¶ 17, Exh. QQ.

37.     The Debtor's misleading allegations of misconduct are entirely irrelevant

to this bankruptcy proceeding, have been released, and fail even if considered on their merits.[12]

---

[12] The Debtor also misquotes and mischaracterizes a statement from the State Court oral argument. The Debtor claims that Lender's counsel said "we have been ready for this from day one," and that this was a reference to Lender's supposed goal of taking control of the Project. Beninati Decl. at ¶ 6. In fact, the transcript reflects that the discussion concerned Lender's efforts to prepare a commercially reasonable UCC foreclosure sale, and its expectation that the Borrowers would challenge the sale. The actual quote is: "We are not surprised that we are standing here today. We knew it from day one." The full context can be found at Kalikow Decl. Exh. DD pp. 26-27.

38.     Finally, as the Debtor disclosed in its objection, it has now also sought discovery from Lender concerning all of its claims.  That discovery has no relevance to the current Motion because, as noted above, it is the Debtor's good faith and genuine ability to reorganize that matters, not the Lender's alleged conduct.  Instead, the Debtor is hoping to continue to sling mud and delay while improperly benefitting from an automatic and unbonded stay that was previously denied by the State Court.[13]  Indeed, if the Debtor wants to proceed with discovery on issues pertinent to the State Court litigation, then the stay should be lifted and both the foreclosure and State Court litigation can proceed.

II.     IN THE ALTERNATIVE, THE AUTOMATIC STAY
        SHOULD BE LIFTED BECAUSE LENDER'S INTEREST IN
        THE COLLATERAL CANNOT BE ADEQUATELY PROTECTED

39.     The Debtor does not dispute that an application to modify the stay based on a debtor's bad-faith filing is decided under the same standards as a motion to dismiss the entire case.  Motion ¶ 50 (citing *In re 234-6 W. 22nd St. Corp.*, 214 B.R. 751, 757-60 (Bankr. S.D.N.Y. 1997) and *In re Syndicom Corp.*, 268 B.R. 26, 48-49 (Bankr. S.D.N.Y. 2001)).  For the reasons set forth above, these factors all favor Lender.

40.     Lender also previously argued that an alternative reason to lift the stay is that the Debtor has not even attempted to, and cannot, offer Lender adequate protection for the use of Lender's collateral as required by the Bankruptcy Code.  In its Objection, the Debtor does not dispute that it is required to provide adequate protection, and that the value of Lender's collateral faces risks and uncertainty.  It has not suggested that it can provide that adequate protection in the form of payments or the provision of other collateral because it has only one asset, has no operations, and is years away from having any cash flow.  Instead, based on an

---

[13] Consistent with the Debtor's goal of delaying this process, it waited nearly a month after the Motion was made to serve what it has called its "first" discovery requests.

appraisal by Cushman & Wakefield that values the Property at $181 million, the Debtor argues that Lender has an equity cushion and is therefore adequately protected. The Debtor is wrong for several reasons.

41. The Debtor's referenced appraisal of the Property at an "as is" value of $181 million is highly speculative. The site is not yet even the proverbial "hole in the ground," as the demolition is still incomplete. Yet the $181 million figure presupposes that the Property's owner will eventually construct a tower on the site of 204,669 square feet of "zoning floor area", which it describes as the Property's present "best use" and "maximum permitted potential." *See* Obj. Exh. A at pp. 3-4, 22. This appraisal thus also presumes that the Property owner will be willing and able to secure and invest hundreds of millions to finance the construction of such a tower. The current ownership group has been completely unable to do that, even with several expert consultants. The appraisal further presumes that the Property owner and its lenders will be willing to wait *years* before the Property generates any return on investment.

42. The appraisal also is stale because it is already six weeks old, and because nearly all the comparable properties that were used to determine the value were sold in 2014 and 2015. *See* Obj. Exh. A at pp. 18-22. But prices for Manhattan development sites have been falling precipitously in early 2016. Indeed, the head of investment sales at Cushman & Wakefield – the company that produced the appraisal – reported less than two weeks ago that the average market value of development sites "has fallen by 25 to 30 percent over the past few months." *See The Real Deal*, March 26, 2016, (Almost) No One is Buying Land in Manhattan Anymore (annexed to the Kalikow Rep. Dec. as Exhibit EEE).[14]

---

[14] The appraisal itself expressly forbids the Debtor's use of it in this proceeding. It states that it was prepared for another company's "exclusive use" – the purpose is never revealed – and further states that "the Report may not be used by any person(s) other than the party(ies) to whom it is addressed or for purposes other than that for which it was prepared." The report further states that the appraiser is not required to testify. Obj. Exh. A at pp. 2 and 10.

43. Further, the $181 million value needs to be netted against the total debt burdening the Property and the Membership Interest – which is more than $171 million at present, and which is increasing by roughly $2.67 million each month. Kalikow Rep. Dec. ¶ 28. This means that there is no, or almost no, equity cushion – and certainly far less of a cushion than courts routinely require to deem a secured creditor adequately protected. "It is generally agreed that an equity cushion of twenty percent (20%) or more constitutes adequate protection, and an equity cushion of less than eleven percent (11%) is not sufficient with courts splitting as to whether an equity cushion between those two figures constitutes adequate protection." *In re Fortune Smooth (U.S.) Ltd.*, No. 93 B 40907 (JLG), 1993 WL 261478, at *6 (Bankr. S.D.N.Y. July 6, 1993) (citing cases). *See also In re Kost*, 102 B.R. 829, 832 (D. Wyo. 1989) (same); *Ukrainian Sav. and Loan Assoc. v. Trident Corp.*, 22 B.R. 491 (E.D. Pa. 1982) (roughly 10% insufficient); *In re Jug End in the Berkshires, Inc.*, 46 B.R. 892 (Bankr. D. Mass. 1985) (8.3% insufficient). Here, even assuming *arguendo* the validity of the $180 million value, the equity cushion is less than 6%.

44. The Debtor's undisputed maturity defaults and bad-faith delaying tactics have left Lender perilously exposed, and the longer this case continues, the more exposed Lender will be. While there is no harm to the creditors that transacted with Sutton Owner in granting relief from the stay – as their claims remain against non-debtor entities – there is no way for the Debtor to adequately protect Lender. The stay should be lifted.

## **Conclusion**

45.     For the foregoing reasons and those set forth in Lender's moving papers,

Lender respectfully requests that the Court grant Lender's motion to dismiss the case or, in the

alternative, lift the automatic stay and grant such other and further relief as is just.

Dated:  New York, New York
         April 6, 2016

Respectfully submitted,

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By:    /s/ Adam C. Rogoff
        Adam C. Rogoff, Esq.
        P. Bradley O'Neill, Esq.
        Natan Hamerman, Esq.

1177 Avenue of the Americas
New York, New York  10036
Tel:  212-715-9100

*Counsel for Sutton 58 Associates LLC*
