**LaMONICA HERBST & MANISCALCO, LLP**
3305 Jerusalem Avenue
Wantagh, New York 11793
Telephone: (516) 826-6500
Joseph S. Maniscalco, Esq.
Adam P. Wofse, Esq.
Holly R. Holecek, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
In re:

| | |
|---|---|
| BH SUTTON MEZZ LLC, | Chapter 11 |
| a Delaware Limited Liability Company, | Case No.: 16-10455 (SHL) |
| SUTTON 58 OWNER LLC, | (Jointly Administered) |
| a Delaware Limited Liability Company, and | |
| SUTTON 58 OWNER LLC, | |
| a New York Limited Liability Company, | |

Debtors.
-------------------------------------------------------------------x

# CHAPTER 11 DEBTORS' FIRST AMENDED JOINT DISCLOSURE STATEMENT

**LAMONICA HERBST & MANISCALCO, LLP**
Attorneys for the Chapter 11 Debtors

By: Joseph S. Maniscalco, Esq.
Adam P. Wofse, Esq.
Holly R. Holecek, Esq.

3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
Telephone: (516) 826-6500

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE DEBTORS' PLAN OF REORGANIZATION (THE "PLAN") PROPOSED BY THE DEBTORS. NO OTHER REPRESENTATIONS CONCERNING THE DEBTORS, THE VALUE OF ITS ASSETS OR BENEFITS OFFERED UNDER THE PLAN HAVE BEEN AUTHORIZED.

THE APPROVAL OF THE DISCLOSURE STATEMENT MEANS THAT THE BANKRUPTCY COURT HAS FOUND THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT CREDITORS OF THE DEBTORS TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT TO VOTE UPON THE PLAN. [COURT APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION ON THE MERITS OF THE PLAN.] A COPY OF THE PLAN IS ANNEXED HERETO AS EXHIBIT "1" AND DESCRIBED HEREIN.

ANY REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE WHICH ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION WHETHER TO APPROVE THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION; NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTORS AND FROM OTHER SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION AND BELIEF.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. ALL CREDITORS AND OTHER INTERESTED PARTIES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

# TABLE OF CONTENTS

Page

I   INTRODUCTION ......................................................................................... 1
   A.   Background ..........................................................................................1
   B.   The Plan Confirmation Process ........................................................2

II   SUMMARY OF PLAN ................................................................................ 2
   A.   Summary of Categories of Claims:....................................................3
   B.   Summary of Plan Distributions:.........................................................4
   C.   Source of Information .........................................................................6

III   HISTORY OF THE CHAPTER 11 CASE ................................................ 7
   A.   Historical Background Of The Debtors And Events Leading Up To The
       Chapter 11 Filing..............................................................................7
       i.   The Project ............................................................................. 7
       ii.   The January 2015 Financing .............................................. 8
       iii.   The June 2015 Financing ................................................. 10
       iv.   The June Mezz Loan Was Not Funded....................................... 13
       v.   The Breakdown in the Relationship with Kalikow Lender ..................... 14
       vi.   The Attempted UCC Sale and State Court Action.......................... 15
   B.   The Jointly Administered Chapter 11 Cases....................................16
       i.   The Sutton Mezz Case ......................................................... 16
       ii.   The Sutton Owner DE Case ................................................ 17
       iii.   The Sutton Owner NY Case ............................................... 17
       iv.   The Debtors' Assets and Organizational Structure.................. 17
   C.   The Defective Purported Merger Of Sutton Owner NY Into Sutton Owner
       DE...................................................................................................18
   D.   The Adversary Proceeding Against Sutton Lender And Its Affiliates .................22
   E.   The Agreed Cash Collateral Order ....................................................24
   F.   Retention of Professionals ................................................................25
   G.   Claims Bar Dates ..............................................................................26

IV   THE PLAN OF REORGANIZATION......................................................... 26
   A.   Explanation of Chapter 11 ................................................................26
   B.   Claims ...............................................................................................27
   C.   Classes Of Claims or Interests ..........................................................27
       Unclassified Claims...........................................................................27
       1.   Administrative Expenses ..................................................... 27
       2.   Fees and Expenses of United States Trustee............................ 28
       3.   Priority Tax Claims.............................................................. 28
       Classified Claims..............................................................................28
   D.   Treatment of Allowed Claims...........................................................29
       Allowed Administrative Expense Claims ........................................ 29
       United States Trustee Claims............................................................ 29
       Priority Tax Claims ........................................................................... 30

i

Class 1 Claims - Allowed Governmental Unit Lien Claims................................. 30
Class 2 Claims – Disputed Mezz Loan Claim .................................................. 30
Class 3 Claims - Disputed Acquisition Loan and Building Loan Claims ........... 31
Class 4 Claims - Allowed Non-Governmental Real Property Lien Claims.......... 33
Class 5 Claims – Allowed Priority Claims ...................................................... 33
Class 6 Claims – Allowed Unsecured Claims .................................................. 33
Class 7 Claims – Administrative Convenience Claims ...................................... 34
Class 8 Claims – Member Interest ................................................................. 34

V        IMPLEMENTATION OF THE PLAN ......................................................... 34
         Assumption/Rejection of Executory Contracts and Unexpired Leases ............... 37

VI       FEASIBILITY ...................................................................................... 39

VII      CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE
         EFFECTIVE DATE................................................................................ 40

VIII     VOTING ............................................................................................ 40

IX       REQUIREMENT FOR CONFIRMATION OF THE PLAN ......................... 40
         A.     Confirmation Hearing...............................................................40
         B.     Objections to Confirmation........................................................41
         C.     Acceptance of the Plan..............................................................41
         D.     Confirmation of Plan.................................................................41
         E.     Cramdown...............................................................................42

X        EFFECT OF CONFIRMATION; DISCHARGE OF DEBTS; INJUNCTION;
         RELEASE ........................................................................................... 43
         A.     Effect of Confirmation..............................................................43
         B.     Discharge of Debts....................................................................43
         C.     Injunction ...............................................................................43
         D.     Release ...................................................................................44
         E.     Exculpation .............................................................................45
         F.     Co-Debtor Stay ........................................................................45

XI       ALTERNATIVES TO THE PLAN AND OTHER CONSIDERATIONS ..................... 47
         A.     Alternatives to the Plan.............................................................47
         B.     Best Interests of Unsecured Creditors.........................................48
         C.     Liquidation Analysis .................................................................49

XII      RECOMMENDATION OF THE DEBTORS ................................................. 50

XIII     ADDITIONAL INFORMATION............................................................... 50

XIV      TAX CONSEQUENCES .......................................................................... 50

XV       CONCLUSION...................................................................................... 52

# I

# INTRODUCTION

**A.**  **Background**

BH Sutton Mezz LLC, a Delaware Limited Liability Company ("**Sutton Mezz** "), Sutton 58 Owner LLC, a Delaware Limited Liability Company ("**Sutton Owner DE**") and Sutton 58 Owner LLC, A New York Limited Liability Company ("**Sutton Owner NY**"), each a debtor and debtor in possession (collectively, the "**Debtors**") submit this First Amended Joint Disclosure Statement (the "**Disclosure Statement**") pursuant to § 1125 of Title 11 of the United States Code (the "**Bankruptcy Code**"), to creditors of the Debtors (the "**Creditors**") in connection with the: (i) the Debtors' First Amended Joint Plan of Reorganization dated August 911, 2016, proposed and filed by the Debtors (the "**Plan**")[1] with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"); and (ii) hearing on confirmation of the Plan to be scheduled by further notice and/or Order of the Court. Unless otherwise defined herein, all capitalized terms contained herein will have the meanings ascribed to them in the Plan.

Attached as an Exhibit to and accompanying this Disclosure Statement is a copy of the following:

Exhibit "1" - The Plan

BALLOTS ARE BEING PROVIDED TO HOLDERS OF ALLOWED CLAIMS IN CLASSES 1, 2, 3, 4, 5, 6 AND 7 BECAUSE CLASSES OF IMPAIRED CLAIMS ARE PERMITTED TO VOTE ON THE PLAN, WHEREAS CLASSES THAT ARE UNIMPAIRED ARE NOT ENTITLED TO VOTE AND ARE PRESUMED TO HAVE ACCEPTED THE PLAN.

---

[1]    All capitalized terms not defined herein shall be ascribed the same meanings as in the Plan.

**B.**    **The Plan Confirmation Process**

The Bankruptcy Court approved this Disclosure Statement as containing adequate information to permit creditors of the Debtors to make a reasonably informed decision in exercising their right to vote upon the Plan. Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan. Each Creditor should read this Disclosure Statement and the Plan in their entirety.

Pursuant to various provisions of the Bankruptcy Code, only classes of claims that are "impaired" under the terms and provisions of a plan are entitled to vote to accept or reject such plan. Accordingly, pursuant to the Debtors' Plan, Classes 1, 2, 3, 4, 5, 6 and 7 are entitled to vote.

In accordance with Section 1128 of the Bankruptcy Code, the Bankruptcy Court shall schedule pursuant to separate notice or Order a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") before the Honorable Sean H. Lane, United States Bankruptcy Judge, at the United States Bankruptcy Court, One Bowling Green, Courtroom 701, New York, New York 10004-1408. Objections, if any, to confirmation of the Plan shall be served and electronically filed with the Bankruptcy Court in accordance with such further notice from and/or Order of the Court. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned hearing date made at the Confirmation Hearing or at any subsequent adjourned date.

**II**

**SUMMARY OF PLAN**

The table below provides a summary of the classification and treatment of Claims under the Plan. The figures set forth in the table below represent the Debtors' best estimate of the total

amount of Allowed Claims in each of these cases. These estimates have been developed by the each Debtor based on: (i) an analysis of its books and records; and (ii) filed proofs of claim. By an Order of the Bankruptcy Court, July 25, 2016 was set as the last date for filing Proofs of Claim with the Clerk of the Bankruptcy Court for Sutton Mezz and Sutton Owner DE.[2] There can be no assurance that the amount of Claims that may be filed and allowed by the Bankruptcy Court will not exceed the amounts set forth or described herein. Nothing set forth in these schedules shall be deemed an admission by the Debtors as to the existence, validity, priority or amount of any claim asserted against the Debtors. The Debtors fully reserve all of its rights to object to claims.

A.    **Summary of Categories of Claims:**

| Class | Nature of Claims | Approximate Dollar Amount of Claims in Class |
|---|---|---|
| Unclassified – Administrative | Administrative claims of Estate including Professionals pursuant to Court Order | $900,000 in the aggregate for all estate professionals as of July 31, 2016[3]; all other post-petition administrative claims to be paid as they come due or as set forth in the Claims Treatment section below. |
| Unclassified – U.S. Trustee | United States Trustee | Unknown |
| Unclassified – Priority Tax Claims | Priority Tax Claims | $5,800 |
| Class 1 | Governmental Unit Lien Claims | Unknown |
| Class 2 | Disputed Mezz Loan Claims | $20 Million (est.). |
| Class 3 | Disputed Acquisition Loan and Building Loan Claims | $150 Million (est.). |
| Class 4 | Allowed Non-Governmental Real Property Lien Claims | $1.762 Million (approx.) |

---

[2]    The bar date for Sutton Owner NY claims has not yet been set by the Court. It is anticipated, however, that the makeup of the creditor body would be the substantially similar as to the other Debtors' estates.

[3]    Such fees and expenses of the Debtors' estates' professionals will correlate to such services rendered through the date of confirmation, including litigation.

| Class 5 | Allowed Priority Claims | Unknown |
| Class 6 | Allowed Unsecured Claims | $29.1 Million (approx.) |
| Class 7 | Administrative Convenience Claims | $174,432.48 |
| Class 8 | Member Interests | N/A |

**B.**    **Summary of Plan Distributions:** A summary description of each class of Claims and the treatment of such Claims is set forth below:

| Class Description | Treatment |
|---|---|
| **Unclassified: Administrative Claims**<br>This class consists of administrative claims of the Debtors' estates, including professionals employed by the Debtors' estates. | Administrative claims shall be paid as they come due, or in full, in cash, on the Effective Date or on such other date and upon such other terms as may be agreed upon by the holder of such Allowed Claims and the Debtors. Administrative claims of the Debtors' estates' professionals are subject to Court approval. |
| **Unclassified: U.S. Trustee**<br><br>This class consists of outstanding fees owed, if any, to the United States Trustee. | Any fees due to the United States Trustee shall be paid as they come due up through and including the earlier of the date of entry of a final decree closing these Chapter 11 proceedings or the date of entry of an order dismissing or converting these cases to cases under Chapter 7 of the Bankruptcy Code. |
| **Unclassified: Priority Tax Claims**<br><br>This class consists of priority claims held by governmental units. | Allowed Priority Tax Claims of governmental units, if any, will be paid in full, in cash, on or within thirty (30) days after the Effective Date. |
| **Class 1: Governmental Unit Lien Claims** | Allowed Governmental Unit Lien Claims shall be paid in full, without interest, in cash, on or within thirty (30) days after the Effective Date. |
| **Class 2: Disputed Mezz Loan Claims** | In the event that the Debtors are successful in expunging the Mezz Loan Claim in its entirety, this class shall receive no distribution under this Plan and any and all obligations arising under, or in connection with, the Mezz Loan Claim shall be deemed extinguished, null, void and of no further force and effect, and any liens associated with the Mezz Loan shall be stricken of record under the Uniform Commercial Code and/or by the New York County Clerk. In the event that the Debtors are successful in reclassifying the Mezz Loan Claim to a general unsecured claim, this class shall have no further lien or Secured Claim against Sutton Mezz, any liens |

| | |
|---|---|
| | associated with the Mezz Loan shall be stricken of record under the Uniform Commercial Code and/or by the New York County Clerk, and this claim, to the extent and amount allowed by the Bankruptcy Court, will either receive the same distribution as Class 6 – Allowed Unsecured Claims or will be subordinated to all Allowed Claims and classes of these estates on account of the allegations raised in the Complaint and shall be paid from the remaining Sale proceeds, to the extent and amount allowed by the Bankruptcy Court, within 30 days of a judicial determination allowing the Disputed Sutton Mezz Loan Claim by Final Order. In the event that the Mezz Loan Claim is deemed to be a valid secured claim as against Sutton Mezz then in the event of a Sale of the Assets this class will be subordinated to all Allowed Claims and classes of these estates on account of the allegations raised in the Complaint and shall be paid from the remaining Sale proceeds, to the extent and amount allowed by the Bankruptcy Court, within 30 days of a judicial determination allowing the Disputed Sutton Mezz Loan Claim by Final Order. In the event that the Adversary Proceeding has not been determined pursuant to a Final Order prior to a closing on the Sale of the Assets then the Debtors shall reserve funds from the net proceeds of the Sale in connection with the Disputed Mezz Loan Claim. The Disputed Mezz Loan Claim shall not incur any interest or penalties as of the Confirmation Date. |
| **Class 3: Disputed Acquisition Loan and Building Loan Claims** | In the event that the Debtors are successful in expunging the Acquisition Loan and/or the Building Loan Claim in their entirety, this class shall receive no distribution under this Plan and any and all obligations arising under, or in connection with, the Acquisition Loan and the Building Loan shall be deemed extinguished, null, void and of no further force and effect, and any liens associated with the Acquisition Loan and the Building Loan shall be stricken of record by the New York County Clerk. In the event that the Debtors are successful in releasing the secured liens against the Real Property and the Development Rights, and reclassifying the Acquisition Loan and the Building Loan to a general unsecured claim against Sutton Owner DE, Sutton Owner NY, or both, then this class shall have no further lien or Secured Claim against Sutton Owner DE and Sutton Owner NY, any liens associated with the Acquisition Loan and the Building Loan shall be stricken of record by the New York County Clerk, and this claim, to the extent and amount allowed by the Bankruptcy Court, will either receive the same distribution as Class 6 – Allowed Unsecured Claims or will be subordinated to all Allowed Claims and classes of these estates on account of the allegations raised in the Adversary Proceeding and shall be paid from the remaining Sale proceeds, to the extent and |

| | amount allowed by the Bankruptcy Court, within 30 days of a judicial determination allowing the Disputed Acquisition Loan or the Building Loan, or both, by Final Order. In the event that either Acquisition Loan or the Building Loan, or both, are deemed to be valid secured claims as against Real Property and Development Rights then in the event of a Sale of the Assets this class will be subordinated to all Allowed Claims and classes of these estates on account of the allegations raised in the Complaint and shall be paid from the remaining Sale proceeds, to the extent and amount allowed by the Bankruptcy Court, within 30 days of a judicial determination allowing wither the Disputed Acquisition Loan Claim or the Disputed Building Loan Claim by Final Order. In the event that the Adversary Proceeding has not been determined pursuant to a Final Order prior to a closing on the Sale of the Assets then the Debtors shall reserve funds from the net proceeds of the Sale in connection with the Disputed Acquisition Loan Claim and the Disputed Building Loan Claim. The Disputed Acquisition Loan Claim and the Disputed Building Loan Claim shall not incur any interest or penalties as of the Confirmation Date. |
|---|---|
| **Class 4: Allowed Non-Governmental Real Property Lien Claims** | Allowed claims will be paid in full, without interest, on or within thirty (30) days after the Effective Date. |
| **Class 5: Allowed Priority Claims** | Allowed claims will be paid in full, without interest, in cash, on or within thirty (30) days after the Effective Date. |
| **Class 6: Allowed Unsecured Claims** | Allowed claims will be paid, without interest, in cash, from the proceeds remaining from the Sale, within 30 days of the Effective Date. |
| **Class 7: Administrative Convenience Claims** | Allowed claims will be paid 57% of their respective claims from one or more of the Member Interests within thirty (30) days after the Confirmation Order becomes a Final Order. |
| **Class 8: Member Interests**<br><br>This class consists of the member interests of the Debtors. | Allowed Member Interests will retain their respective interests in the Debtors to the extent and nature as they existed on the Petition Date. In an effort to facilitate the Debtors' Plan, the Member Interests shall make a capital contribution to the Debtors in an amount necessary to pay Class 7 claims in accordance with the Plan. |

## C.     Source of Information

The information contained in this Disclosure Statement was prepared by Joseph Beninati ("**Beninati**"), managing member and principal of each of the Debtors, based upon the Debtors' books and records, the Debtors' bankruptcy petition and schedules, and reviewing all proofs of

claim timely filed with the Bankruptcy Court. The estimates of Claims set forth herein may vary from the final amount of Claims allowed by the Bankruptcy Court.

### III

### HISTORY OF THE CHAPTER 11 CASE

A.    **Historical Background Of The Debtors And Events Leading Up To The Chapter 11 Filing**

The Debtors' businesses consist primarily of the development of a 950-foot building in midtown Manhattan (the "**Project**") in the historic Sutton Place neighborhood located at 428, 430 and 432 East 58th Street, New York, New York 10022 (the "**Real Property**"). According to an appraisal prepared by Cushman & Wakefield dated February 22, 2016, the Project is valued at $181 Million "as is," $256 Million "fully massed," $277 Million with a completed foundation and over $1 Billion "as completed". [4]

i.    **The Project**

In 2014, Beninati embarked on assembling the Project. To make his vision a reality, Beninati put together an all-star team of professionals in their respective fields, including the world-renowned and Pritzker Price winning architectural firm of Foster + Partners. Richard Kalikow, Esq. ("**Attorney Kalikow**") of Herrick, Feinstein LLP ("**Herrick**") and Herrick acted as counsel. The individuals involved in the Project are Beninati, Christopher Jones ("**Jones**") and Daniel Lee ("**Lee**" and, together with Jones and Beninati, the "**Sutton Principals**").

On or about June 13, 2014, Sutton Owner NY entered into an agreement of sale with 428-430-432 East 58th Street, LLC ("**RP Seller**") for the purchase of the Real Property for $32,000,000

---

[4]    The values are taken from a February 22, 2016 report completed by Cushman & Wakefield, an independent, sophisticated, world-leading firm that is unaffiliated with the Debtors. The report was completed for an unaffiliated third party that proposes to invest $140 Million into the Project. Separately: (i) two of the largest residential brokerage firms in New York City – Douglas Elliman and Corcoran Sunshine – estimated that the "as completed" building would be valued at $840 Million and $770 Million, respectively.

(the "**RP Agreement**"). Upon execution of the RP Agreement on or about June 13, 2014, Sutton Owner NY paid RP Seller a non-refundable deposit of $3,200,000, with the remaining purchase price to be paid at closing.

Simultaneous with negotiating and finalizing numerous contracts for the Real Property, significant zoning and unused development rights from neighboring buildings and tenant buyouts, Beninati sought project acquisition financing for the initial phase of the Project. Although Beninati had been speaking with various lenders about financing approximately $60 Million to fund the first round of acquisition costs, his lawyer, Attorney Kalikow, urged him to engage N. Richard Kalikow ("**Kalikow Lender**"), Attorney Kalikow's cousin, as a lender for the Project. Despite Beninati's concerns, Attorney Kalikow continued to insist that financing be obtained from Kalikow Lender. In reliance on Attorney Kalikow, Beninati agreed to use Kalikow Lender for the initial financing.

      ii.        **The January 2015 Financing**

On or about January 16, 2015, Gamma Lending S58 LP ("**Gamma Lending**"), an affiliate or nominee controlled by Kalikow Lender, entered into a loan agreement with Sutton Owner NY in the principal amount, on paper, of $32.25 Million (the "**Initial Loan**"). The January Loan was secured by a first priority mortgage on the Real Property and certain development rights in favor of Gamma Lending (the "**Initial Mortgage**"). The loan maturity date was August 1, 2016.

On or about January 16, 2015, Gamma Lending and Sutton Mezz also entered into a Mezzanine Loan Agreement in the principal amount of $20 Million secured by a pledge of Sutton Mezz's membership interest in Sutton Owner NY (the "**January Mezz Loan**"). The loan maturity date was August 1, 2016.

A mezzanine loan, not collateralized in real property, is a higher risk loan than a first mortgage loan and, therefore, will typically earn a higher interest rate. It is highly unusual for both a mezzanine loan and a first mortgage loan for the same project to bear the same rate of interest. Here, the January Mortgage and the January Mezz Loan bear the exact same rate of interest and have exactly the same terms except for the names and amount borrowed. It is the Debtors' position that the bifurcation of Beninati's request for a $63 Million loan into the January Mortgage and the January Mezz Loan, each held by the same lender with substantially similar terms, was intended to provide Gamma Lending and Kalikow Lender with a mechanism by which to circumvent the traditional foreclosure process. Beninati was not aware that the loan would be split this way until shortly before the closing. When made aware in the eleventh hour of the splitting of the loans from the same lender under identical terms, Beninati was faced with the last minute prospect of defaulting on each of the property contracts, tenant buyout agreements and zoning and development agreement(s) if he were not to execute the January Mezz Loan agreements. As such, Beninati was compelled to execute the January Mezz Loan documents without being afforded a reasonable opportunity by Gamma Lending and/or Kalikow Lender to digest, negotiate and/or dispute the loan structure.

At the same time, and as a condition precedent to the loans, Kalikow Lender required that Sutton Owner NY execute an agreement pursuant to which Kalikow Lender retained the right to exercise an option to purchase a residential unit of its choice from the Project at a present day cost basis with no requirement of a down payment with all transfer taxes to be borne by Sutton Owner NY (the "**Option Agreement**").

On January 20, 2015, Sutton Owner NY purchased closed on the purchase of the Real Property for $32.3 Million.

Days later, on January 23, 2015, Sutton Owner NY and Gamma Lending entered into a first amendment to loan agreement, which increased the Initial Loan from $32.24 Million to $43 Million through an additional loan of $10.75 Million (the "**GAP Loan**"). On the same date, Sutton Owner NY executed a consolidated, amended and restated mortgage secured against the Real Property in favor of Gamma Lending in the amount of $45,979,880 (the "**Amended January Mortgage**").[5] The loan maturity date was August 1, 2016.

By Agreement dated January 23, 2015, the January Mortgage and the GAP Mortgage were consolidated to create a single first priority lien secured against the Real Property in the amount of $45,979,880.00 (the "**Consolidated January Mortgage**", and together with the January Mezz Loan, the "**January Loan**").[6] The January Loan Documents each had a maturity date of August 1, 2016. The January Mezz Loan was not consolidated with the January Loan.

In connection with the January Loan, Herrick issued an opinion letter dated January 23, 2016 to Gamma Funding on behalf of Sutton Owner NY and the Sutton Principals.

On January 23, 2015, using proceeds from GAP Loan, Sutton Owner NY acquired certain unused developmental rights in connection with the Project for $8,847,129.00 (the "**Development Rights**").

iii.    **The June 2015 Financing**

The Debtors submit that, within months of the closing on the January Loan, Kalikow Lender realized the lucrative nature of the Project and the extraordinary accomplishments of Beninati and his team in putting together the massive assemblage for the Project. The Debtors

---

[5]    The difference between $10,750,000.00 and $11,494,970.00 relates to additional accrued interest Lender received in the amount of $744,970.00.

[6]    Based upon a review of the closing statement and loan files in the Debtors' possession, another entity owned and/or controlled by Kalikow Lender called "Gamma Funding Management" provided the proceeds for the January Loan and not Gamma Funding, i.e., the contract lender on the loan documents.

submit that, instead of encouraging Sutton Principals to pursue all debt opportunities, Attorney Kalikow and Kalikow Lender collaborated to have the Sutton Principals take a new senior loan from Kalikow Lender, or an entity owned or controlled by him.

As a result, by Acquisition Loan Agreement dated June 19, 2015, Sutton 58 Associates LLC ("**Sutton Lender**"), an affiliate or nominee controlled by Kalikow Lender, Lender extended a loan to Sutton Owner DE in the principal amount of $125.85 Million (the "**Acquisition Loan**"). The maturity date for the loan was January 19, 2016. The Acquisition Loan was evidenced, in part, by a purported $82,850,000 promissory note (the "**Acquisition GAP Note**") and purportedly secured by a mortgage encumbering the Real Property and Development Rights (the "**Acquisition GAP Mortgage**").

The Acquisition GAP Note and original note from the January Loan were then consolidated into a $125,850,000 amended and restated promissory note (the "**Consolidated Acquisition Note**"), representing the entire principal amount of the Acquisition Loan. Similarly, the Acquisition GAP Mortgage and the Consolidated January Mortgage were consolidated into an amended and restated mortgage purportedly securing the Consolidated Acquisition Note (the "**Consolidated Acquisition Mortgage**").

Sutton Owner DE and Sutton Lender also executed a building loan agreement (the "**Building Loan Agreement**") for a loan of $1.4 Million, bearing interest at a rate of 6% per year, and imposing "additional interest" of $280,000 to be paid at maturity or upon prepayment (the "**Building Loan**"). The maturity date for the Building Loan was January 19, 2016. The Building Loan was evidenced by a $1.4 Million promissory note (the "**Building Note**") and secured by a mortgage encumbering the Real Property and Development Rights (the "**Building Mortgage**").

At the same time, Kalikow Lender required Sutton Mezz to execute a mezzanine loan agreement (the "**June Mezz Agreement**") in the face amount of $20 Million (the "**June Mezz Loan**"). The June Mezz Loan was evidenced by a $20 Million promissory note (the "**June Mezz Note**") and purportedly secured by a pledge of Sutton Mezz's membership interest in Sutton Owner DE (the Consolidated Acquisition Note, Building Loan and June Mezz Loan are collectively referred to as the "**June Loan**").

The Debtors believe that the proceeds of the June Loan were used to: (a) pay off the January Loan; (b) purchase Kalikow Lender's Apartment Option for $1.375 Million (a present value price based on Defendants' $1.4 billion valuation of the "as completed" Project); (c) close on the purchase of certain additional development rights and expenses; (d) fund additional interest reserves; and (e) pay transactional costs and fees, including legal fees to Attorney Kalikow in the amount of $628,451.96 in legal fees to Attorney Kalikow's counsel in the amount of $340,000.00. The proceeds from the Building Loan were used to: (a) pay an interest reserve; (b) pay an architectural reserve; and (c) pay a demolition reserve.

As a result of the foregoing, Kalikow Lender's Gamma Lending received the sum of approximately $75 Million on a $63 Million loan within a 6-month period. In doing so, Gamma Lending collected approximately $12 Million in interest, exit fees and buy back fees within five months of making its January Loan (i.e., a 38% annualized interest rate). Additionally, Kalikow Lender further managed to modify the January Loan maturity date from August 1, 2016 to January 19, 2016, a reduction of eight (8) months. As a result, the Debtors now had a shorter window within which to pay off a loan more than double in amount.

It cannot be overstated and is important for all interested parties to note that the interpersonal relationship between Kalikow Lender and Attorney Kalikow. Effectively, Kalikow

12

Lender sat at both sides of the negotiating table. The attorney for the borrower was a close family member to Kalikow Lender. A review of the loan documents, exorbitant fees, transaction costs and reserves illustrate an atypical and unconscionable transaction. The Sutton Principals believed that that the loan documents would be negotiated in good faith and that the Debtors' attorney would act in good faith to ensure the preparation and execution of fair and reasonable legal and loan documents. The Debtors submit that, unbeknownst to the Sutton Principals at the time, Kalikow Lender enjoyed what is tantamount to an insider trading relationship and had knowledge of the Debtors' strategies, benefits and proprietary information not readily available to traditional lenders by virtue of his relationship with Attorney Kalikow.

### iv.    The June Mezz Loan Was Not Funded

Prior to the closing on the June Loan, Kalikow Lender and Sutton Owner DE agreed that Sutton Owner DE would borrow: (a) $145,850,000 as a single loan to refinance the January Loan and to acquire additional development rights; and (b) $1,400,000 as a construction loan to fund the demolition of the existing buildings on the Real Property. They did not agree to a new mezzanine loan. The closing statement from the June Loan reflects what the parties actually agreed to, i.e., a $145,850,000 single mortgage loan rather than Kalikow Lender's allocation of a portion as a loan to attempt to make Sutton Mezz a borrower by technicality.

It is the Debtors' belief that $20 Million was funded as part of the Acquisition Loan and that the June Mezz Loan was not funded at all. A review of documents reveals that no cancelled checks or wire transfers exist regarding a purported funding of the June Mezz Loan.

As a result, the Debtors effectively transferred a pledge of its membership interests to the Sutton Lender and paid approximately $4.1 Million in exit fees without receiving any consideration in exchange. The Debtors believe that the June Mezz Loan was concocted without

13

prior notice or explanation merely as a way to circumvent the State Court mortgage foreclosure process and to strip the Debtors of their rights.

      **v.**       <u>**The Breakdown in the Relationship with Kalikow Lender**</u>

In the summer of 2015, the relationship between the Debtors and Kalikow Lender began to unravel. Beginning in June and culminating in December 2015, Kalikow Lender took greater control over the Project, refused to fund the Project in accordance with the June Loan Documents, ceased communicating with the Debtors and insisted upon a waiver letter before resuming communications with the Debtors, even though the Debtors were never in default of the June Loan.

Pursuant to the Building Loan documents, $107,067 was placed in an "Architect Reserve" for architectural fees incurred in connection with the Project. Additionally, $1,243,000 was placed in a "Demolition Reserve" for costs associated with the demolition of the existing buildings on the Real Property. Despite receiving appropriate disbursement requests, Kalikow Lender refused to fund the $107,067 "Architect Reserve" for architectural fees and the $1,243,000 "Demolition Reserve" for costs associated with the demolition of the existing buildings, falsely claiming that a demolition permit was required as a precondition to any disbursements.

While the Debtors were required to obtain certain demolition permits, the New York City Department of Buildings requires first that three permits be issued for critical initial preparatory work actions such as erecting scaffolding, disconnecting utilities and removing asbestos, which was to be paid for out of the "Demolition Reserve." By failing to make these disbursements, Kalikow Lender prevented the Debtors from completing the very work that is a prerequisite for the permit Kalikow Lender insisted was required. As a result of Kalikow Lender's failure to pay contractors and his refusal to make proper disbursements from the various reserve accounts, the

Debtors were substantially limited in their ability to obtain replacement financing prior to the maturity date of the June Loan.

To make matters worse, in or around August 2015, Kalikow Lender began to send payments directly to vendors in such an irresponsible way that the vendors were unable to reconcile the payments. The wrong vendors, suppliers and contractors were paid and/or some vendors, suppliers and contractors were paid the wrong amount; in some cases they were overpaid but, in most, they were underpaid. This was yet another way for Sutton Lender to exert control of the Project and the Debtors' accounts quickly became delinquent and vendors, suppliers and contractors halted work on the Project. As a result, Beninati, on behalf of the Debtors, was derailed for almost sixty (60) days attempting to reconcile the accounting nightmare created by Kalikow Lender.

By October 2015, Kalikow Lender and Sutton Owner DE's relationship had completely broken down. Beninati sent a letter to Attorney Kalikow expressing his frustrations with the situation and Sutton Lender's and Kalikow Lender's actions. Beninati also sent a letter to Attorney Kalikow about Kalikow Lender's insistence upon a pre-negotiation letter (as explained below), just so Kalikow Lender would meet with the Debtors.

In December 2015, the Debtors were advised and directed to execute a pre-negotiation letter prepared by Attorney Kalikow. The letter provided for, among other things, a purported waiver and release of: (i) any lender liability claims against Lender and Kalikow Lender, and (ii) any attorney conflict claims against Attorney Kalikow (the "**Waiver Letter**"). At the time the Waiver Letter was signed, the Debtors were not in default under the June Loan or the June Mezz Loan and no notices of default had been issued.

     **vi.**     **The Attempted UCC Sale and State Court Action**

Thereafter, on January 20, 2016, Sutton Mezz was sent a Notification of Disposition of Collateral (the "**Original Sale Notice**"), scheduling an auction sale to the highest qualified bidder on February 11, 2016 at Kalikow Lender's counsel's offices (the "**UCC Sale**"), which UCC Sale was subsequently rescheduled for February 29, 2016.

On February 17, 2016, the Debtors commenced an action in the Supreme Court of the State of New York, County of New York (the "**State Court**") captioned as, <u>Sutton 58 Owner, LLC and BH Sutton Mezz LLC v. Sutton 58 Associates, LLC</u>, under Index Number 650832/2016, seeking a temporary restraining order and preliminary injunction enjoining the UCC Sale from moving forward on February 29, 2016 (the "**State Court Action**").

After initially obtaining a TRO, the State Court denied[7] the Debtors' request for a preliminary injunction.

**B.    The Jointly Administered Chapter 11 Cases**

**i.    The Sutton Mezz Case**

On February 26, 2016, Sutton Mezz filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court. On April 6, 2016, Sutton Mezz filed its schedules of assets and liabilities and statement of financial affairs, certain of which were amended on August 5, 2016.

Sutton Mezz has continued in the management of its business and the operation of its affairs as a debtor and debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No Trustee or Examiner has been appointed in the Sutton Mezz case.

On March 23, 2016, an Official Committee of Unsecured Creditors was formed in the Sutton Mezz case (the "**Committee**").

---

[7]    No written decision from the court exists.

Sutton Mezz owns 100% of the membership interest in Sutton Owner DE and Sutton Owner NY.

### ii.      The Sutton Owner DE Case

On April 6, 2016, Sutton Owner DE filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code with the Court.

Sutton Owner DE has continued in the management of its business and the operation of its affairs as a debtor and debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No Trustee or Examiner has been appointed in the Sutton Owner DE case.

On May 3, 2016, an amended appointment of the Committee was filed with the Court.

### iii.      The Sutton Owner NY Case

On July 12, 2016, Sutton Owner NY filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code with the Court.

Sutton Owner NY has continued in the management of its business and the operation of its affairs as a debtor and debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No Trustee or Examiner has been appointed in the Sutton Owner NY case.

Pursuant to Orders of the Court, the Debtors cases are being jointly administered under the Sutton Mezz case.

### iv.      The Debtors' Assets and Organizational Structure

The discovery of the defective purported merger of Sutton Owner NY and Sutton Owner DE precipitated Sutton Owner NY's bankruptcy filing. For the reasons set forth more fully below, the Debtors submit that a legal, valid merger never occurred with Sutton Owner DE. As a result, Sutton Owner NY was and remains a separate and distinct legal entity from Sutton Owner DE. As reflected in its schedules that were filed with the Court, Sutton Owner NY maintains that it owns

the Real Property and Development Rights, free and clear of any liens, claims or encumbrances.

Collectively, the Debtors assert that their assets consist of the following:

| Debtor | Assets |
|---|---|
| Sutton Mezz | 100% interest in Sutton Owner DE<br>100% interest in Sutton Owner NY<br>Accounts Receivable<br>Office Equipment and Furniture |
| Sutton Owner DE | Accounts Receivable<br>Office Equipment and Furniture<br>Cooperative Apartments located at 504 Merrick Road, Lynbrook, New York 11563 |
| Sutton Owner NY | Real Property<br>Development Rights<br>Office Equipment and Furniture |

An organizational chart identifying the Debtors and their non-debtor owners and their owners follows:



## C.    The Defective Purported Merger Of Sutton Owner NY Into Sutton Owner DE

As more fully set forth below, on July 13, 2016, the Debtors filed a complaint (the "**Complaint**") against Sutton Lender and affiliated defendants (the "**Defendants**") seeking damages and relief based upon multiple counts of legal and equitable relief [Adv. Pro. No. 16-

1187 (SHL)]. By the Complaint, the Debtors seek, among other things, a declaration from the Court as to the effectiveness of the purported merger of Sutton Owner NY and Sutton Owner DE and to attack the nature, extent and validity of the purported liens of Sutton Lender on the Real Property and Development Rights.

Prior to filing the Complaint, extensive due diligence was conducted by Debtors' counsel, which included a review of documents and information consensually turned over by Herrick, as well as conversations with the Sutton Principals relating to the purported merger. While Beninati remembered the concept of a merger, it was only contemplated in connection with a closing that never occurred.

Specifically, after the January 16, 2015 closing with Sutton Lender's affiliate, Gamma Lending, Beninati continued negotiations with third party lenders on behalf of Sutton Owner NY. During the negotiations, one of the lenders, Banco Inbursa, S.A., Institución de Banca Múltiple, Grupo Financiero Inbursa ("**Inbursa**") or Power China, requested that the borrower be a Delaware limited liability company as opposed to a New York limited liability company. At the time, the Real Property and Development Rights were owned by Sutton Owner NY and Sutton Owner DE did not exist. According to Beninati, he agreed to have the necessary documents prepared to create a Delaware entity and merge the new Delaware entity with Sutton Owner NY subject to closing with Inbursa and/or Power China. Such a closing never occurred.

On March 10, 2015, Herrick caused Sutton Owner DE to be formed. A paralegal at Herrick identified as James E. Gedeon was purportedly given authority to from Sutton Owner DE in a limited liability company agreement dated March 10, 2015 (the "**Sutton Owner DE Operating Agreement**"). The Sutton Owner DE Operating Agreement provided James E. Gedeon with limited authority to act: "to execute, deliver and file the Certificate of Formation of the Company

with the Secretary of the State of DE, such filing being approved". Upon the filing of the certificate of formation of Sutton Owner DE, the Sutton Owner DE Operating Agreement provides that James E. Gedeon's limited authority ceased. The Sutton Owner DE Certificate of Formation was also signed by "James E. Gedeon" as an "Authorized Person" of Sutton Owner DE. According to Beninati, he did not sign the Sutton Owner DE Operating Agreement. Based upon a review of documents and emails turned over by Herrick, it appears that the signature page from Sutton Owner NY's Operating Agreement executed in January 2015 was reused in the Sutton Owner DE Operating Agreement.

On March 13, 2015, in anticipation of the Inbursa financing, an attorney at Herrick forwarded Beninati a signature page to what would later become an Agreement of Merger of Sutton Owner NY into Sutton Owner DE (the "**Merger Agreement**"). At no time did the Sutton Principals authorize the actual formation of the Sutton Owner DE entity or the merger of Sutton Owner NY into Sutton Owner DE; rather, such formation and merger were contingent upon the closing of the Inbursa and/or Power China loan.

Despite the limited authority granted in the Sutton Owner DE Operating Agreement, on March 17, 2015, James E. Gedeon subsequently filed a Certificate of Merger in Delaware (the "**DE Certificate of Merger**"). On that same date, a Certificate of Merger was also filed with the New York Secretary of State, purportedly executed by Beninati using "s/ Joseph Beninati" as the signature (the "**NY Certificate of Merger**" and, together with the DE Certificate of Merger, the "**Certificates of Merger**"). According to the Sutton Principals, they did not have knowledge of the filing of either the Certificates of Merger and neither they nor Sutton Mezz authorized their filing.

The Merger Agreement, to the extent that it is valid, provides that the merger becomes effective upon the filing of the Certificates of Merger with the New York Department of State and the Delaware Department of State. As neither Certificates of Merger were legally valid, the Debtors maintain that the purported merger of Sutton Owner NY and Sutton Owner DE was never effective. In addition, the Debtors do not believe that a copy of the NY Certificate of Merger was filed with the Clerk of Supreme Court of the State of New York, for the County of New York, as required by section 1003(c) of New York Limited Liability Company Law.

As set forth above, at the closing on the June Loan in June 2015, the debts of Sutton Owner NY were paid off and a satisfaction of those debts was issued. The loan documents associated with the June Loan do not contain any ratification of prior corporate acts or background information related to the purported merger. Instead, the preambles merely identify the borrower as a "successor by merger" and the signature pages indicate that Sutton Owner DE is signing as "successor by merger." Equally as important, neither a corrective deed nor a new deed transferring the Real Property to Sutton Owner DE was ever prepared or recorded. In addition, documents transferring the Development Rights from Sutton Owner NY to Sutton Owner DE were never prepared or recorded. Finally, in stark contrast to the January Loan, Herrick did not issue an opinion letter with respect to the June Loan.

Based on the foregoing, the Debtors maintain that the purported merger of Sutton Owner NY and Sutton Owner DE was defective and Sutton Owner NY owns the Real Property and Development Rights, free and clear of any liens claims and encumbrances.

Sutton Lender maintains that its liens are properly secured and perfected in the Real Property and the Development Rights. On or about July 21, 2016, Sutton Lender filed a proof of claim against Sutton Mezz, which claim was designated as claim number 6-1 by the Clerk of the

21

Court ("**Claim 6**"). Claim 6 was filed as a secured claim in the total amount of $175,632,304. On that same date, Sutton Lender filed an identical proof of claim against Sutton Owner DE, which claim was designated as claim number 13-1 ("**Claim 13**"). Claim 13 was also filed as a secured claim in the total amount of $175,632,304. To the extent the Debtors prevail on their claims in the Complaint relating to the purported merger, Sutton Lender's liens are not properly secured or perfected in either the Real Property or Development Rights.

**D.**      **The Adversary Proceeding Against Sutton Lender And Its Affiliates**

The Adversary Proceeding arises out of the planned development of the Project. Specifically, the Debtors commenced the Adversary Proceeding to recover damages from and to obtain equitable relief against the Defendants for, among other things, breach of contract, breach of implied duty of good faith and fair dealing, contractual unconscionability, fraud, deceit, estoppel, equitable subordination, objection to claim, criminal usury, unjust enrichment and lender liability. As set forth in the Complaint, the Debtors believe that, based upon Sutton Lender's pre-petition conduct, the amount of Sutton Lender's claim will be substantially less than what it asserts by Claim 6 and Claim 13 or Sutton Lender will be subordinated to the general unsecured creditors in these cases.

Defendants' improper conduct included, but is not limited to, creating fabricated defaults under the lending agreements, failing to fund the Project at critical times and never actually sending a notice of default or opportunity to cure prior to maturity. Instead of complying with their own loan documents, Defendants stopped financing the Project at a time when the Debtors still had at least $20 Million in available committed funds.[8] By strangling the Debtors' cash flow with

---

[8]      The Debtors believe Defendants may not have had the committed funds at all times relevant during the term of the loans and Defendants were comingling funds from other projects.

immaterial and fabricated defaults, without notice to the Debtors, Defendants caused substantial harm to the Project, allowed mechanics' liens to be filed against the Project and left the Project in the midst of demolition. This caused, inter alia, public safety issues and reputational backlash.

Defendants controlled the Project and the flow of finances practically from inception. They controlled the disbursement of almost every penny, they paid themselves back, they reserved interest payments for themselves and they controlled which vendors were paid, including when, why and how much.[9] Defendants were also unjustly enriched through different fees in excess of $61 Million.[10] This was accomplished not only through the financial underpinnings of the Debtors' development and assemblage but, more importantly, through a close personal family relationship with the Debtors' attorney, Attorney Kalikow, and the unconscionable legal documents Attorney Kalikow and Defendants' attorneys created, advised and directed the Debtors to sign. Kalikow Lender even paid his own attorneys on two occasions with the Debtors' reserves, without ever advising or obtaining authorization from the Debtors or Beninati for such payments.

As addressed above, Defendants further caused and directed Attorney Kalikow to prepare and have the Debtors the Waiver Letter. Such agreement is void and grossly disregards and violates all applicable ethical standards. With the Waiver Letter in hand, the Defendants were ready to proceed and did proceed with their UCC Sale and attempt to obtain control over the Sutton Mezz's membership interests.

---

[9]     Starting in or around August 2015, Kalikow Lender dealt with vendors and trade professionals directly. Kalikow Lender's accounting was sloppy. It is believed that funds were comingled with other deals and other investors having nothing to do with this Project. As a result, Beninati was distracted for months while he dealt with and corrected Kalikow Lender's irresponsible accounting.

[10]    The behavior of Kalikow Lender and the lending documents created by Attorney Kalikow are tantamount to criminal usury. Kalikow Lender advanced approximately $110 Million on the Project pre-petition, yet asserts it is owed $171 Million.

23

By the Complaint, the Debtors also seek a declaration from the Court as to the effectiveness of the purported merger of Sutton Owner NY and Sutton Owner DE and to attack the nature extent and validity of the alleged liens of Sutton Lender. Notwithstanding any language to the contrary, Sutton Owner NY believes it currently owns the Real Property and the Development Rights free and clear of any liens of Sutton Lender. Nevertheless, Sutton Owner NY intends to use the assets identified on its petition and schedules (and as set forth in footnote 12 herein) for the benefit of all creditors in the Plan.

The Adversary Proceeding is pending and Defendants' time to answer or move with respect to the Complaint expires on August 12, 2016.

As more fully set forth below in the Plan Implementation section herein, the Debtors filed their Plan on August 9, 2016. Through the Plan (as set forth in the Plan Implementation Section below), the Debtors will proceed with the sale.

### E.    The Agreed Cash Collateral Order

The Debtors, the Committee and Sutton Lender all agreed that the next critical step in the development of the Project is the demolition of the existing buildings on the Real Property. To this end, the Debtors, the Committee and Sutton Lender negotiated a stipulated order (the "**Cash Collateral Order**") and budget (the "**Budget**") for the Debtors' use of cash collateral (the "**Cash** Collateral" or the "**Cash Collateral Funds**") in order to pay the actual and reasonable costs of the demolition.

The Cash Collateral Funds (from a reserve account established in connection with prior funding but secured to Sutton Lender) are in the amount of $1,761,882.07. The Cash Collateral Funds, as set forth in the Budget, shall be used to demolish the existing buildings at the Real Property and to undertake such other permitted uses (if any). The vendors and tasks delineated in the Budget cover, among other things, architects, law firms, a dismantling company, NYC

Department of Taxation and Finance, and the United States Trustee. The demolition of the buildings will enhance, protect and preserve the value of the Debtors' assets, as well as physically safeguard the public from the current hazardous conditions of the buildings, for the benefit of all concerned.

In consideration for the use of the Cash Collateral and pursuant to the Cash Collateral Order Sutton Lender will have a replacement lien and allowed first priority secured claim against all of the Debtors' assets (except for claims and causes of action under Chapter 5 of the Bankruptcy Code) in the amount of the Cash Collateral funds. Further, Sutton Lender will have an allowed super-priority administrative expense claim for such amount.

The Cash Collateral Order is in the best interest of the Debtors and of all interested parties in order to accomplish the demolition of the buildings at the Real Property. The Cash Collateral Order was noticed by presentment to the Court with a presentment date of August 3, 2016. No objections to the Cash Collateral Order were filed with the Court.

**F.**      **Retention of Professionals**

By Orders of the Court, Sutton Mezz and Sutton Owner DE employed LaMonica Herbst & Maniscalco, LLP ("**LH&M**") as their counsel effective as of their respective petition dates. By application dated July 28, 2016, Sutton Owner NY seeks to employ LH&M as its counsel effective as of its petition date. The United States Trustee has approved the proposed employment order, which was submitted to the Court.

By Orders of the Court, Sutton Mezz and Sutton Owner DE employed CohnReznick LLP as their general accountants. By application dated August 8, 2016, 2016, Sutton Owner seeks to employ CohnReznick LLP as its general accountants.

By Order of the Court, the Committee employed Westerman Ball Ederer Miller Zucker & Sharfstein, LLP as its counsel.

G.    **Claims Bar Dates**

By Order of the Court dated June 8, 2016 (the "**Mezz and DE Claims Order**"), the Court

fixed July 25, 2016 (the "**Mezz and DE Bar Date**") as the date by which creditors, with claims

against Sutton Mezz or Sutton Owner DE must have filed a proof of claim ("**Proof of Claim**").

Accordingly, any Creditor having filed a Proof of Claim with the Bankruptcy Court on or before

the Mezz and DE Bar Date, and whose Claim is deemed an Allowed Claim, will receive payment

in accordance with the terms of the Plan. Any Creditor of Sutton Mezz or Sutton Owner DE who

failed to file a Proof of Claim on or before the Mezz and DE Bar Date, i.e. July 25, 2016, which:

(i) is not listed on the Sutton Mezz or Sutton Owner DE's Schedules; or (ii) is listed as "disputed,"

"contingent" or "unliquidated" on the Debtors' Schedules, will not receive a distribution under the

Plan.

A bar date for creditors with claims against Sutton Owner NY will be set by the Court by

separate Order.

IV

**THE PLAN OF REORGANIZATION**

A.    **Explanation of Chapter 11**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter

11, a debtor seeks to reorganize its business and financial affairs. A debtor may also liquidate its

assets and wind up its affairs in Chapter 11. The formulation and confirmation of a plan of

reorganization is the principal purpose of a Chapter 11 case. A plan of reorganization sets forth

the means of satisfying or discharging the holders of claims against a Chapter 11 debtor. Chapter

11 does not require that each holder of a claim against a debtor vote in favor of a plan in order for

the Bankruptcy Court to approve a plan. If any class of claimants is "impaired" by a plan, the plan

must be accepted by at least one "impaired" class of claims. A claim that will not be repaid in full,

26

or a Claimant whose legal rights are altered, or an interest that is adversely affected, are deemed "impaired."

The holder of an impaired claim is entitled to vote to accept or reject the plan if the claim has been allowed under Section 502 of the Bankruptcy Code, or temporarily allowed for voting purposes under Rule 3018 of the Federal Rules of Bankruptcy Procedure. Acceptance by a particular class must be by a majority in number and two-thirds (2/3) of the dollar amount of the total claims actually voting in the class.

**B.    Claims**

Pursuant to the Mezz and DE Claims Order, any Creditor of Sutton Mezz or Sutton Owner DE who failed to file a proof of Claim on or before the Mezz and DE Bar Date and: (i) was not listed on the Schedules; or (ii) was listed as "disputed," "contingent" or "unliquidated" cannot be treated as a Creditor with respect to such Claim for purposes of voting on and receiving a Distribution under the Plan.

All Proofs of Claim filed in this case will be reviewed, and to the extent necessary, the Debtors will file objections to filed claims. The Court will retain jurisdiction to adjudicate objections to claims brought by the Debtors, including any settlements or compromises of such claims. The Debtors reserve all rights to object to claims, and anticipates filing objections to one or more claims.

**C.    Classes Of Claims or Interests**

**Unclassified Claims**

**1.    Administrative Expenses:** Allowed Administrative Expense Claims are claims against the estate for any costs or expenses incurred during the Chapter 11 case that are allowed and entitled to priority under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, but not limited to, all actual and necessary expenses, and all allowances of compensation or

27

reimbursement of expenses of professionals retained by the Debtors to the extent permitted by the Court.

Administrative Claims include claims of Professionals approved by Order of the Bankruptcy Court who have assisted in the administration of this case and the administrative proofs of claims that were filed with the Court. This sum includes the fees and expenses of the Debtors' estate professionals (which includes the fees and expenses of the Committee professional) retained pursuant to Orders of the Bankruptcy Court. All such professional fees are subject to Court approval.

**2.** **Fees and Expenses of United States Trustee:** The Debtors shall pay all statutory quarterly fees due to the United States Trustee that come due through and including the date of the earlier of the entry of a final decree closing this Chapter 11 proceeding, or dismissal or conversion of this case.

**3.** **Priority Tax Claims:** Allowed Priority Tax Claims of governmental units that are entitled to priority in payment over Allowed Unsecured Claims pursuant to section 507(a)(8) of the Bankruptcy Code.

### Classified Claims

Class 1 Claims: Governmental Unit Lien Claims: Class 1 consists of Allowed Governmental Unit Lien Claims.

Class 2 Claims: Disputed Mezz Loan Claims: Class 2 consists of Allowed Mezz Loan Claims.

Class 3 Claims: Disputed Acquisition Loan and Building Loan Claims: Class 3 consists of Allowed Acquisition Loan and Building Loan Claims.

28

Class 4 Claims: Class 4 consists of Allowed Non-Governmental Real Property Lien Claims.

Class 5 Claims: Class 5 consists of Allowed Priority Claims.

Class 6 Claims: Class 6 consists of Allowed Unsecured Claims.

Class 7 Claims: Class 7 consists of Administrative Convenience Claims.

Class 8 Interests: Class 8 consists of the Member Interests of the Debtors.

D.     **Treatment of Allowed Claims**

**Allowed Administrative Expense Claims**

Administrative Expense Claims are unimpaired. Allowed Administrative Claims shall consist of: (a) fees and expenses (with any applicable interest) of the United States Trustee ("**Trustee's Fees**"); (b) Professionals' Fees; and (c) the Debtors' post-Filing Date, pre-Effective Date operating expenses. Each holder of an Allowed Administrative Expense Claim shall be paid in full, in cash, on the Effective Date or on such other date and upon such other terms as may be agreed upon by the holder of such Allowed Administrative Expense Claim and the Debtors. In the event of any subsequent conversion of this case to a case under Chapter 7 of the Bankruptcy Code, all payments on account of any Allowed Administrative Expense Claim are deemed to have been made in the ordinary course of the Debtors' business and will not be deemed preferential or unauthorized under Sections 547 or 549 of the Bankruptcy Code. Holders of Administrative Expense Claims are not entitled to vote on the Plan and are deemed to have accepted the Plan.

Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors will be assumed and paid by the Debtors in accordance with the terms and conditions of the arrangements with the particular creditor and in accordance with ordinary business terms.

**United States Trustee Claims**

The United States Trustee's claims are unimpaired. The Debtors will pay all statutory fees due to the United States Trustee that come due up to and including the date of the earlier of the entry of a final decree closing this Chapter 11 proceeding, or dismissal or conversion of this case.

**Priority Tax Claims**

Priority Tax Claims are unimpaired. Allowed Priority Tax Claims, if any, will be paid in full, in cash, on or within thirty (30) days after the Applicable Effective Date.

**Class 1 Claims - Allowed Governmental Unit Lien Claims**

Governmental Unit Lien Claims are impaired. The Allowed Governmental Unit Lien Claims shall be paid in full, without interest, in cash, on or within thirty (30) days after the Effective Date. Therefore, this class is impaired and entitled to vote on the Plan.

**Class 2 Claims – Disputed Mezz Loan Claim**

This class is impaired. This class consists of the Disputed Claim of Sutton Associates on account of the Mezz Loan as against Sutton Mezz. On July 13, 2016, the Debtors commenced the Adversary Proceeding by the filing of the Complaint contesting the nature, extent and validity of the lien associated with the Mezz Loan and seeking to, among other things, expunge, reclassify and/or reduce the Mezz Loan Claim. In the event that the Debtors are successful in expunging the Mezz Loan Claim in its entirety, this class shall receive no distribution under this Plan and any and all obligations arising under, or in connection with, the Mezz Loan Claim shall be deemed extinguished, null, void and of no further force and effect, and any liens associated with the Mezz Loan shall be stricken of record under the Uniform Commercial Code and/or by the New York County Clerk. In the event that the Debtors are successful in reclassifying the Mezz Loan Claim to a general unsecured claim, this class shall have no further lien or Secured Claim against Sutton Mezz, any liens associated with the Mezz Loan shall be stricken of record under the Uniform

Commercial Code and/or by the New York County Clerk, and this claim, to the extent and amount allowed by the Bankruptcy Court, will either receive the same distribution as Class 6 – Allowed Unsecured Claims or will be subordinated to all Allowed Claims and classes of these estates on account of the allegations raised in the Complaint and shall be paid from the remaining Sale proceeds, to the extent and amount allowed by the Bankruptcy Court, within 30 days of a judicial determination allowing the Disputed Sutton Mezz Loan Claim by Final Order. In the event that the Mezz Loan Claim is deemed to be a valid secured claim as against Sutton Mezz then in the event of a Sale of the Assets this class will be subordinated to all Allowed Claims and classes of these estates on account of the allegations raised in the Complaint and shall be paid from the remaining Sale proceeds, to the extent and amount allowed by the Bankruptcy Court, within 30 days of a judicial determination allowing the Disputed Sutton Mezz Loan Claim by Final Order. In the event that the Adversary Proceeding has not been determined pursuant to a Final Order prior to a closing on the Sale of the Assets then the Debtors shall reserve funds from the net proceeds of the Sale in connection with the Disputed Mezz Loan Claim. The Disputed Mezz Loan Claim shall not incur any interest or penalties as of the Confirmation Date. Therefore, Class 2 is impaired and entitled to vote on the Plan.

**Class 3 Claims - Disputed Acquisition Loan and Building Loan Claims**

This class is impaired. This class consists of the Disputed Claims of Sutton Associates on account of the Acquisition Loan and the Building Loan claims as against Sutton Owner DE and Sutton Owner NY. The Complaint attacks the nature, extent and validity of liens on the Real Property and the Development Rights. The claims related to the Building Loan are usurious and the Debtors intend to seek summary judgment on those claims. Under New York law, those claims

should be dismissed by the Court. In the event that the Debtors are successful in expunging the

Acquisition Loan and/or the Building Loan Claim in their entirety, this class shall receive no

distribution under this Plan and any and all obligations arising under, or in connection with, the

Acquisition Loan and the Building Loan shall be deemed extinguished, null, void and of no further

force and effect, and any liens associated with the Acquisition Loan and the Building Loan shall

be stricken of record by the New York County Clerk. In the event that the Debtors are successful

in releasing the secured liens against the Real Property and the Development Rights, and

reclassifying the Acquisition Loan and the Building Loan to a general unsecured claim against

Sutton Owner DE, Sutton Owner NY, or both, then this class shall have no further lien or Secured

Claim against Sutton Owner DE and Sutton Owner NY, any liens associated with the Acquisition

Loan and the Building Loan shall be stricken of record by the New York County Clerk, and this

claim, to the extent and amount allowed by the Bankruptcy Court, will either receive the same

distribution as Class 6 – Allowed Unsecured Claims or will be subordinated to all Allowed Claims

and classes of these estates on account of the allegations raised in the Adversary Proceeding and

shall be paid from the remaining Sale proceeds, to the extent and amount allowed by the

Bankruptcy Court, within 30 days of a judicial determination allowing the Disputed Acquisition

Loan or the Building Loan, or both, by Final Order. In the event that either Acquisition Loan or

the Building Loan, or both, are deemed to be valid secured claims as against Real Property and the

Development Rights then in the event of a Sale of the Assets this class will be subordinated to all

Allowed Claims and classes of these estates on account of the allegations raised in the Complaint

and shall be paid from the remaining Sale proceeds, to the extent and amount allowed by the

Bankruptcy Court, within 30 days of a judicial determination allowing wither the Disputed

Acquisition Loan Claim or the Disputed Building Loan Claim by Final Order. In the event that the

32

Adversary Proceeding has not been determined pursuant to a Final Order prior to a closing on the Sale of the Assets then the Debtors shall reserve funds from the net proceeds of the Sale in connection with the Disputed Acquisition Loan Claim and the Disputed Building Loan Claim. The Disputed Acquisition Loan Claim and the Disputed Building Loan Claim shall not incur any interest or penalties as of the Confirmation Date. Therefore, Class 3 is impaired and entitled to vote on the Plan.

### Class 4 Claims - Allowed Non-Governmental Real Property Lien Claims

This class is impaired. This class consists of Allowed Secured Claims of non-governmental agencies that have a valid lien against the Real Property on account of mechanics liens or judgment liens, other than those in Class 1, Class 2 or Class 3. This class will be paid in full, without interest, on or within thirty (30) days after the Effective Date. Therefore, Class 4 is impaired and entitled to vote on the Plan.

### Class 5 Claims – Allowed Priority Claims

This class is impaired. This class consists of unsecured claims that are not Administrative Expense Claims, Secured Claims, Priority Tax Claims, but which may be entitled to priority under Section 507 of the Bankruptcy Code (excluding those claims entitled to priority under Section 507(a)(8) of the Bankruptcy Code). This class will be paid in full, without interest, on or within thirty (30) days after the Effective Date. Therefore, Class 5 is impaired and entitled to vote on the Plan.

### Class 6 Claims – Allowed Unsecured Claims

This class is impaired. This class consists of general unsecured, non-priority claims of the Debtors' estates, except for those claimants treated in Class 7, that are not Administrative Expense Claims, Secured Claims, Priority Tax Claims or Priority Claims. This class will be paid, without

interest, from the proceeds remaining from the Sale, within 30 days of the Effective Date. Therefore, this class is impaired and entitled to vote on the Plan.

### Class 7 Claims – Administrative Convenience Claims

This class is impaired. This class consists of Allowed Unsecured Claims each in the amount less than $30,000.00. The total aggregate amount of such class equals $174,432.48. All Allowed Unsecured Claims with a filed or scheduled claim each in the amount less than $30,000.00 shall be paid 57% of their respective claims (i.e. the approximate aggregate of $100,000.00) from one or more of the Member Interests within fifteen (15) days after the Confirmation Order becoming a Final Order. Therefore, this class is impaired and entitled to vote on the Plan.

### Class 8 Claims – Member Interest

This class is unimpaired. This class consists of the Allowed Member Interests of the Debtors. The Member Interest shall be paid any funds remaining in the Confirmation Account after the payment of Allowed Administrative Expense Claims and Allowed Claims in accordance with the Plan and in accordance with their legal rights. The Member Interest shall retain their respective equity interests in the Debtors to the extent and nature as they existed on the Petition Date. In an effort to facilitate the Debtors' Plan, the Member Interests shall make a capital contribution to the Debtors in an amount necessary to pay Class 7 in accordance with the Plan. Therefore, Class 8 is unimpaired, not entitled to vote, and deemed to have accepted the Plan.

### V

### IMPLEMENTATION OF THE PLAN

The Debtors believe that Sutton Owner NY was, and still remains, a distinct and separate entity from Sutton Owner DE and has separate and distinct assets from Sutton Owner DE. As detailed in the Complaint, Sutton Owner NY is the legal and equitable owner of the Real Property, the Development Rights and the Additional Development Rights. Regardless of the foregoing,

and in an effort to implement the Plan, Sutton Owner NY will permit its assets to be utilized for the benefit of each of the Debtors' estates and their Allowed Claims.

The Debtors shall commence a joint marketing program for a Sale of the Assets. In connection with the Sale, the Debtors shall retain a reputable, qualified real estate broker to offer and market the Assets for sale over a period of seven (7) months commencing on the Confirmation Date. The Sale of the Assets shall take place on the Sale Date. During that time, the Debtors intend to work with its retained real estate broker in assembling the required information so that prospective buyers can conduct all required due diligence in an efficient and responsible manner. The Debtors intend to shall launch a virtual online due diligence portal which will contain information regarding the Assets. A copy of the Terms of Sale containing the precise terms of the Debtors' Sale of the Assets is annexed to the Plan as **Exhibit "A**". On the Effective Date, the Debtors shall sell, assign, transfer and convey all right, title and interest in and to the Assets in accordance with this Plan and the Terms of Sale. The Sale shall be free and clear of all liens, claims, and encumbrances of whatever kind or nature with such liens, claims, and encumbrances (to the extent and amount allowed), which such liens, if any, to attach to the proceeds of sale in the same order and priority as they existed on the Applicable Petition Date. As permitted by the Sections 1123(a)(5) and 1123(b)(4) of the Bankruptcy Code, confirmation of the Plan by the Bankruptcy Court shall constitute approval of a sale of the Assets to a prospective buyer and the authorization for the Debtors to close on the sale of the Assets. The Effective Date shall be the date which is the later of the closing on the sale of the Real Property and the Development Rights or the Apartments. Pursuant to Sections 363(f)(4) and 363(k) of the Bankruptcy Code, Sutton Associates and any of its affiliates may not credit bid for the purchase of any of the Assets on account of their Disputed Claims.

Under a Sale, Distributions to all Allowed Administrative Expense Claims and Allowed Claims under the Plan (to the extent not already paid) will be funded from the initial proceeds realized from the Sale of the Assets substantially in the following order:

(i)     customary and traditional closing costs including the fees and expenses of the estates' retained real estate broker, and to the extent applicable any capital gains taxes, title fees, recording costs, real estate tax adjustments, utility adjustments and transfer taxes that may be due and owing as of the closing;

(ii)    repayment of $1,761.882.07, plus interest at six (6%) from the date of such advances, or such other amount as may be advanced, to Sutton Associates on account of that certain final order authorizing the use of cash collateral;

(iii)   payments for additional zoning and development rights related to the Project in order to "fully mass" the Project in an approximate amount of $23 Million[11];

(iv)    a return of approximately $5.4 Million to Sutton Associates for monies advanced to Fisher Brothers in connection with the acquisition of air rights;

(v)     payment of fees and expenses of the Professionals of the Debtors' estates including the Debtors' retained professionals, attorneys and accountants, counsel to the Creditors' Committee and other retained professionals, and any outstanding fees owed to the Office of the United States Trustee;

(vi)    Allowed Claims in Classes 1 and 4-6, in the order of their classes;

(vii)   $3.0 Million to be placed into a litigation trust (the "**Litigation Trust**") to be held by, and for the benefit of, LaMonica Herbst & Maniscalco, LLP or other retained

---

[11]   According to the Appraisal, the valuation of the Project will be increased by approximately $75 Million once it is "fully massed" with its air rights. As such, the Debtors seek to market and sell the Assets with the air rights so as to maximize value for the benefit of the Debtors' estates and their creditors.

professionals of the Debtors in connection with costs and expenses related to the Adversary Proceeding;

(viii)    The balance of Sale proceeds to be reserved in connection with Disputed Claims of Sutton Associates and Class 8 Allowed Member Interests until a Final Order is entered by the Bankruptcy Court with respect to all counts alleged in the Adversary Proceeding.

The sale and transfer of the Assets by the Debtors to a buyer shall not result in the incurrence of any transfer tax, stamp tax or similar tax as those taxes are exempt under Section 1146(a) of the Bankruptcy Code. The Office of the City Register of the City of New York shall record any documents effectuating such transfer without the payment of such transfer taxes.

The Apartments shall be sold by separate application and further Order of the Court.

On or after the Effective Date, the Debtors shall continue to exist with all the powers of a limited liability company under applicable law, may use and dispose of property and compromise or settle any claims in accordance with this Plan.

Notwithstanding the foregoing, the Debtors reserve their rights up to and until the acceptance by the Debtors of an offer to purchase the Assets in accordance with the Terms of Sale, to seek and obtain financing from a DIP Facility. In the event that the Debtors agree to terms with a DIP Lender for a DIP Facility, the Debtors shall seek such approval from the Bankruptcy Court and reserve the right to amend this Plan as it may be affected by the DIP Facility.

Assumption/Rejection of Executory Contracts and Unexpired Leases

In the event of a Sale, the Debtors shall be deemed to have assumed, as of the Effective Date, the executory contracts that relate to the purchase of certain zoning and development rights,

including the Development Rights and the Additional Development Rights, except that JAL 58 LLC shall be subject to the New Lease (as defined below).

To the extent the Debtors were a lessee to any other executory contracts and/or unexpired leases, as of the Applicable Petition Date, the Debtors shall be deemed to have rejected each executory contract and unexpired lease to which it is a party, unless such contract or lease: (i) was previously assumed or rejected by the Debtors, (ii) previously expired or terminated pursuant to its own terms, or (iii) is the subject of a motion to assume filed on or before the Confirmation Date. The Confirmation Order shall constitute an order of the Court under Sections 363 and 365 of the Bankruptcy Code rejecting the contract and lease assumptions described above, as of the Effective Date. Notwithstanding any language to the contrary, the Debtors expressly reserve all rights to file a motion prior to the Confirmation Date seeking to assume any other executory contracts or unexpired leases not described above, on a case by case basis, in accordance with the terms set forth above.

To the extent applicable, any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, under Section 365(b)(1) of the Bankruptcy Code, at the option of the Debtors or the assignee of the Debtors assuming such contract or lease, by cure, or by such other treatment as to which each Debtors and such non-Debtor party to the executory contract or unexpired lease shall have agreed in writing. If there is a dispute regarding (i) the nature or amount of any cure, (ii) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, cure shall occur within thirty (30) days following the entry of a

Final Order resolving the dispute and approving the assumption or the assumption and assignment, as the case may be.

If the rejection by the Debtors, pursuant to the Plan or otherwise, of an executory contract or unexpired lease results in a rejection claim that is not theretofore evidenced by a timely filed proof of claim or a proof of claim that is deemed to be timely filed under applicable law, then such Claim shall be forever barred and shall not be enforceable against the Debtors or the Debtors' estates, unless a proof of claim is filed with the Clerk of the Court and served upon counsel for the Debtors within thirty (30) calendar days of entry of the Confirmation Order.

Notwithstanding any language to the contrary herein, pursuant to a stipulation dated in August 2016, Sutton Owner DE enter into a new month to month lease with its landlord, JAL 58, LLC, with respect to Apartment 3A in the building located 422 East 58th Street, New York, New York 10022 for a monthly payment of $2,700 per month (the "**New Lease**"). The New Lease is a month to month tenancy and will not cause any unnecessary burden on the Debtors to perform. Under the New Lease, three (3) months of security deposits have been paid to the landlord by the principals. Sutton Owner DE intends to continue with the New Lease.

## VI

## FEASIBILITY

The Debtors' Plan is capable of being achieved through the Sale of the Assets. The Debtors will seek to employ a real estate broker that will market the Assets for sale. The Assets are highly desirable assets which will garner substantial interest in the real estate marketplace, especially given the prestigious location and scarce amount of available properties for development of this type in the area.

Based upon the foregoing, the Debtors believe that they will be able to make the distributions proposed under the Plan. Thus, the Debtors submit that the Plan will satisfy the feasibility requirement for confirmation of the Plan.

## VII

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

In order for the Plan to be confirmed, the Confirmation Order must be entered by the Bankruptcy Court and must be a Final Order.

## VIII

## VOTING

Under the Plan, only creditors in Classes 1, 2, 3, 4, 5, 6 and 7 are impaired and entitled to vote. To be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by the deadline set by the Court, at Debtors' counsel's office, LaMonica Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Wantagh, New York 11793, Attn: Joseph S. Maniscalco, Esq., Adam P. Wofse, Esq. and Holly R. Holecek, Esq.

## IX

## REQUIREMENT FOR CONFIRMATION OF THE PLAN

A.    **Confirmation Hearing**

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider confirmation of the Plan. The confirmation hearing (the "**Confirmation Hearing**") shall be scheduled by the Court to be held before the Honorable Sean H. Lane, in the United States Bankruptcy Court, Southern District of New York, One Bowling Green, Courtroom 701 New York, New York 10004-1408. The Confirmation Hearing may be adjourned from time to time by

the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing.

**B.**     **Objections to Confirmation**

The Bankruptcy Court will direct that objections, if any, to Confirmation of the Plan be in writing, filed with the Bankruptcy Court with a courtesy copy to chambers of the Honorable Sean H. Lane, with proof of service and that such objections be served on or before such date as set forth in an additional notice or Order of the Court. Objections must be served upon (i) counsel to the Debtors, LaMonica Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Wantagh, New York, 11793, Attention: Joseph S. Maniscalco, Esq. and Adam P. Wofse, Esq.; and (ii) the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, Attention: Susan Golden, Esq. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

**C.**     **Acceptance of the Plan**

Acceptance of the Plan requires that each impaired Class of Claims accepts the Plan, with certain exceptions discussed below. Thus, acceptance of the Plan is tested on a class by class basis. Classes of Claims that are not impaired under the Plan are deemed to have accepted the Plan. Under the Plan, Classes 2, 3, 6 and 7 are impaired and as a result, Classes 2, 3, 6 and 7 are entitled to vote.

**D.**     **Confirmation of Plan**

In order to confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations concerning the Plan, including: (i) that the Plan has classified Claims in a permissible manner; (ii) that the contents of the Plan comply with the technical requirements of the Bankruptcy Code; (iii) that the Plan has been proposed in good faith; and (iv) that disclosures concerning the Plan have been made which are adequate and include information concerning all

41

payments made or promised in connection with the Plan and the Chapter 11 case. The Debtors believe that all of these conditions have been or will be met.

## E.    **Cramdown**

Section 1129 establishes the requirements for confirmation of a Chapter 11 plan. The requirements are numerous and differ depending on whether or not confirmation is consensual. If consensual confirmation is sought because all impaired classes accepted the plan, Section 1129(a) governs.

For non-consensual confirmation or "cramdown" under Section 1129(b), the Debtors must meet all of the requirements contained in Section 1129(a), except paragraph (8) of Section 1129(a). In addition, the Debtors must show that the plan does not unfairly discriminate against dissenting classes, and that the treatment of the dissenting classes is fair and equitable. In other words, the court may confirm over the dissent of a class of unsecured claims only if the members of the class are unimpaired, if they will receive under the plan property of a value equal to the allowed amount of their unsecured claims, or if no class junior will share under the plan. That is, if the class is impaired, then they must be paid in full or, if paid less than in full, then no class junior may receive anything under the plan[12].

Although the Debtors seeks confirmation from its impaired classes by voting to accept the Plan, in the event an impaired class votes to reject the Plan, the Debtors will seek to confirm its Plan by utilizing the cram-down provision contained in Section 1129(b) of the Bankruptcy Code.

---

[12]    In order to resolve any potential objection concerning the absolute priority rule in the event that the cramdown provisions of the Bankruptcy Code need to be utilized by the Debtors to confirm the Debtors' Plan, and in order to permit the Debtors' Member Interests to retain such interests in the Debtors, in an effort to facilitate the Debtors' Plan, the Member Interests shall make a capital contribution to the Debtors in an amount necessary to pay Class 7 in accordance with the Plan.

X

**EFFECT OF CONFIRMATION; DISCHARGE OF DEBTS; INJUNCTION; RELEASE**

A.      **Effect of Confirmation**

On the Confirmation Date, the terms of this Plan bind all holders of all Claims against the Debtors, whether or not such holders accept this Plan.

B.      **Discharge of Debts**

The rights afforded herein and the treatment of all Claims herein shall be in exchange for a complete satisfaction, discharge and release of Claims of any of any nature whatsoever, against the Debtors, the Debtors' estates or any of its/their assets or properties. Except as otherwise provided herein, on the Applicable Effective Date, all such Claims against the Debtors shall be satisfied, discharged and released in full, and all persons or entities are precluded and enjoined from asserting against the Debtors, the reorganized Debtors, their successors, or their assets or property any other or further Claims based upon any act, omission, transaction or other activity of any kind or nature that occurred before the Confirmation Date.

C.      **Injunction**

Effective on the Confirmation Date, all creditors who have held, hold, or may hold Claims against the Debtors or their assets are enjoined from taking any of the following actions against or affecting the Debtors or the assets of the Debtors with respect to such Claims (other than actions brought to enforce any rights or obligations under the Plan or appeals, if any, from the Confirmation Order): (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against the Debtors or the assets of the Debtors or any direct or indirect successor in interest to the Debtors, or any assets of any such transferee or successor; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order against

43

the Debtors or their assets or any direct or indirect successor in interest to the Debtors, or any assets of such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors or the assets of the Debtors or any direct or indirect successor in interest to the Debtors, or any assets of any such transferee or successor other than as contemplated by the Plan; (iv) asserting any set-off, right of subrogation or recoupment of any kind directly or indirectly against any obligation due the Debtors or their assets or any direct or indirect transferee of any assets of, or successor in interest to, the Debtors; and (v) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan.

**D.    <u>Release</u>**

Effective on the Confirmation Date, to the extent authorized by Section 1141 of the Bankruptcy Code, the Debtors, their respective officers, directors, members, agents, representatives, general partners, managers, or employees including Joseph Beninati 2015 Generation Skipping Trust, Joseph Beninati, Chris Jones, Danny Lee, Sutton Opportunity LLC, Michael Pilevsky and Seth Pilevsky, and any professional person employed by any of the foregoing including attorneys and accountants, shall be deemed released from all Claims, demands, actions, claims for relief, causes of actions, suits, debts, covenants, agreements and demands of any nature whatsoever, in law and in equity, that any creditor had, or now has, or may hereafter have against the Debtors arising prior to the Confirmation Date. Except as otherwise provided herein and in Section 1141 of the Bankruptcy Code, all Persons shall be precluded and enjoined from asserting against the Debtors, their assets or properties, or against any property that is distributed, or is to be distributed under the Plan, any other or further Claim upon any acts or omissions, transactions or other activity of any kind or nature that occurred prior to the Confirmation Date.

### E.    Exculpation

The Debtors, their respective officers, directors, members, agents, representatives, general partners, managers, or employees including Joseph Beninati 2015 Generation Skipping Trust, Joseph Beninati, Chris Jones, Danny Lee, Sutton Opportunity LLC, Michael Pilevsky and Seth Pilevsky, and any professional persons employed by any of the foregoing including attorneys and accountants who provided services to the Debtors' estates during these Chapter 11 cases, and all direct or indirect predecessors-in-interest to any of the foregoing Persons, will not have or incur any liability to any Person for any act taken or omission occurring on or after the Petition Date in connection with or related to these estates, including but not limited to (i) the commencement and administration of these Chapter 11 cases, (ii) the operation of the Debtors during the pendency of the Chapter 11 Case, (iii) formulating, preparing, disseminating, implementing, confirming, consummating or administering the Plan (including soliciting acceptances or rejections thereof); (iv) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken during the administration of these Chapter 11 cases or in connection with the Plan; or (v) any distributions made pursuant to the Plan.

### F.    Co-Debtor Stay

On March 10, 2016, Sutton 58 Associates LLC ("**Lender**") commenced an action styled *Sutton 58 Associates LLC v. Joseph Beninati, Christopher Jones, Daniel Lee*, Index No. 651296/2016 (the "**State Court Action**") in the Supreme Court for the State of New York (the "**State Court**") by filing a summary judgment in lieu of complaint against the Sutton Principals. By the State Court Action, the Lender asserts that the Principals are personally liable to the Lender for the full amount of the Mezz Loan pursuant to a personal guaranty executed by each of the Principals (the "**Guaranty**"). By the State Court Action, the Lender seeks a judgment against each of the Principals in the amount of: (i) $20 million, the principal amount defined under the Mezz

Loan, (ii) $4 million as additional interest under the Mezz Loan, plus (iii) interest at the default rate under the Mezz Loan of 24% compounded monthly.

The State Court Action should be stayed through the later of the Sale Date or the entry of a Final Order with respect to the claims raised in the Adversary Proceeding. The stay is necessary to foster the Debtors' reorganization efforts for several reasons.

First, the undivided attention of the Sutton Principals is crucial to facilitate the complex reorganization and sale process contemplated herein. Forcing the Sutton Principals to defend the State Court Action, whereby the Lender seeks judgments against them in excess of $24 million, will only serve to distract the Sutton Principals from the Debtors' reorganization efforts to the detriment of all parties-in-interest.

Second, the identity between Sutton Mezz and the Sutton Principals are such that Sutton Mezz is the real party defendant to the State Court Action because: (i) the Sutton Principals' alleged liability in the State Court Action arises from the Guaranty and is derivative to Sutton Mezz's liability under the Mezz Loan; and (ii) Sutton Mezz is obligated pursuant to its LLC Agreement and applicable law to indemnify the Sutton Principals with respect to any loss incurred in connection with the State Court Action.

Finally, the State Court Action against the Sutton Principals is solely based on the Guaranty and, accordingly, is derivative of the Debtors' alleged default under the loan documents. Several of the same assertions and defenses raised by the Debtors and Lender in this Court have been, and will be raised, by the Sutton Principals and the Lender in the State Court. The Lender's claims and the Debtors' defenses should proceed before this Court, as opposed to proceeding in separate forums. Separate proceedings will lead to separate discovery, separate hearings, potentially

46

inconsistent rulings and a waste of judicial resources. This may cause the Debtors to suffer from collateral estoppel and/or evidentiary prejudice if the State Court Action proceeds.

The Debtors submit that there is a sufficient basis to stay to the State Court Action. The requested stay of the State Court Action will provide the Debtors with the "breathing spell" contemplated by section 362 and the opportunity to minimize administrative expenses that could otherwise frustrate their efforts to reorganize. Staying the State Court Action to cover the Principals is in the best interest of the Debtors, their creditors, and other parties in interest in these Chapter 11 cases.

## XI

## ALTERNATIVES TO THE PLAN AND OTHER CONSIDERATIONS

### A.    Alternatives to the Plan

The Debtors believe that the Plan provides creditors with the earliest and greatest possible value that can be realized on their respective Claims. The principal alternatives to confirmation of the Plan are: (i) dismissal of the case, or (ii) conversion of the case to Chapter 7 of the Bankruptcy Code.

(i)    Dismissal

In the event of a dismissal of these cases, the Lender may pursue its non-bankruptcy rights and remedies, and will likely continue with its foreclosure of the member interests and take over the Assets. In such event, unsecured creditors will receive no distribution.

Therefore, the Debtors' best opportunity to satisfy its obligations to its creditors would be through the Debtors' Plan.

(ii)    Conversion to Chapter 7

The Debtors believe that a conversion to Chapter 7 would not be in the best interests of creditors. As described in Section XI (B) below ("**Best Interests of Unsecured Creditors**"), liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code would not generate a greater distribution to creditors than proposed under the Plan. Similar to the analysis stated above concerning dismissal, due to the lack of additional assets, conversion under Chapter 7 of the Bankruptcy Code would entail the appointment of a trustee likely to have no historical experience or knowledge of the Debtors or their assets. Moreover, the additional administrative costs incurred by a trustee and its attorneys and accountants could also be substantial and will impact upon the ability of creditors to receive payments on their claims. Finally, any additional administrative costs will adversely affect the distribution to claimants and will not inure to their benefit. In the event of a sale by a trustee, the estates would suffer the impact of applicable transfer taxes and would not obtain the benefit of the tax exemption under Section 1146(a) of the Bankruptcy Code. In such event, the only creditor which would likely receive any distribution would be to allowed secured claims, with no distribution to unsecured creditors.

Therefore, the Debtors believe that confirmation of the Plan is preferable to the alternatives described above because the Plan maximizes the property available for distribution to all Classes of Claims and appropriately distributes all of the Debtors' assets to the creditors without the added Administrative Expenses of a Chapter 7 Trustee and its attorneys and other professionals.

**B.      Best Interests of Unsecured Creditors**

Notwithstanding acceptance of the Plan by Classes of Claims, in order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of all Classes of Claims. The "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of each impaired Class of Claims a recovery which has a present value at least equal to the present value of the distribution which each such creditor would receive from

48

the Debtors if their assets were instead distributed by a Trustee under Chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan satisfies the "Best Interests Test" with respect to all Classes of Claims since under the Plan unsecured creditors receive the distribution as indicated herein, whereas in a Chapter 7 liquidation such creditors would receive no distribution.

Significantly, if the merger was indeed ineffective, then the Real Property and the Development Rights are only available to the creditors of the Sutton Mezz and Sutton Owner DE estates under the Plan. If the case is converted to Chapter 7, the Real Property and the Development Rights would not be available to the creditors of the Sutton Mezz and Sutton Owner DE estates.

The cost of converting the case to one under Chapter 7 would include the fees of a trustee, as well as those of the Chapter 7 Trustee's counsel and other professionals that may be retained by the Chapter 7 trustee, and unpaid expenses incurred by the Debtors during the Chapter 11 case (such as fees for attorneys and accountants). These Claims, and such other Claims as might arise in the liquidation or result from the Debtors' chapter 11 cases, would be paid from the Debtors' assets before their assets would be available to pay other Claims.

THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE GREATEST AND EARLIEST POSSIBLE RECOVERY ON ACCOUNT OF CLAIMS AND THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS

## C.    <u>Liquidation Analysis</u>

Pursuant to the Plan, the Debtors provide for unsecured creditors to receive full payment on their claims. Whereas, the Debtors believe that if the case were converted to a Chapter 7 case, unsecured creditors would receive no distribution as a liquidation would only result in certain secured creditors receiving a distribution. Further, confirmation of the Debtors' Plan will avoid the additional layer of Chapter 7 Administrative Claims that must be paid if the case were converted to Chapter 7.

49

The Debtors believe that confirmation of the Plan is preferable to the alternatives described above because the Plan maximizes the value of all property available for distribution to all Classes of Claims. Accordingly, the Debtors believe that confirmation of the Plan, rather than the alternatives described above, is in the best interests of creditors and all parties in interest.

## XII

## RECOMMENDATION OF THE DEBTORS

The Plan and this Disclosure Statement were drafted and submitted by the Debtors. As such, the Debtors strongly support this Plan and believes that Confirmation of the Plan provides the creditors with the best possible recovery in the shortest possible time.

## XIII

## ADDITIONAL INFORMATION

Requests for information and additional copies of this Disclosure Statement, the Plan, and any other materials or questions relating to the Plan and this Disclosure Statement should be directed to Debtors' counsel, LaMonica Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Wantagh, New York 11793, Attention: Joseph S. Maniscalco, Esq., Adam P. Wofse, Esq. and Holly R. Holecek, Esq., at (516) 826-6500 during regular business hours.

## XIV

## TAX CONSEQUENCES

The Debtors are not aware of any tax consequences which may result from the confirmation of the Plan. Creditors should consult with their own tax advisor concerning any such tax related implications. Creditors should consult with their tax advisor concerning (a) any deductions which may be applicable to them as bad debt deductions, or (b) income tax implications based upon forgiveness of debt, if applicable, based upon the provisions of the Debtors' Plan.

Pursuant to IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that (a) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims should seek advice based upon their particular circumstances from an independent tax advisor.

## XV

## <u>CONCLUSION</u>

The Debtors believe the Plan is in the best interests of all creditors.

Dated: August 911, 2016
       Wantagh, New York       **LaMonica Herbst & Maniscalco, LLP**
                         Attorneys for the Chapter 11 Debtors

          By:     *s/ Joseph S. Maniscalco*
                         Joseph S. Maniscalco, Esq.
                         Adam P. Wofse, Esq.
                         Holly R. Holecek, Esq.
                         3305 Jerusalem Avenue, Suite 201
                         Wantagh, New York 11793
                         Telephone: (516) 826-6500

Dated: August 911, 2016
       Greenwich, Connecticut    **BH Sutton Mezz, LLC**

          By:     *s/ Joseph Beninati*
                         Joseph Beninati,
                         Managing Member

                         **Sutton 58 Owner LLC, a Delaware Limited
                         Liability Company**

          By:     *s/ Joseph Beninati*
                         Joseph Beninati,
                         Managing Member

                         **Sutton 58 Owner LLC, a New York Limited
                         Liability Company**

          By:     *s/ Joseph Beninati*
                         Joseph Beninati,
                         Managing Member